# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE:  GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL 2724**<br>**16-MD-2724**<br>**HON. CYNTHIA M. RUFE** |
| 1199SEIU NATIONAL BENEFIT FUND; 1199SEIU GREATER NEW YORK BENEFIT FUND; 1199SEIU NATIONAL BENEFIT FUND FOR HOME CARE WORKERS; 1199SEIU LICENSED PRACTICAL NURSES WELFARE FUND; | **CIVIL ACTION NO.** |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN; | **JURY TRIAL DEMANDED** |
| LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.; | |
| SELF-INSURED SCHOOLS OF CALIFORNIA; | **END-PAYER** |
| SERGEANTS BENEVOLENT ASSOCIATION OF THE POLICE DEPARTMENT OF THE CITY OF NEW YORK HEALTH AND WELFARE FUND; and | **CLASS ACTION COMPLAINT** |
| UNITE HERE HEALTH, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| ACTAVIS HOLDCO US, INC.;<br>ACTAVIS ELIZABETH LLC;<br>ACTAVIS PHARMA, INC.;<br>APOTEX CORP.;<br>AUROBINDO PHARMA USA, INC.;<br>BARR PHARMACEUTICALS, LLC;<br>CITRON PHARMA LLC;<br>DAVA PHARMACEUTICALS, LLC;<br>DR. REDDY'S LABORATORIES, INC.;<br>FOUGERA PHARMACEUTICALS INC.;<br>GENERICS BIDCO I, LLC;<br>GLENMARK PHARMACEUTICALS, INC.;<br>HERITAGE PHARMACEUTICALS, INC.; | |

LANNETT COMPANY, INC.;

MAYNE PHARMA INC.;

MUTUAL PHARMACEUTICAL COMPANY, INC.;

MYLAN INC.;

MYLAN PHARMACEUTICALS, INC.;

PAR PHARMACEUTICAL, INC.;

PERRIGO NEW YORK, INC.;

PLIVA, INC.;

RAJIV MALIK;

SANDOZ, INC.;

SUN PHARMACEUTICAL INDUSTRIES, INC.;

TARO PHARMACEUTICALS USA, INC.;

TEVA PHARMACEUTICALS USA, INC.;

WEST-WARD PHARMACEUTICALS CORP.; and,

ZYDUS PHARMACEUTICALS (USA), INC.

Defendants.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................ 1

II.     ONGOING FEDERAL AND STATE INVESTIGATIONS.................................. 8

III.    JURISDICTION AND VENUE ......................................................................... 11

IV.     PLAINTIFFS ................................................................................................... 12

V.      DEFENDANTS ................................................................................................ 18

VI.     CO-CONSPIRATORS...................................................................................... 26

VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE .............................. 26

VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY........................................ 27

        A.      Generic Drugs Are Commodity Products  ............................................ 27

        B.      Pricing in the U.S. Prescription Drug Industry  .................................. 30

IX.     DEFENDANTS' OVERARCHING CONSPIRACY......................................... 33

        A.      Defendants Are Competitors or Potential Competitors for
                All Drugs at Issue ................................................................................38

        B.      The Principles of "Playing Fair" and "Fair Share" Governed Defendants'
                Interactions ........................................................................................41

        C.      Sales Managers Played an Essential Role in Implementing the Conspiracy ........44

        D.      Defendants Frequently Communicated Directly and Privately As Part of the
                Overarching Conspiracy  ....................................................................47

        E.      Timeline of Defendants' Overarching Conspiracy  ...............................49

X.      AS PART OF THEIR OVERARCHING CONSPIRACY, DEFENDANTS
        CONSPIRED TO FIX PRICES, ALLOCATE MARKETS AND/OR RIG BIDS
        FOR THE DRUGS AT ISSUE ...................................................................... 60

        A.      Nystatin  ..............................................................................................60

        B.      Nimodipine  .........................................................................................73

        C.      Doxycycline Hyclate ...........................................................................79

i

D.     Doxycycline Monohydrate .............................................................88

E.     Zoledronic Acid ...........................................................................95

F.     Meprobamate ..............................................................................100

G.     Acetazolamide ............................................................................103

H.     Fosinopril-HCTZ ........................................................................110

I.     Glipizide-Metformin ...................................................................117

J.     Glyburide ....................................................................................120

K.     Glyburide-Metformin ..................................................................124

L.     Leflunomide ................................................................................128

M.     Paromomycin ..............................................................................131

N.     Theophylline ...............................................................................134

O.     Verapamil ...................................................................................136

XI.    FACTORS INCREASING THE MARKET'S SUSCEPTIBILITY
       TO COLLUSION ......................................................................... 140

       1.     Industry Concentration ........................................................ 141

       2.     Barriers to Entry .................................................................. 141

       3.     Demand Inelasticity ............................................................. 141

       4.     Lack of Substitutes .............................................................. 142

       5.     Standardized Product with High Degree of Interchangeability ....................... 143

       6.     Inter-Competitor Contacts and Communications ............................................ 143

XII.   THE STATUTES OF LIMITATIONS DO NOT BAR
       PLAINTIFFS' CLAIMS ................................................................ 151

       A.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did
              Not and Could Not Discover Defendants' Unlawful Conspiracy ....................151

       B.     Fraudulent Concealment Tolled the Statutes of Limitations ..............................154

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

       1.       Active Concealment of the Conspiracy ................................................. 155

       2.       Plaintiffs Exercised Reasonable Diligence ........................................ 158

XIII.  CONTINUING VIOLATIONS ........................................................................ 159

XIV.  DEFENDANTS' ANTITRUST VIOLATIONS................................................. 159

XV.   CLASS ACTION ALLEGATIONS .............................................................. 161

XVI.  CAUSES OF ACTION ................................................................................. 165

FIRST COUNT - Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)....................................... 166

SECOND COUNT - Violation of State Antitrust Statutes
(on behalf of Plaintiffs and the Damages Class)........................................... 169

THIRD COUNT - Violation of State Consumer Protection Statutes
(on behalf of Plaintiffs and the Damages Class)........................................... 190

FOURTH COUNT – Unjust Enrichment
(on behalf of Plaintiffs and the Damages Class)........................................... 224

XVII.  PRAYER FOR RELIEF ............................................................................. 249

XVIII.  JURY DEMAND ...................................................................................... 251

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

# I.   **NATURE OF THE ACTION**

1.      This suit brings claims on behalf of End-Payer Purchasers ("End-Payers" or "Plaintiffs") of generic pharmaceutical drugs to secure injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise, and/or stabilize the prices of the following generic pharmaceutical drugs: Acetazolamide[1], Doxycycline Hyclate[2], Doxycycline Monohydrate[3], Fosinopril-Hydrochlorothiazide[4], Glipizide-Metformin[5], Glyburide[6], Glyburide-Metformin[7], Leflunomide[8], Meprobamate[9], Nimodipine[10], Nystatin[11], Paromomycin[12], Theophylline[13], Verapamil[14] and

---

[1] Acetazolamide as used herein includes: Acetazolamide tablets (125mg and 250mg) and extended release capsules (500mg).

[2] Doxycycline Hyclate as used herein includes:  Doxycycline Hyclate regular release ("Doxy RR") tablets (100mg) and capsules (50mg and 100mg); Doxycycline Hyclate delayed release ("Doxy DR") tablets (75mg, 100mg and 150mg).

[3] Doxycycline Monohydrate ("Doxy Mono") as used herein includes: Doxycycline Monohydrate tablets (50mg, 75mg, 100mg and 150mg).

[4] Fosinopril-Hydrochlorothiazide ("Fosinopril-HCTZ") as used herein includes: Fosinopril-HCTZ tablets (10-12.5mg and 20-12.5mg).

[5] Glipizide-Metformin as used herein includes: Glipizide-Metformin Hydrochloride tablets (2.5-250mg, 2.5-500mg, and 5-500mg).

[6] Glyburide as used herein includes: Glyburide tablets (1.25mg, 2.5mg and 5mg).

[7] Glyburide-Metformin as used herein includes: Glyburide-Metformin Hydrochloride tablets (1.25-250mg, 2.5-500mg, and 5-500mg).

[8] Leflunomide as used herein includes: Leflunomide tablets (10mg and 20mg).

[9] Meprobamate as used herein includes: Meprobamate tablets (200mg and 400mg).

[10] Nimodipine as used herein includes: Nimodipine capsules (30mg).

[11] Nystatin as used herein includes: Nystatin cream; Nystatin ointment; and Nystatin oral tablets.

[12] Paromomycin as used herein includes: Paromomycin Sulphate capsules (250mg).

[13] Theophylline as used herein includes: Theophylline (anhydrous) extended release tablets (300mg and 450mg).

[14] Verapamil as used herein includes: Verapamil Hydrochloride regular tablets (80mg & 120mg) and Verapamil Hydrochloride sustained release capsules (120mg, 180mg, 240mg).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Zoledronic Acid.[15]  Together, these drugs are referred to herein as "Drugs at Issue."

2.      Defendants participated in an overarching conspiracy, the purpose of which was to raise prices and minimize competition in the generic drug industry for numerous generic drugs. This overarching conspiracy encompassed an agreement among all Defendants that covered all Drugs at Issue, and included subsidiary agreements among certain Defendants relating to individual Drugs at Issue.

3.      Defendants' conspiratorial conduct was widespread and has had a tremendous impact on the marketplace. In addition to the Drugs at Issue identified in this overarching conspiracy complaint, numerous lawsuits alleging conspiratorial conduct relating to 16 other drugs[16] and involving all of these Defendants (and additional defendants) are currently pending.[17]

---

[15] Zoledronic Acid as used herein includes: Zoledronic Acid for intravenous infusion (4mg/5ml and 5mg/100ml).

[16] The EPP complaints for other drugs implicated in this MDL include: Albuterol (Case 2:16-AL-27242-CMR, Doc. 49); Amitriptyline (Case 2:16-AM-27242-CMR, Doc. 39); Baclofen (Case 2:16-BC-27242-CMR, Doc. 44); Benazepril (Case 2:16-BZ-27242-CMR, Doc. 39); Clobetasol (Case 2:16-CB-27242-CMR, Doc. 92); Clomipramine (Case 2:16-CM-27242-CMR, Doc. 74); Desonide (Case 2:16-DS-27242-CMR, Doc. 96); Digoxin (Case 2:16-DG-27242-CMR, Doc. 109); Divalproex (Case 2:16-DV-27242-CMR, Doc. 63); Econazole (Case 2:16-EC-27242-CMR, Doc. 73); Fluocinonide (Case 2:16-FL-27242-CMR, Doc. 75); Levothyroxine (Case 2:16-LV-27242-CMR, Doc. 63); Lidocaine-Prilocaine (Case 2:16-LD-27242-CMR, Doc. 58); Pravastatin (Case 2:16-PV-27242-CMR, Doc. 79); Propranolol (Case 2:16-PP-27242-CMR, Doc. 76); Ursodiol (Case 2:16-UR-27242-CMR, Doc. 46).

[17] With the exception of the EPP Consolidated Class Action Complaint for Glyburide (Case 2:16-GL-27242-CMR, Doc. 47) ("Glyburide Complaint"), EPPs anticipate that all other EPP single-drug complaints will proceed as separate cases, including EPP's Consolidated Amended Class Action Complaint for Doxycycline Hyclate (Case No. 2:16-DX-27242-CMR, Doc. 123) ("Doxycycline Complaint"). Plaintiffs propose that their Glyburide Complaint be incorporated into this complaint for the purposes of judicial efficiency. EPPs will meet and confer with Defendants regarding the procedural mechanism for doing so. Although the allegations in EPP's Doxycycline Complaint also relate to and are a part of the overarching conspiracy alleged herein, given the advanced procedural posture of that case Plaintiffs propose for the sake of judicial efficiency to keep that case on an individual track at least until motions to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

4.      In a competitive marketplace, each generic drug manufacturer should price its drug competitively relative to other manufacturers. Accordingly, if any one company decided to raise prices, it would do so at the risk of losing customers and sales to its rivals with more competitive prices. But, beginning at least as early as 2011, the generic pharmaceutical market has not been characterized by such competition.

5.      Defendants engaged in pervasive conspiratorial conduct designed to maintain inflated prices and avoid competition with one another.

6.      Throughout the conspiracy, Defendants communicated with each other to determine and agree on the amount of market share each competitor would be allocated. These shares were determined by the timing of each Defendant's entry into the market (with early entrants entitled to a proportionately larger share than later entrants).

7.      The purpose of Defendants' unlawful "fair share" allocation was to fix, maintain and stabilize prices—either for a particular generic drug or any number of generic drugs. In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug. Defendants implemented the "fair share" agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful.

8.      Additionally, in conjunction with their market allocation agreement, Defendants also agreed to raise prices for the Drugs at Issue. Defendants were able to raise, maintain or slow the decline of prices that would have been lower absent their conspiratorial agreements.

9.      The generic drug pricing described in this Complaint cannot be explained by changes in supply, the costs of production, or demand, or any other competitive market feature.

---

dismiss are resolved. Accordingly, in this complaint Plaintiffs do not seek to recover damages or equitable relief arising from overcharges for Doxycycline Hyclate.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Instead, the price levels were the result of an illegal agreement among Defendants to fix the prices of the Drugs at Issue and not the result of free and fair market competition.

10.     The generic pharmaceutical industry has a number of features that make it highly susceptible to collusion. The markets for the Drugs at Issue were controlled by Defendants, and are subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements. Each generic drug described in this Complaint is a commodity product, for which reasonable substitutes are not available and demand is highly inelastic. Federal regulations require generic products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another. Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

11.     Because purchasers choose whose generic pharmaceutical product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to raise its prices without assurance that its competitors either would also increase prices or at least not compete on pricing.

12.     Moreover, due to the regulated nature of the industry, generic pharmaceutical manufacturers are typically able to determine in advance which manufacturers are coming in and out of the market for a particular generic drug. Armed with that knowledge, Defendants were able to reach a common understanding that each competitor would be entitled to a "fair share," meaning that each Defendant would be entitled to a percentage of the market for each generic drug that it manufactures.

13.     Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on generic drug prices and allocate markets and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

customers. As alleged in greater detail below, the sheer volume of industry meetings provided the perfect opportunity for Defendants to implement and maintain their conspiracy, and evidence uncovered in the pending governmental investigations described below confirms that Defendants availed themselves of this opportunity. Defendants implemented their conspiracy through numerous meetings and communications between and among their representatives, including at industry events such as the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance) ("HDA"), Efficient Collaborative Retail Marketing ("ECRM"), and Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP").

14.     Indeed, such routine meetings facilitated the Defendants' ability to reach agreements on their "fair shares" of the market for any given drug.

15.     Extreme and unprecedented price increases in the generic drug industry have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

16.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Defendant Heritage relating to the sale of Glyburide and Doxycycline Hyclate. And DOJ has made clear that its "investigation is ongoing"[18] and that the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the

---

[18] DOJ, Division Update Spring 2017 (Mar. 28, 2017), https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[19] In late April 2018, Bloomberg reported that at least two companies were expected to be indicted in the coming months, in addition to several executives, and that another company could plead guilty before then.[20]

17.    The Office of the Attorney General for the State of Connecticut ("Connecticut AG"), which has been leading a multi-state attorney general investigation of the generic drug industry parallel to that of DOJ, confirms that there is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States….[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[21]

18.    Further, after filing a Proposed Consolidated Amended Complaint, which named 17 corporate defendants and two individual defendants and addressed conspiratorial conduct related to numerous drugs that were not already subject to independent litigation, the Connecticut AG acknowledged that "[b]ased upon our investigation, there certainly will be additional complaints. . . . [A]bsolutely, there will be additional complaints, in the future. They will likely be focused on specific defendants and [ ] the drugs that they sell."[22] More recently, in mid-April 2018, the Connecticut AG acknowledged that the States' investigation has "exploded into wide-ranging conduct in all areas of the generic drug industry" over the preceding six months, that the

---

[19] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[20] David McLaughlin & Drew Armstrong, Generic-Drug Companies to Face First Charges in U.S. Probe, BLOOMBERG (Apr. 24, 2018), https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face-first-charges-in-u-s-probe.

[21] Connecticut AG, Press Release (Dec. 15, 2016), http://portal.ct.gov/AG/Press-Releases/2016-Press-Releases.

[22] 02/21/2018 Status Conference Hearing Transcript at 7.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

existing litigation "is essentially dwarfed by the conduct we're seeing in the rest of our litigation," and that the States expect to bring even more actions in the future.[23]

19.     The scope of the governmental investigations is large and continues to grow. In addition to the guilty pleas by the two executives at Defendant Heritage, numerous other Defendants named here have received criminal subpoenas in connection with DOJ investigation, including: Actavis Holdco U.S., Inc.; Aurobindo Pharma USA, Inc.; Citron Pharma LLC; Dr. Reddy's Laboratories, Inc.; Lannett Company, Inc.; Mayne Pharma Inc.; Mylan Pharmaceuticals, Inc.; Par Pharmaceutical, Inc.; Perrigo New York, Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Taro Pharmaceuticals USA, Inc.; Teva Pharmaceuticals USA, Inc.; and Zydus Pharmaceuticals USA, Inc.

20.     Further, at least two Defendants have been raided by federal authorities in connection with the investigation.  Perrigo disclosed that its offices were raided in 2017, and Mylan's Pennsylvania headquarters were raided by the FBI in the fall of 2016.[24]

21.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below. Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Drugs at Issue manufactured by any Defendant, other than for resale, from at least March 1, 2011 to the present ("Class Period"), and (b) a damages class of persons and entities in the states and

---

[23] Can Celik, 'More to come' from states' generic drug investigation, Connecticut official says, mLex (Apr. 12, 2018).

[24] David McLaughlin & Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, BLOOMBERG (Apr. 24, 2018), https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face-first-charges-in-u-s-probe.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Drugs at Issue manufactured by any Defendant, other than for resale, from at least March 1, 2011 to the present.[25]

22.    The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Plaintiffs' counsel. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the classes they seek to represent, Plaintiffs allege as follows:

## II.    ONGOING FEDERAL AND STATE INVESTIGATIONS

23.    Now in its fourth year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal informations accusing Heritage executives of conspiring with unidentified co-conspirators to "knowingly enter[] into and engage[] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products,...the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States."[26]

24.    On January 9, 2017, Chief Executive Officer ("CEO") Jeffrey Glazer ("Glazer") and President Jason Malek ("Malek") of Heritage pleaded guilty to felony charges that they

---

[25] The proposed Classes exclude natural person consumers. *See infra* Section XV (Class Action Allegations).

[26] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conspired with competitors to manipulate prices and allocate customers for Doxycycline Hyclate and Glyburide.[27]

25.    Malek admitted substantially the same facts.[28]

26.    As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation. Moreover, as further indication of criminal price-fixing in the generic drug industry, "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under the DOJ's leniency program[.]"[29] As explained on the DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[30]

27.    More criminal charges and guilty pleas are expected to follow as early as this summer.[31]

28.    Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are

---

[27] Tr. of Plea Hearing at 19:16-20:4, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id.* at 22:4-11 (admitting facts).

[28] Tr. of Plea Hearing at 19:12-20:1, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id.* at 21:23-22:6 (admitting facts).

[29] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says*, mLex (Feb. 21, 2017).

[30] DOJ, *Frequently Asked Questions About the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download.

[31] *See, e.g.*, David McLaughlin & Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, BLOOMBERG (Apr. 24, 2018), *available at* https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face-first-charges-in-u-s-probe.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

much, much broader. The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[32]

29.     Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[33] The DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least eighteen pharmaceutical companies, including at least 15 of the Defendants here.

30.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs. Now joined by the AGs of 45 states, Puerto Rico and the District of Columbia, the Connecticut AG has filed a [Proposed] Consolidated Amended Complaint ("State AG Complaint") in the U.S. District Court for the Eastern District of Pennsylvania alleging price-fixing and customer allocation.[34] The State AG Complaint describes the defendants' participation "in an overarching conspiracy, the effect of which was to minimize if not thwart competition across the generic drug industry."[35]

31.     The State AG Complaint focuses on the following generic drugs: Acetazolamide, Doxycycline Hyclate Delayed Release, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide,

_____

[32] David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be Filed by Year-End*, BLOOMBERG (Nov. 3, 2016), http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[33] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[34] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724 (ECF No. 417). A Proposed Consolidated Amended Complaint was filed in November 2017, and is available at: http://portal.ct.gov/AG/Press-Releases/2017-Press-Releases/AG-Jepsen-Leads-Coalition-in-New-Expanded-Complaint-in-Federal-Generic-Drug-Antitrust-Lawsuit.

[35] State AG Complaint ¶ 2.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, Verapamil and Zoledronic Acid.[36] Additionally, the States make clear that they have uncovered wide-ranging conduct implicating numerous different drugs and competitors and suggest that additional drugs and manufacturers will be added at the appropriate time.[37]

### III.    JURISDICTION AND VENUE

32.    Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

33.    This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

34.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

35.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c), and (d); and § 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ

---

[36] State AG Complaint ¶ 1.
[37] State AG Complaint ¶ 3.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[38]

36.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold generic drugs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.    <u>PLAINTIFFS</u>

37.     Plaintiffs 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, and 1199SEIU Licensed Practical Nurses Welfare Fund are jointly administered health and welfare funds (collectively, "1199SEIU Benefit Funds"). The 1199SEIU Benefit Funds are among the largest labor-management funds in the nation, providing comprehensive health benefits to hundreds of thousands of working and retired healthcare industry workers and their families. They provide health and welfare benefits to 400,000 members, retirees, and their families, who reside in numerous locations in the United States. During the Class Period, the 1199SEIU Benefit Funds

---

[38] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

indirectly purchased and paid, not for resale, for some or all of the purchase price for all Drugs at Issue manufactured by the Defendants, with the exception of Theophylline. Plaintiffs made such payments and/or reimbursements for at least one Drug at Issue in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia, thereby suffering injury to its business and property. During the Class Period, the 1199SEIU Benefit Funds paid and reimbursed more for these products than they would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, the 1199SEIU Benefit Funds were injured in their business or property by reason of the violations of law alleged herein. The 1199SEIU Benefit Funds intend to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

38.     Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York. District Council 37 (the "Union") is New York City's largest public employee union. The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers. Members covered by DC 37's benefit plan work in almost every agency in New York City, including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

treatment facilities, and city colleges. DC 37 provides supplemental health benefits, including a prescription drug benefit, to approximately 313,000 individuals, including both active members and their families and 50,000 retirees, who reside in numerous locations in the United States. During the Class Period, DC 37 indirectly purchased and paid, other than for resale, for some or all of the purchase price for one or more prescriptions of all Drugs at Issue manufactured by the Defendants, with the exceptions of Glipizide-Metformin and Glyburide-Metformin. Plaintiff made such payments and/or reimbursements for at least one Drug at Issue in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and Wisconsin, and thereby suffering injury to its business and property.   During the Class Period, DC 37 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, DC 37 was injured in its business or property by reason of the violations of law alleged herein. DC 37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

39.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is Louisiana's oldest and largest domestic health insurer. It is headquartered in Baton Rouge, Louisiana. It provides health insurance coverage to over one million members who reside in numerous

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

locations in the United States. During the Class Period, BCBS-LA indirectly purchased and paid, not for resale, for some or all of the purchase price for one or more prescriptions of all Drugs at Issue manufactured by the Defendants, with the exception of Zoledronic Acid. Plaintiff BCBS-LA made such payments and/or reimbursements for at least one Drug at Issue in every U.S. state, the District of Columbia and Puerto Rico, thereby suffering injury to its business and property. During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein. BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

40.     Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public schools. It is headquartered in Bakersfield, California. It provides pharmacy benefits to approximately 260,000 members who reside in numerous locations in the United States. During the Class Period, SISC indirectly purchased and paid, other than for resale, for some or all of the purchase price for one or more prescriptions of every Drug at Issue manufactured by the Defendants. SISC made such payments and/or reimbursements for at least one Drug at Issue in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, Wisconsin, and Wyoming, thereby suffering injury to its business and property. During the Class Period, SISC paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein. SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

41.     Sergeants Benevolent Association of the Police Department of the City of New York Health and Welfare Fund ("SBA Fund") is a citizen of the State of New York, and has its principal place of business at 35 Worth Street, New York, New York. SBA Fund is an independent labor organization operating under Internal Revenue Code section 501(c)(5), and is sponsored and administered by a Board of Trustees. As such, SBA Fund is a legal entity entitled to bring suit in its own name. SBA Fund is an "employee welfare benefit plan" and an "employee benefit plan" with membership of approximately 4,700 active and 7,600 retired sergeants of the New York City Police Department. It provides comprehensive health care benefits, including prescription drug benefits, to participants and their dependents. During the Class Period, SBA Fund indirectly purchased and paid, other than for resale, for some or all of the purchase price for one or more prescriptions of all Drugs at Issue manufactured by the Defendants, with the exception of Zoledronic Acid. SBA Fund made such payments and/or reimbursements for at least one Drug at Issue in Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Nevada, New Hampshire, New Jersey, New Mexico, New

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

York, North Carolina, Ohio, Pennsylvania, Puerto Rico, South Carolina, Tennessee, Texas, Vermont, Virginia and Washington, thereby suffering injury to its business and property. During the Class Period, SBA Fund paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, SBA Fund was injured in its business or property by reasons of the violations of law alleged herein. SBA Fund intends to continue paying and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

42.    Plaintiff UNITE HERE HEALTH ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market. Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid, other than for resale, for some or all of the purchase price for one or more prescriptions of every Drug at Issue manufactured by the Defendants. Plaintiff UHH made such payments and/or reimbursements for at least one Drug at Issue in Alabama, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming, thereby suffering injury to its business and property.  During the Class Period, UHH purchased and paid more for these products than it would have absent

17

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, UHH was injured in its business or property by reason of the violations of law alleged herein. UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V.   DEFENDANTS

### A.   Actavis Defendants

43.   Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceuticals USA, Inc. acquired the Actavis Generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research, development and manufacturing entity for Actavis generic operations), among others. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceuticals Industries Ltd., an Israeli entity.

44.   Defendant Actavis Pharma, Inc. ("Actavis Pharma") is Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic drugs. Actavis

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pharma is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

45.     Actavis Elizabeth LLC ("Actavis Elizabeth") is a Delaware company with its principal place of business in Elizabeth, New Jersey. It is a wholly owned subsidiary of Actavis Holdco and is a research, development and manufacturing entity for Actavis generic operations.

46.     Unless addressed individually, Actavis Holdco, Actavis Pharma and Actavis Elizabeth are collectively referred to herein as "Actavis." During the Class Period, Actavis marketed and sold generic pharmaceuticals in this District and throughout the United States.

### B.     Apotex

47.     Defendant Apotex Corp. ("Apotex") is a Delaware corporation with its principal place of business in Weston, Florida. During the Class Period, Apotex marketed and sold generic pharmaceuticals in this District and throughout the United States.

### C.     Aurobindo

48.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey. Aurobindo is a subsidiary of Aurobindo Pharma Limited, a corporation based in Hyderabad, India. During the Class Period, Aurobindo marketed and sold generic pharmaceuticals in this District and throughout the United States.

### D.     Citron

49.     Defendant Citron Pharma, LLC ("Citron") is a New Jersey corporation with its principal place of business in East Brunswick, New Jersey. During the Class Period, Citron marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### E.      Dr. Reddy's

50.      Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business in Princeton, New Jersey.  It is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., which is an Indian company with its principal place of business in Hyderabad, Telangana, India. Dr. Reddy's is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Dr. Reddy's marketed and sold generic pharmaceuticals in this District and throughout the United States.

### F.      Glenmark

51.      Defendant Glenmark Pharmaceuticals, Inc., USA ("Glenmark") is a Delaware corporation with its principal place of business in Mahwah, New Jersey.  It is a wholly-owned subsidiary of Glenmark Pharmaceuticals Ltd., headquartered in Mumbai, India. During the Class Period, Glenmark marketed and sold generic pharmaceuticals in this District and throughout the United States.

### G.      Heritage

52.      Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. It is the exclusive United States commercial operation for Emcure Pharmaceuticals Ltd., an Indian company headquartered in Pune, India. During the Class Period, Heritage marketed and sold generic pharmaceuticals in this District and throughout the United States.

### H.      Lannett

53.      Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Lannett is registered with the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pennsylvania Department of State as a foreign corporation.  During the Class Period, Lannett marketed and sold generic pharmaceuticals in this District and throughout the United States.

### I.     Mayne

54.     Defendant Mayne Pharma Inc. is a Delaware corporation that has its principal place of business in Raleigh, North Carolina. Mayne is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. In 2012, Mayne acquired Metrics, Inc. and its division, Midlothian Laboratories, and has also operated under the name Midlothian since that time. In 2013, Mayne acquired Libertas Pharma. Unless addressed individually, Metrics, Inc., Midlothian Laboratories, Libertas Pharma and Mayne Pharma Inc. are collectively referred to herein as "Mayne." During the Class Period, Mayne marketed and sold generic pharmaceuticals in this District and throughout the United States.

### J.     Mylan Defendants

55.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

56.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

57.     Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company. Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan." During the Class Period, Mylan marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

58.     Defendant Rajiv Malik ("Malik") is an individual residing at 605 Grandview Drive, Gibsonia, Pennsylvania. During the Class Period, Malik has acted as the President and Executive Director of Mylan N.V., which is the parent company of Defendants Mylan Inc. and Mylan Pharmaceuticals, Inc. In his role as President of Mylan N.V., Malik is responsible for overseeing the sales and marketing of Mylan's generic pharmaceutical business, which is accomplished at least in part through acting on behalf of Defendant Mylan.

### K.     Par Defendants

59.     Defendant Par Pharmaceutical, Inc. ("PPI") is a New York corporation with its principal place of business in Chestnut Ridge, New York. PPI is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

60.      Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama. Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").

61.     Defendant DAVA Pharmaceuticals, LLC ("DAVA") is a Delaware company with its principal place of business in Fort Lee, New Jersey.

62.     PPI, Generics Bidco and DAVA are wholly-owned subsidiaries of Endo International plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland and its U.S. headquarters located in Malvern, Pennsylvania. PPI, Generics Bidco and DAVA collectively do business as Par Pharmaceutical. Unless addressed individually, Endo, PPI, Generics Bidco, DAVA and Qualitest are collectively referred to herein as "Par." During the Class Period, Par marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### L.    Perrigo

63.    Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in Bronx, NY. It is a subsidiary of Perrigo Company plc, an Irish company with its principal place of business in Dublin, Ireland. Perrigo is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Perrigo marketed and sold generic pharmaceuticals to customers in this District and other locations in the United States.

### M.    Sandoz Defendants

64.    Defendant Sandoz, Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey.   Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.   Sandoz is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

65.    Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Foguera is a wholly-owned subsidiary of Defendant Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

66.    Unless addressed individually, Fougera and Sandoz Inc. are collectively referred to herein as "Sandoz." During the Class Period, Sandoz marketed and sold generic pharmaceuticals in this District and throughout the United States.

### N.    Sun Defendants

67.    Defendant Sun Pharmaceutical Industries, Inc. ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. SPII is a wholly-owned subsidiary

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of Sun Pharmaceutical Industries Ltd. ("Sun Pharma"), an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Taro Pharmaceutical USA, Inc. Beginning in 1997, Sun Pharma began a series of investments in Caraco Pharmaceutical Laboratories Ltd. ("Caraco") and in 2013 acquired 100% of Caraco and merged it into SPII to become Sun Pharma's US operations for generic pharmaceutical products. In late 2012, SPII acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, PA. Until at least June 2016, URL and Mutual operated a pharmaceutical manufacturing facility in Philadelphia. URL was registered with the Pennsylvania Department of State as a foreign corporation and maintained a registered agent in Pennsylvania during the Class Period until April 28, 2015, at which time it was merged with Mutual.

68.     Defendant Mutual is a Delaware corporation with its principal place of business located in Philadelphia, PA. It is a wholly-owned subsidiary of SPII. Since April 29, 2015 (the day after Mutual and URL merged), Mutual has been registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Many of the pharmaceutical products sold and distributed throughout the United States during the Class Period by SPII, URL and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.

69.     Unless addressed individually, SPII, URL, Mutual and Caraco are collectively referred to herein as "Sun." During the Class Period, Sun marketed and sold generic pharmaceuticals in this District and throughout the United States.

**O.     Taro**

70.     Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Sun Pharma. During the Class Period, Taro marketed and sold generic pharmaceuticals in this District and throughout the United States.

### P.   Teva Defendants

71.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity. Teva USA is registered with the Pennsylvania Department of State as a foreign corporation.

72.     Defendant Barr Pharmaceuticals, LLC ("Barr") is a Delaware company with its principal place of business in North Wales, Pennsylvania. Barr is a wholly-owned subsidiary of Teva USA, which acquired Barr (then called Barr Pharmaceuticals, Inc.) in 2008.

73.     Defendant PLIVA, Inc. is a New Jersey corporation with its principal place of business in East Hanover, New Jersey. PLIVA is a wholly owned subsidiary of Teva USA, which acquired the PLIVA assets as part of the Barr acquisition.

74.     Unless addressed individually, Teva USA, Barr and PLIVA are collectively referred to herein as "Teva." During the Class Period, Teva sold generic pharmaceuticals in this District and throughout the United States.

### Q.   West-Ward

75.     Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company. During the Class Period, West-Ward sold generic pharmaceuticals in this District and other locations in the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### R.    Zydus

76.    Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, New Jersey. It is a subsidiary of Cadila HealthCare, an Indian company headquartered in Mumbai. Zydus is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Zydus marketed and sold generic pharmaceuticals in this District and throughout the United States.

## VI.    CO-CONSPIRATORS

### A.    Ascend

77.    Ascend Laboratories, LLC ("Ascend") is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Parsippany, New Jersey. During the Class Period, Ascend marketed and sold generic pharmaceuticals in this District and throughout the United States.

### B.    Unknown Co-Conspirators

78.    Various other persons, firms, corporations, and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein. Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE

79.    During the Class Period, Defendants sold and distributed generic drugs in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

80.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic drugs, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

81.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic drugs to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.     Generic Drugs Are Commodity Products.

82.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[39] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[40]

83.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[41] Once the FDA approves a generic drug as "therapeutically equivalent" to a

---

[39] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[40] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://portal.ct.gov/AG/Press-Releases/2016-Press-Releases.

[41] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[42]

84.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name counterpart."[43] And that may be conservative. According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[44] Mature generic markets typically have several manufacturers that compete for sales, hence keeping prices in check.

85.     Generic drug price competition provides enormous savings to Plaintiffs, as well as to consumers, pharmacies, other drug purchasers, and state Medicaid programs.

86.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

87.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug

---

[42] *Id.*

[43] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800.

[44] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

88.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[45] In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

89.     It is well-established that competition among generic manufacturers drives down prices. Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales. When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives. Over time, the price of a generic drug approaches the manufacturers' marginal costs. As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[45] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM) 1999-2004, extracted February 2005

90.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share. A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[46]

91.     When there are multiple generic manufacturers in an established generic market, prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.      Pricing in the U.S. Prescription Drug Industry.**

92.     In essence, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies

---

[46] U.S. Government Accountability Office Report: Generic Drugs Under Medicare ("GAO Report") at 23, (August 2016), *available at* https://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured. The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies. These agreements and payments are sometimes arranged and intermediated by middlemen known as Pharmacy Benefit Managers ("PBMs").

93.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious. Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[47] "NADAC is a simple average of the drug acquisition costs submitted by retail community pharmacies."[48] In effect, NADAC is "a single national average."[49] Thus, NADAC is one way to track general price trends in the marketplace.

94.     While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks—like WACs (Wholesale Acquisition Costs)—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are

---

[47] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[48] *Id.* at 15.

[49] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

not actual transaction prices; rather, they are the manufacturer's reported list price. Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[50]

95.     The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC. The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee. Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs. As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

96.     To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MACs")—that set the amounts they will pay pharmacies for some generic drugs. A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

97.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug. So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices. A

---

[50] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry. AWP is the average price wholesalers pay to purchase drugs from pharmaceutical manufacturers, inclusive of rebates and discounts. *See* Ctrs. for Medicare & Medicaid Servs., *Medicare Part B Average Sales Price*, *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Part-B-Drugs/McrPartBDrugAvgSalesPrice/. QuintilesIMS's National Sales Perspectives ("IMS NSP") is a measure of manufacturer specific pricing. IMS NSP data captures sales at actual transaction prices and includes sales by manufacturers into various outlets. IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* http://quintilesimsconsultinggroup.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

98.     Drug purchasers always have an incentive to buy the least expensive available drug. Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price. Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales. A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

## IX.     DEFENDANTS' OVERARCHING CONSPIRACY

99.     Defendants have participated in a long-running conspiracy to allocate market shares and to fix, raise and/or stabilize the prices of the Drugs at Issue.

100.     As detailed below, Defendants facilitated their conspiracy through personal connections formed through frequent movement within the industry, through frequent in-person meetings at various happy hours, dinners, lunches, golf outings, trade shows, and industry conferences, and through frequent direct communications in person, via chat and email, and on the telephone (both voice and text).

101.     Inter-defendant communications were commonplace in the industry and dated as far back as 2006. Starting in at least 2011, if not before, Defendants implemented anti-competitive agreements to increase the prices and allocate the markets of at least the Drugs at Issue, and possibly many more.

102.     The foundational agreement between all Defendants was premised on the understanding that they are current or future competitors with each other across numerous

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic drugs. All of these Defendants market and sell multiple products. The effectiveness of an agreement on any one drug would be limited and unstable without a broader agreement that encompassed other drugs as well. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price. Therefore, Defendants understood that in order to be effective, their agreement needed to extend to multiple manufacturers and drugs.

103.    In furtherance of that objective, Defendants developed the concept of "fair share," in which each market participant (within and across multiple drugs) was able to obtain an allocated share of market sales without resorting to free and fair price competition. Because Defendants are repeat players who routinely enter new markets but face the same competitors, their basic agreement—to eschew price competition and seek only a "fair share" of the market— became the "rules of the road" that governed their overarching conspiracy. As described more fully below, Defendants' decisions whether and if so when to enter a market, how to price their drugs, and which customers to target were made in accordance with their unlawful "fair share" agreement.

104.    From this broad agreement among all Defendants to market and sell the Drugs at Issue under a "fair share" understanding, sprang subsidiary agreements among the manufacturing Defendants relating to each of the Drugs at Issue.

105.    The higher prices and overcharges for Drugs at Issue that resulted from Defendants' anticompetitive conduct are directly traceable through the pharmaceutical distribution chain to End-Payers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

106.    Table 1 lists Defendants' drug-specific agreements.

**Table 1**
**Defendants' Unlawful Drug-Specific Agreements**

| | | |
|---|---|---|
| Acetazolamide | Capsules | Heritage, Teva, Zydus |
| | Tablets | Lannett, Taro |
| Doxycycline Hyclate | Regular Release | Actavis, Mylan, Par, Sun, West-Ward |
| | Delayed Release | Heritage, Mayne, Mylan |
| Doxycycline Monohydrate | | Heritage, Lannett, Mylan, Par |
| Fosinopril-HCTZ | | Aurobindo, Citron, Glenmark, Heritage, Sandoz |
| Glipizide Metformin | | Heritage, Mylan, Teva |
| Glyburide | | Aurobindo, Citron, Heritage, Teva |
| Glyburide Metformin | | Actavis, Aurobindo, Citron, Heritage, Teva |
| Leflunomide | | Apotex, Heritage, Teva |
| Meprobamate | | Dr. Reddy's, Heritage |
| Nimodipine | | Heritage, Sun |
| Nystatin | Tablets | Heritage, Sun, Teva |
| | Ointment | Actavis, Perrigo, Sandoz |
| | Cream | Actavis, Par, Perrigo, Sandoz, Taro |
| Paromomycin | | Heritage, Sun |
| Theophylline | | Heritage, Teva |
| Verapamil | | Actavis, Heritage, Mylan |
| Zoledronic Acid | | Dr. Reddy's, Heritage, Par |

107.    The drug-specific agreements involve only those Defendants that marketed and sold the relevant Drug at Issue during the Class Period. But each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific agreement, was a party to the broader, overarching conspiracy to abide by the "fair share" agreement covering all Drugs at Issue. The purpose and effect of these agreements was to lessen competition in the markets for each of the Drugs at Issue.

108.    The   drug-specific   Defendant   agreements   and   known   conspiratorial

35

communications[51] a e mapped in the graphic below:



109.   The  above grap hic vividly   illustrates  the ex tensive we b o f antico mpetitive

agreements and co   mmunications be tween these De   fendants. I  deed, the   graphic ac tually

understates the exte nt o f the a greements a nd co mmu  ications be tween Defe ndants. *First*, the

---

[51] Tables 3 a  d 4, *infra*, include alleged telephone communi ations.

PUBLIC VERSION
RED ACTED PURSUANT TO MDL 2724 PROTE TIVE ORDER

relationship map shows a single line between Defendants regardless of how many communications or drug-specific agreements they have. For example, Aurobindo and Citron entered into three drug-specific agreements (relating to Fosinopril-HCTZ, Glyburide, and Glyburide Metformin) but there is only a single line between them. Similarly, although Teva and Glenmark communicated at least 94 times in a 13 month period (Table 4, *infra*), this is depicted as a single dotted line in the graphic. *Second*, the conspiratorial communications depicted in the chart only appear where there are communications between Defendants that do ***not*** have a (known) drug-specific agreement. For example, Teva and Zydus communicated at least 638 times in a 13 month period (Table 4, *infra*), but there is no indication of this in the graphic, which instead shows a single solid line for the agreement between them relating to Acetazolamide. Moreover, the communications included here are likely incomplete; Plaintiffs do not yet have access to discovery materials, and the communications alleged herein are based on the limited materials included in the State AG Complaint.

110.    The graphic above also highlights the existence of direct and private inter-competitor communications between Defendants that do not have a (known) drug-specific agreement—*i.e.*, between Defendants that did not concurrently sell any Drug at Issue during the Class Period. These communications (between Teva and each of Dr. Reddy's, Glenmark, Lannett, Mayne, Par and Sandoz) underscore the overarching nature of the conspiracy: even Defendants that were not selling the same Drugs at Issue were communicating in furtherance of the conspiracy in order to lessen competition in the markets for ***all*** Drugs at Issue.

111.    Both the "fair share" agreement and the drug-specific agreements created a web of relationships and understandings among and between all Defendants that had the purpose and effect of lessening competition among Defendants for all the Drugs at Issue.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

A.    **Defendants Are Competitors or Potential Competitors for All Drugs at Issue.**

112.    All Defendants are competitors or potential competitors with each other for each and every Drug at Issue. As described below, far more Defendants had the right (*i.e.*, regulatory approval) to sell the Drugs at Issue than actually did so during the Class Period. And all Defendants could have obtained approval or otherwise acquired marketing rights (by, *e.g.*, licensing) to sell the Drugs at Issue, had they chosen to do so.

113.    Although the process for obtaining approval to sell a generic drug can be long, Defendants were able to obtain and did obtain numerous ANDAs covering the Drugs at Issue. The core function of Defendants' businesses is to market and sell generic pharmaceuticals and, accordingly, Defendants are highly adept at obtaining access to the markets for generic pharmaceuticals, including the Drugs at Issue.

114.    Defendants gain access to generic pharmaceutical markets through at least three methods, all of which were employed by Defendants during the relevant time frame. *First*, Defendants can go through the ANDA process to obtain approval from the FDA to sell a specific drug. Heritage and Dr. Reddy's, for example, applied for ANDAs relating to Zoledronic Acid (and, as described below, coordinated with each other while their applications were pending to ensure that they would obtain a "fair share" of the market once the ANDAs were approved). *Second*, Defendants can obtain existing ANDAs by purchasing them from companies that have ANDAs, or by acquiring the company that owns them. For example, in 2008, Teva acquired Barr, which had an ANDA for Acetazolamide capsules. *Third*, Defendants can license the use of an ANDA held by someone else. For example, during the relevant time frame, neither Glenmark nor Citron owned an ANDA for any Drug at Issue, yet both were able to obtain rights to market Drugs at Issue via licensing arrangements.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

115.    Table 2 shows the ANDAs owned or licensed by Defendants for Drugs at Issue:[52]

**Table 2**
**Defendant ANDAs**

| | | |
|---|---|---|
| Acetazolamide | Capsules | **Heritage**, **Teva**, **Zydus** |
| | Tablets | Actavis*, Heritage, **Lannett**, Sun, **Taro**, Teva* |
| Doxycycline Hyclate | Regular Release | **Actavis**, Citron, **Mylan**, **Par**, **Sun**, Teva*, **West-Ward**, Zydus |
| | Delayed Release | Actavis, **Heritage**, **Mayne**, **Mylan** |
| Doxycycline Monohydrate | | **Heritage**, **Lannett**, **Mylan**, **Par**, Sandoz*, Sun, Zydus |
| Fosinopril-HCTZ | | Actavis*, **Aurobindo**, **Citron**, **Glenmark**, **Heritage**, Mylan*, **Sandoz**, Sun*, Teva* |
| Glipizide Metformin | | **Heritage**, **Mylan**, Sun, **Teva**, Zydus |
| Glyburide | | Actavis, **Aurobindo**, **Citron**, **Heritage**, **Teva**, Zydus |
| Glyburide Metformin | | **Actavis**, **Aurobindo**, **Citron**, Dr. Reddy's, **Heritage**, **Teva***, Zydus |
| Leflunomide | | **Apotex**, **Heritage**, Sandoz*, **Teva** |
| Meprobamate | | Actavis, **Dr. Reddy's**, **Heritage**, Lannett*, Mylan*, Perrigo*, Sandoz*, Sun*, Taro, Teva*, West-Ward* |
| Nimodipine | | **Heritage**, **Sun** |
| Nystatin | Tablets | Actavis*, **Heritage**, Sandoz*, **Sun**, **Teva** |
| | Ointment | **Actavis**, **Perrigo**, **Sandoz** |
| | Cream | **Actavis**, **Par, Perrigo**, **Sandoz**, **Taro** |
| Paromomycin | | **Heritage**, **Sun** |
| Theophylline | | Actavis*, **Heritage**, **Teva** |
| Verapamil | | **Actavis**, **Heritage**, **Mylan**, Sun*, Teva* |
| Zoledronic Acid | | Actavis, Apotex, Aurobindo, **Dr. Reddy's**, **Heritage**, Mylan, **Par**, Sun, Teva, West-Ward |

\*      = Discontinued
**Bold** = Drug-specific agreement (see above Table 1)

_____

[52] Table 2 includes "discontinued" ANDAs, which can be re-activated with relative ease. *See* Kurt R. Karst, "Waking From a Drug Coma: How to Bring a Drug Out of Discontinued Status – It's As Easy As 1, 2, 3 . . . 4, and 5," *available at* http://www.fdalawblog.net/2015/09/waking-from-a-drug-coma-how-to-bring-a-drug-out-of-discontinued-status-its-as-easy-as-1-2-3-4-and-5/.

39

116.    Table 2 demonstrates the extent to which these Defendants can and do access the markets for Drugs at Issue. Defendants listed in bold type were the primary manufacturers during the Class Period, but many more Defendants had or later obtained ANDAs for Drugs at Issue. The competitive overlap of these Defendants is indisputable, and is mapped below:




117.    Table 2 and the graphic above highlight that all Defendants are actual or potential competitors for all Drugs at Issue. Indeed, the above graphic *understates* the competitive

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

relationships between these Defendants in a number of ways. *First*, the relationship map shows a single line between Defendants regardless of how many drugs for which they have common ANDAs. For example, Par, Mylan and Sun have overlapping ANDAs for at least 3 formulations of Drugs at Issue (Doxycycline Hyclate, Doxycycline Monohydrate, and Zoledronic Acid) yet the graphic shows only a single line between each of them; Mylan and Heritage have overlapping ANDAs for at least 7 formulations of Drugs at Issue, though the graphic shows only a single line between them.  *Second*, the graphic above is limited to ANDAs for formulations of Drugs at Issue. If it were expanded to include all of the drugs in the MDL, or all drugs in Defendants' portfolios of generic pharmaceuticals, the web of competitive overlap would be even denser. *Third*, the graphic does not capture Defendants' ability to seek out and license ANDAs, which essentially provides each Defendant with the ability to access the market for every Drug at Issue.

**B.      The Principles of "Playing Fair" and "Fair Share" Governed Defendants' Interactions.**

118.    In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share.[53] As a result, each subsequent entry into a generic market should decrease the market prices as manufacturers compete for market share. As discussed in detail below, this did not happen for the Drugs at Issue because Defendants used their "fair play" and "fair share" agreement to coordinate market share and pricing.

119.    Because application for entry into a generic market is a public process, Defendants know which manufacturers have approval to manufacture a generic drug and

---

[53] U.S. Government Accountability Office Report: Generic Drugs Under Medicare ("GAO Report") at 23, (August 2016), *available at* https://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

approximately when they will enter the market. This creates an incentive and opportunity to coordinate pricing and allocate the market among competitors in order to maintain pricing levels and maximize profit.

120.    The practice of contacting competitors to determine their market intentions— whether through in-person meetings, telephone communications, or other interactions—is a long-standing industry practice and dates back to at least 2006. Indeed, when Glazer began working at Heritage in early 2006, the then-head of sales, Konstantine Ostaficiuk,[54] taught him the importance of speaking to competitors in order to figure out pricing and how to secure adequate customer volume without depressing prices market wide.

121.    Defendants understood and engaged in the practice of contacting their competitors when they were preparing to enter a particular generic market so that they could allocate the market according to their "fair share" agreement. Reaching out to competitors was part of the "tool kit" used in the ordinary course of business.

122.    "Fair shares" were allocated to Defendants within a particular drug market based upon the number of competitors in the market and the timing of their entry into the market. Traditionally, the first entrant to the market received the largest share of the market, and each subsequent entrant received a progressively smaller share. This system aimed to allocate to each Defendant a "fair share" of the market without depressing prices. As detailed below, through this overarching conspiracy, Defendants often were able to raise prices or enter the market at elevated prices.

---

[54] Mr. Ostaficiuk is currently the President of Camber Pharmaceuticals, Inc. (http://camberpharma.com/about-us/management-team).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

123.    The "fair share" agreement was so ingrained that some Defendant account managers and sales teams viewed contacting their counterparts at other companies—even to discuss market allocation and/or price increases—as part of the normal course of business.

124.    Defendants understood the "rules of the road" and that they needed to "play nice in the sandbox." This understanding meant that Defendants did not compete with each other on price and did not take advantage of another Defendant's price increase by providing a lower bid to "steal" the customer.

125.    The concept of a "fair share" was not limited to a specific drug. Rather, the concept of "fair share" extended across (at least) the Drugs at Issue. Defendants that "played fair" and maintained a "fair share" would benefit from the overarching conspiracy as a whole, even if Defendants would occasionally "lose out" on one specific drug. For example, customers in one generic drug market were sometimes traded for customers in a different generic drug market so that fair shares could be allocated across the larger market. In other instances, competitors would support a price increase for one drug with the understanding that their competitors would support a price increase for a different drug. Defendants who undercut other Defendants' prices were seen as "not playing fair" and "punishing" a competitor, which was contrary to the "fair share" agreement.

126.    The "fair share" agreement was utilized repeatedly during the Class Period. Defendants routinely and readily agreed to follow or not to compete on price increases for a number of generic drugs. Additionally, when customers requested new bids in response to price increases instituted from other Defendants, the Defendant-competitors spoke to each other and devised strategies for responding without undermining pricing. Consequently, consistent with

43

their understanding of fair share, Defendants sometimes refused to bid or provided a cover bid that allowed a competitor's price increase to succeed.

127.    The "fair share" practice injured Plaintiffs and the Class. Plaintiffs paid more for the Drugs at Issue than they otherwise would have paid absent Defendants' anticompetitive "fair share" and drug-specific agreements.

**C.      Sales Managers Played an Essential Role in Implementing the Conspiracy.**

128.    National Account Managers ("NAMs") are the sales force within the pharmaceutical industry. Although NAMs at the various Defendants compete for the same customers, they also have developed close relationships. NAMs frequently met with each other in various social settings, which made it easy to exchange competitive information.

129.    Moreover, many of the NAMs and other marketing and sales personnel employed by Defendants have worked at multiple companies—including other Defendants—during their careers. These employees maintained contact with people at their prior employers. In turn, this facilitated the ease with which conspiratorial agreements could be reached.

130.    For example, Susan Knoblauch worked at Defendant Sun for nearly 10 years before moving to a different sales position at Defendant Citron. Beth Hamilton worked at Defendant Apotex before moving to Defendant Mayne. Heritage's Daniel Lukasiewicz began his career at Defendant Aurobindo, moved to Defendant Zydus and currently works at Defendant Heritage.

131.    Among Defendants, this familiarity spawned collusion. For example, as discussed below, in the spring and summer of 2014, Heritage's Lukasiewicz—at the direction of CEO Glazer—reached out to Aurobindo, his former place of employment, to coordinate pricing on Glyburide, Glyburide-Metformin and Fosinopril-HCTZ.

44

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

132.    Similarly, Teva's Director of Strategic Customer Marketing Nisha Patel met Heritage's then-Sr. Vice President Malek when she worked at Amerisource Bergen, which was a Heritage customer that Malek managed. When Patel moved to Defendant Teva in April 2013, she contacted Malek to determine which generic drug products Teva sold that overlapped with generic drugs sold by Heritage so that they could coordinate pricing. As detailed below, Malek and Patel used their relationship to orchestrate a number of price increases throughout the Class Period—some led by Teva, others led by Heritage.

133.    Malek and Patel's relationship was valued and accepted by Malek's supervisors. For example, in April 2014, Malek and Glazer met with the CEO (Satish Mehta) and President Vikas Thapar) of Emcure, Heritage's parent, to discuss potential price increases for several drugs. During that meeting, Heritage's Malek told Emcure's Mehta and Thapar about his contact at Teva, Nisha Patel. Malek, who already had been discussing price increases for Nystatin with Patel since mid-2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer allocation. Mehta and Thapar approved of Malek's strategy to coordinate prices and allocate customers with Teva.

134.    Defendants' geographic proximity to each other—at least 41 different generic drug manufacturers are concentrated between the New York City and Philadelphia metropolitan areas, including Defendants Actavis, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Par, Perrigo, Sandoz, Sun, Taro, Teva, West-Ward, Zydus and co-conspirator Ascend—facilitated Defendants' frequent in-person meetings at "industry dinners" and other social events. These events provided Defendants with additional opportunities to collude.

135.    Defendants also had almost constant opportunities to conspire and interact with each other at trade shows and customer conferences and such contacts were encouraged.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Heritage's Malek expressly directed Heritage's NAMs to have pricing communications with competitors at trade association meetings.

136.    Trade shows and customer conferences were so abundant within the industry that during a 41-week period between February 20, 2013 and December 20, 2013 there were 44 different trade shows where Defendants had the opportunity to meet and collude with each other. *See* Exhibit 1 (Trade Association Attendance).

137.    But trade shows were not the only place where Defendant personnel communicated with one another. Defendants also had their own events and activities that presented numerous opportunities for sharing competitive information.

138.    For instance, certain sales representatives, including those employed by Defendants, regularly met for what was referred to as "Girls Night Out" ("GNO") or "Women in the Industry" meetings or dinners which were used as a place to meet with competitors and discuss competitively sensitive information. Some of these meetings were organized by Anne Sather, a Heritage NAM who resides in Minnesota. While GNO participants were largely salespeople residing in the area, sales representatives from out of the area also were aware of these dinners and were included in GNO when they were in the area.

139.    The types of inter-competitor contacts that transpired at GNOs were consistent with the types of contacts sales people at Defendants were expected to have. For instance, since at least 2012, Heritage's Malek frequently instructed his NAMs to contact competitors to find out what they were doing. This conduct was so common in the industry that Malek did not view the inter-competitor communications as unusual.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

140.    In addition to their regular meetings in person, Defendants used text messages, phone calls, and messages passed through third-party services such as LinkedIn to facilitate their conspiratorial communications.

**D.    Defendants Frequently Communicated Directly and Privately As Part of the Overarching Conspiracy.**

141.    The State AGs have shown that between July 1, 2013 and July 30, 2014, senior sales executives and other individuals with pricing authority at Heritage and at Teva spoke with representatives of nearly every other U.S.-based corporate Defendant by telephone and/or text message on multiple occasions.[55]

142.    In total, during a one-year period, Heritage had *at least* 513 contacts with personnel at Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Teva, and Zydus. During that same one-year time period, Teva had 1,501 contacts with personnel at Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Teva, and Zydus. Tables 3 and 4 below tally these communications.

---

[55] The State AG Complaint does not name Perrigo, Taro or West-Ward as Defendants and thus does not include information about telephone contacts involving those companies.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Table 3**[56]
**Heritage Phone/Text Communications with Co-Conspirators (by Month)**
**July 1, 2013-July 30, 2014**

| | July 2013 | Aug 2013 | Sep 2013 | Oct 2013 | Nov 2013 | Dec 2013 | Jan 2014 | Feb 2014 | Mar 2014 | Apr 2014 | May 2014 | Jun 2014 | Jul 2014 | Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Actavis** | | | | | | | | | | 2 | | | | 2 |
| **Apotex** | | | | | | | | | | | 17 | 2 | 1 | 20 |
| **Ascend** | | | | | | | | | | 1 | | | | 1 |
| **Aurobindo** | | | | 1 | 1 | | | 1 | | 5 | 2 | 1 | 3 | 14 |
| **Citron** | | | | 6 | 1 | 12 | | 7 | 1 | | 2 | 29 | 52 | 110 |
| **DRL** | 1 | 6 | 3 | 2 | | | | 1 | | 5 | 3 | | | 21 |
| **Glenmark** | | | | | | | | | 1 | | | | 3 | 4 |
| **Lannett** | | 35 | | 27 | | | 21 | 8 | | 3 | 3 | 14 | 2 | 113 |
| **Mayne** | | | | | | 1 | | | 2 | 7 | 3 | | | 13 |
| **Mylan** | 3 | 1 | | | 1 | | 1 | | 2 | 8 | | 2 | | 18 |
| **Par** | | | | | | | | | | | 3 | 6 | | 9 |
| **Sandoz** | | | | | | | | | | | 4 | 3 | | 7 |
| **Sun** | 1 | 2 | | 1 | | | | 3 | | 3 | 10 | 32 | 7 | 59 |
| **Teva** | 7 | 9 | | | | | | 5 | 5 | 3 | | 1 | 5 | 35 |
| **Zydus** | | 61 | 19 | 6 | | | | | | | | | 1 | 87 |
| | | | | | | | | | | | | | | 513 |

**Table 4**[57]
**Teva Phone/Text Communications with Co-Conspirators (by Month)**
**July 1, 2013-July 30, 2014**

| | July 2013 | Aug 2013 | Sep 2013 | Oct 2013 | Nov 2013 | Dec 2013 | Jan 2014 | Feb 2014 | Mar 2014 | Apr 2014 | May 2014 | Jun 2014 | Jul 2014 | Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Actavis** | | 11 | 16 | 37 | 11 | 35 | 25 | 14 | 36 | 30 | 63 | 13 | 43 | 334 |
| **Apotex** | 3 | 4 | | | | | | | | | | | | 7 |
| **Ascend** | | 3 | | | | | | | | | | | | 3 |
| **Aurobindo** | 17 | 5 | 3 | 15 | 8 | 10 | 7 | 7 | 6 | 6 | | | 5 | 89 |
| **Citron** | | | | 3 | 3 | 3 | | 1 | | 1 | | 1 | | 12 |
| **DRL** | 2 | | | | | | | | | 2 | 1 | 3 | 6 | 14 |
| **Glenmark** | 7 | 8 | 1 | 17 | 18 | 21 | 5 | 4 | 2 | | 3 | | 8 | 94 |
| **Heritage** | 7 | 10 | | | | | | 5 | 5 | 3 | | 1 | 5 | 36 |
| **Lannett** | | | | | | | | | 16 | 13 | | 1 | 13 | 43 |
| **Mayne** | 2 | | 2 | 1 | 1 | 2 | 4 | 5 | | | | 7 | | 24 |
| **Mylan** | 28 | 22 | 2 | 7 | | 12 | 6 | 1 | 1 | 1 | 7 | 1 | | 88 |
| **Par** | | | 4 | 4 | 3 | 16 | 1 | 18 | 6 | 9 | 11 | 14 | 3 | 89 |
| **Sandoz** | 3 | 5 | 3 | | | | 7 | | 2 | 3 | | 1 | | 24 |
| **Sun** | | | | 2 | | 1 | | | | 1 | | | 2 | 6 |
| **Zydus** | 75 | 29 | 25 | 203 | 43 | 48 | 20 | 39 | 46 | 35 | 41 | 14 | 20 | 638 |
| | | | | | | | | | | | | | | 1501 |

[56] AG Complaint ¶¶ 94-95, Table 1.

[57] AG Complaint ¶¶ 94-95, Table 2.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

143.    Astonishingly, these numbers very likely underrepresent the volume of contacts between Defendants during this period because they include only phone and text message records from *some* of the executives and salespeople at issue. It is clear, however, from the limited information adduced to date, that there was a widespread pattern of communications occurring simultaneously between Defendants that marketed and sold the Drugs at Issue.[58]

144.    For example, and as detailed below, while Heritage's Associate Director of National Accounts Neal O'Mara was discussing pricing and market share of Zoledronic Acid with VP of Sales and Marketing John Adams at Dr. Reddy's, O'Mara and Heritage's Sr. NAM Matthew Edelson were also discussing pricing for Meprobamate with Dr. Reddy's. At the same time, Heritage's Sather was speaking with Director of National Accounts Tracy Sullivan at Lannett about pricing for Doxycycline Monohydrate ("Doxy Mono"). A month later, in April 2013, Sun, Heritage, and Teva began discussing pricing for Nystatin. Similarly, in May 2013, Malek, with the assistance of Emcure CEO Mehta, began talking about the pricing for Doxycycline DR ("Doxy DR") with Defendant Rajiv Malik, President of Mylan.

### E.    Timeline of Defendants' Overarching Conspiracy

145.    From at least as early as the beginning of the Class Period, Defendants conspired to raise prices, not just for the Drugs at Issue in this complaint, but also for the numerous drugs subject to separate litigation before this MDL.

146.    The following Table presents a chronology of anticompetitive conduct for Drugs at Issue and the other drugs implicated in MDL 2724.

---

[58] The State AGs have publicly disclosed only those communications that transpired between July 2013 and July 2014, but the evidence suggests that communications between Defendants also occurred before and after this period.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Table 5**
**Timeline of Anticompetitive Conduct for Drugs at Issue and MDL 2724 Drugs**

| Timeline | Anticompetitive Conduct |
|---|---|
| Summer 2011 | **Nystatin** (cream and ointment) |
| Fall 2011 | |
| Winter 2012 | |
| Spring 2012 | **Acetazolamide** (tablets) |
| Summer 2012 | **Nimodipine** |
| Fall 2012 | **Doxycycline Hyclate** (RR)**; Paromomycin; Verapamil** (tablets) |
| Winter 2013 | |
| Spring 2013 | Albuterol; Desonide; **Meprobamate; Nimodipine; Nystatin** (tablets); Propranolol (capsules); **Zoledronic Acid** |
| Summer 2013 | Clomipramine; Divalproex; **Doxycycline Hyclate** (DR); **Doxycycline Monohydrate**; Levothyroxine; Pravastatin; **Verapamil** (capsules) |
| Fall 2013 | **Acetazolamide** (tablets); Benazepril; Digoxin |
| Winter 2014 | Baclofen |
| Spring 2014 | **Doxycycline Hyclate** (DR); Lidocaine-Prilocaine; **Theophyline**; Ursodiol |
| Summer 2014 | **Acetazolamide** (capsules); Amitriptyline; Clobetasol; Econazole; Fluocinonide; **Fosinopril-HCTZ; Glipizide-Metformin; Glyburide; Glyburide-Metformin; Leflunomide; Nystatin** (tablets)**; Paromomycin; Theophylline; Verapamil** (tablets) |
| Fall 2014 | |
| Winter 2015 | Propranolol (tablets) |
| Spring 2015 | **Leflunomide; Verapamil** (capsules) |

**Bold** = Drugs at Issue

147.   What follows is a brief, chronological description of the relevant events since 2011 and shows the workings of the overarching conspiracy. More detailed descriptions of the conduct and events relating to each Drug at Issue appear in Section X of this complaint.

148.   In the spring and summer of 2011, Defendants Taro and Perrigo imposed abrupt, large and nearly identical price increases for Nystatin external cream. Par joined the price increase by late summer. By October, Actavis also joined the price increase. These Defendants

maintained elevated prices thereafter. When Sandoz ramped up production in the summer of 2013, it imposed nearly identical prices for Nystatin cream.

149. Not long after the price increases for Nystatin cream in the summer of 2011, Actavis, Perrigo and Sandoz began to impose similar increases to Nystatin ointment. The price increases were large, abrupt and nearly identical, but staggered by approximately 6 month increments.

150. While the Nystatin cream and ointment increases were occurring, Defendants had the opportunity to meet and discuss pricing at the ECRM Retail Pharmaceutical Conferences and NACDS Annual Meetings in 2011 and 2012. All four of these meetings were attended by Actavis, Par, Perrigo, Sandoz and Taro. *See* Exhibit 1.

151. In the spring of 2012, Defendants Taro and Lannett tested the waters with a relatively small price increase for their Acetazolamide tablets. The increases were nearly simultaneous and nearly identical.

152. In the summer of 2012, Heritage and Sun began to discuss price increases for at least two additional Drugs at Issue: Nimodipine and Paromomycin. Heritage and Sun were able to reach agreements through multiple emails, text messages and in-person communication at trade events, including the 2012 ECRM Retail Pharmaceutical Conference and the HDMA Business Leadership Conference. *See* Exhibit 1. ████████████████████████ ███████████████████████, though it did not immediately raise list (WAC) prices. Actavis and West-Ward also attended 2012 conferences with Sun and Heritage, and in the following months joined Sun in dramatic Doxycycline Hyclate price increases.

153. Heritage and Sun, as well as Defendants Actavis, Apotex, Aurobindo, Dr. Reddy's, Glenmark, Lannett, Mylan, Par, Perrigo, Sandoz, Taro, Teva, and Zydus, had the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

opportunity to discuss pricing and market share and otherwise further the conspiracy while attending the October 2012 GPhA meeting. *See* Exhibit 1.

154.    By late 2012 and into early 2013, Sun increased list prices for Paromomycin consistent with Heritage's pricing, and Sun, Actavis and West-Ward all dramatically increased prices for Doxycycline Hyclate (regular release). Mylan increased prices for Verapamil tablets and allowed Heritage—a relative newcomer to the market—to gain market share. By March 1, 2013, Heritage had increased its Nimodipine list prices consistent with its agreement with Sun.

155.    Between January 2013 and March 2013, representatives from Heritage and Dr. Reddy's spoke or texted multiple times, and representatives of all U.S. Defendants (except Citron) attended at least one trade association meeting where Defendants had the opportunity to meet and discuss pricing and market allocation of multiple generic drugs. *See* Exhibit 1. During at least one of those trade association meetings, Dr. Reddy's Adams and Heritage's O'Mara discussed the pricing of at least Zoledronic Acid.

156.    On the heels of these communications and meetings, by April 2013, Defendants had increased the prices of three additional Drugs at Issue: Meprobamate (Dr. Reddy's, Heritage), Nystatin tablets (Heritage, Sun), and Zoledronic Acid (Dr. Reddy's, Heritage). Sun implemented price increases for Nystatin tablets in order to facilitate Heritage obtaining a "fair share" of the market (just as Mylan had raised prices on Verapamil tablets to allow Heritage to gain share). Defendants also raised prices on an additional Doxycycline Hyclate regular release product (Actavis, Sun, West-Ward).

157.    During this time frame Defendants also increased the prices of other drugs implicated in MDL 2724: Albuterol (Mylan and Sun), Desonide (Actavis, Sandoz, Perrigo,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Taro), and Propranolol capsules (Actavis, along with MDL Defendants Breckenridge and Upsher-Smith).[59]

158.    Notably, even if a particular manufacturer was not directly involved in a price increase, it nonetheless monitored the increases carefully. For example, even though Heritage did not increase its price for Nystatin tablets in April 2013, it maintained close contact with Sun in the lead up to and following Sun's price increase. For example, the day after Sun increased its Nystatin prices, representatives for the two companies spoke for nearly 40 minutes.

159.    Defendants' pattern of conspiratorial communications continued between April and June 2013. During these three months, Heritage spoke with at least Mylan, Teva, Sun, Dr. Reddy's and Lannett. After a series of communications with Sun, Heritage doubled the price of Nimodipine. Lannett and Par also independently spoke with each other. Every U.S. Defendant (except Mayne) also attended at least one trade association meeting where Defendants had the opportunity to meet and discuss market share and pricing. *See* Exhibit 1.

160.    Based on evidence obtained by the State AGs and disclosed in their complaint, documented contacts between Defendants increased dramatically starting in July 2013. Between July 2013 and September 2013, Teva and Heritage contacted their competitors via text or phone call hundreds of times. *See* Tables 3 & 4. Teva had 144 separate contacts with nine Defendants in July 2013; 97 contacts with nine Defendants in August; and 56 different contacts with eight Defendants in September. As detailed below, these discussions involved at least: Doxycycline Hyclate (delayed release), Doxycycline Monohydrate, and Nystatin (tablets).

161.    Further, in addition to their phone and text contacts, between July and September of 2013, representatives from every U.S. Defendant (except Mayne) attended at least one trade

---

[59] Albuterol Complaint ¶¶ 3, 85-87; Desonide Complaint ¶¶ 3, 89; Propranolol Complaint ¶¶ 82, 88.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

association meeting where Defendants had the opportunity to discuss pricing and market allocation. *See* Exhibit 1. At least one of the meetings, the NACDS Total Store Expo, was attended by a number of individuals that are directly implicated in anticompetitive communications, including: Heritage's Glazer, Malek, O'Mara, Sather and Edelson; Lannett's Sullivan; Mylan's James Nesta (VP of Sales) and Michael Aigner (Director, National Accounts); Sun's Susan Knoblauch (Sr. Manager of Sales); Aurobindo's Robert Cunard (CEO); and Apotex's Beth Hamilton (VP of Marketing). Daniel Lukasiewicz, then employed by Zydus (and who would later join Heritage and assist in orchestrating various pricing agreements), also attended. Representatives from Actavis, Dr. Reddy's, Glenmark, Par, Perrigo, Sandoz, Taro, Teva and West-Ward also attended the Expo. As discussed below, at least Sather used this meeting as an opportunity to solidify agreements on pricing for multiple drugs.

162.   As was the case in prior months, price increases accompanied these inter-Defendant contacts. By the end of the summer of 2013, Defendants Actavis and Mylan began to implement price increases for Verapamil capsules. Defendants Heritage, Lannett, Mylan and Par were in frequent contact with each other and increased their Doxycycline Monohydrate prices. During the same period, Heritage and Mylan were frequently communicating in order to work out agreements relating to customers and pricing for Doxycycline Hyclate delayed release.

163.   During this time frame Defendants also increased the prices of various other drugs implicated in MDL 2724: Clomipramine (Mylan, Sandoz, Taro); Divalproex (Dr. Reddy's, Mylan, Par, Zydus); Levothyroxine (Lannett, Mylan, Sandoz); and Pravastatin (Apotex, Glenmark, Sandoz, Teva, Zydus and MDL Defendant Lupin).[60] Concurrent with these price increases, Actavis entered the Desonide cream market at the same elevated prices that had

---

[60] Clomipramine Complaint ¶¶ 3, 80, 94; Divalproex Complaint ¶¶ 3, 78-79, 91; Levothyroxine Complaint ¶¶ 3, 73, 89; Pravastatin Complaint ¶¶ 8, 97, 121-22.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

already been implemented by Taro and Perrigo. Actavis, Taro and Perrigo maintained their elevated prices of Nystatin cream and ointment during the period, as well.

164.     Defendants remained in frequent contact between October and December 2013. In that three-month period, Teva and Heritage exchanged 582 text messages or phone calls with Defendants. *See* Tables 3 & 4. Additionally, all but two Defendants attended at least one trade association meeting in the last quarter of 2013 and had an opportunity to further their conspiratorial plans. *See* Exhibit 1.

165.     Following these communications, Defendants implemented another price increase for a Drug at Issue: Acetazolamide tablets (Taro, Lannett). Shortly after meeting at the GPhA Fall Technical Conference at the end of October, Taro and Lannett implemented large, nearly identical and nearly simultaneous price increases for Acetazolamide tablets.

166.     Defendants also raised the prices of two additional drugs implicated in MDL 2724: Benazepril (Mylan, Sandoz) and Digoxin (Lannett, Mylan, Par, West-Ward and MDL Defendant Impax).[61]

167.     Defendants' strategy did not change in the New Year. During the first quarter of 2014, Teva and Heritage contacted Defendants by phone or text 348 times. Teva was involved in the majority of the contacts. *See* Tables 3 & 4.

168.     These communications were accompanied by numerous opportunities for Defendants to meet in person and exchange information. Representatives from every U.S. Defendant (except Glenmark) attended at least one trade association meeting during the first quarter of 2014, including the ECRM Retail Pharmacy Conference, which was attended by a number of Defendant personnel directly implicated in anticompetitive communications:

---

[61] Benazepril Complaint ¶¶ 3, 76, 87; Digoxin Complaint ¶¶ 3, 81, 83.

Heritage's ███████████████████████ Sun's ████████ and Apotex's

████. Representatives from Defendants Actavis, Citron, Dr. Reddy's, Lannett, Mayne, Par,

Perrigo, Sandoz, Taro, Teva, West-Ward and Zydus also attended the conference. *See* Exhibit 1.

169.    Following the price increases at the end of 2013, in January 2014, at least thirteen

high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various

generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey. Executives from

Defendants Actavis, Aurobindo, Dr. Reddy's, Lannett and Sun, among others, attended.

170.    During this time frame (the first quarter of 2014), Defendants imposed another

price increase for a drug implicated in MDL 2724: Baclofen (Lannett, Par, Teva and MDL

Defendant Upsher-Smith).[62] Teva and Par's increases for Baclofen occurred after Teva and Par

communicated at least 34 times during January and February. Par also joined the Digoxin price

increase in this period, and Sandoz joined the Desonide price increase.[63]

171.    Between April 2014 and July 2014,[64] Teva and Heritage had 639 different phone

or text contacts with Defendants. *See* Tables 3 & 4. Teva, Actavis and Zydus were involved in

almost half of those interactions—speaking or texting 259 times over the course of four months.

*See* Table 4. And as Citron prepared to enter the market for numerous drugs, its contacts with

Heritage increased substantially. *See* Table 3. As discussed below, Heritage's communications

involved at least fourteen Drugs at Issue: Acetazolamide, Doxycycline Hyclate, Doxycycline

Monohydrate, Fosinopril-HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin,

Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, and Verapamil.

---

[62] Baclofen Complaint ¶¶ 7, 84.
[63] Digoxin Complaint ¶ 78; Desonide Complaint ¶ 89.
[64] July 2014 is the last month for which the State AGs have publically disclosed evidence of specific phone or text communications between Defendants.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

172.    Defendants advanced their conspiracy through attendance at (at least) four trade association meetings between April and July. *See* Exhibit 1. A number of Defendants' personnel directly implicated in anticompetitive communications attended at least one of these meetings, including: Heritage's Glazer, Sather and O'Mara; Mylan's Nesta, Aigner and Jan Bell (Director National Accounts); Lannett's Sullivan; Sun's Knoblauch; Teva's Patel; Apotex's Hamilton; and Aurobindo's Cunard. *Id.* As discussed below, Heritage's Sather used the May 2014 MMCAP National Member Conference as an opportunity to confirm personally agreements on pricing for Drugs at Issue with Aurobindo (Fosinopril/HCTZ, Glyburide and Glyburide/Metformin), Sandoz (Fosinopril-HCTZ), and Lannett (Doxy Mono). Also during this time, Heritage, Mylan and Mayne coordinated Mayne's entry into the market for Doxycycline Hyclate (delayed release) so as not to erode pricing.

173.    On June 1-4, 2014, Heritage's O'Mara and Sather, Teva's Patel, Mylan's Aigner, and Lannett's Sullivan all attended the HDMA Business and Leadership Conference. Nearly every Defendant had representatives attending this conference. *See* Exhibit 1. On June 3, while at the conference, Heritage's Sather had dinner and drinks with a number of Heritage's competitors at the Sandbar Restaurant, including personnel from Sandoz, Par, and Lannett—likely Tracy Sullivan. In advance of the dinner, one of the attendees, likely Sather, exchanged text messages with someone at Sandoz, who also was attending the meeting, and invited him to the dinner.

174.    Following these trade association meetings, there was a sharp uptick in discussions among competitors. Between June 3 and 10, 2014, an Aurobindo employee had three phone calls with a Sandoz employee and five phone calls and multiple text messages with Glenmark, presumably to discuss pricing on Fosinopril-HCTZ. On June 16, 2014, a different

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Glenmark employee called a different Aurobindo employee and they spoke for twenty-two minutes. As discussed below, these discussions involved pricing agreements for generic drugs.

175.    On August 20, 2014, a Heritage employee exchanged text messages with a Sun employee which described the pricing agreements reached with Actavis for Glyburide-Metformin and Verapamil. Notably, Sun did not market or sell either drug at the time of this communication, thus highlighting the overarching nature of Defendants' conspiracy. Sun needed to be kept apprised of drug-specific agreements between other Defendant co-conspirators—*even for drugs Sun did not sell*—because the efforts of all Defendants to inflate the prices of all Drugs at Issue were interrelated.

176.    Days later, the 2014 NACDS Total Store Expo, which was held from August 23 through 26, was attended by representatives from every U.S. Defendant. A number of individuals directly implicated in anticompetitive communications attended, including from Heritage (Glazer, Malek, O'Mara, Edelson and Sather), Lannett (Sullivan), Mylan (Aigner and Nesta), Sun (Knoblauch), Teva (Patel), Apotex (Hamilton), Aurobindo (Cunard) and Mayne (Gloria Peluso-Schmid, NAM).

177.    Following these meetings and communications, Heritage began to announce price increases. By July, Heritage had announced increases for Fosinopril-HCTZ, Glyburide, Acetazolamide (capsules), Glipizide-Metformin, Glyburide-Metformin, Leflunomide, Nystatin (tablets), Paromomycin, Theophylline and Verapamil (tablets).

178.    Thereafter, multiple Defendants either led or followed price increases for at least five Drugs at Issue: Fosinopril-HCTZ (Aurobindo, Citron, Heritage, Glenmark, Sandoz); Leflunomide (Apotex, Heritage, Teva); Nystatin tablets (Heritage, Sun); Paromomycin

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(Heritage, Sun); and Theophylline (Heritage, Teva). Sandoz re-joined the Nystatin cream market at the elevated prices that already had been imposed by Actavis, Par, Perrigo and Taro.

179.    Defendants also increased the prices of other drugs implicated in MDL 2724 during this time frame: Amitriptyline (Mylan, Par, Sandoz); Clobetasol (Actavis, Perrigo, Sandoz, Taro and MDL Defendants Akorn, Hi-Tech Pharmacal and Wockhardt); Econazole (Perrigo, Taro and MDL Defendant Teligent); Fluocinonide (Actavis, Teva and Taro); Lidocaine-Prilocaine (Sandoz and MDL Defendants Akorn and Impax); and Ursodiol (Actavis, Lannett and MDL Defendant Epic).[65] In addition, Lannett joined the Baclofen price increase during this period.[66]

180.    Defendants' frequent contacts and price increases continued in 2015. Defendants implemented additional price increases for Leflunomide and Verapamil capsules. Defendants also increased the prices of Propranolol tablets, yet another drug implicated in MDL 2724.[67] Prices for the Drugs at Issue remained elevated above competitive levels thereafter.

181.    The price increases implemented by Defendants during the Class Period were not the result of a free market. Rather, these price increases occurred because Defendants engaged in an overarching conspiracy to fix, raise or stabilize prices of the Drugs at Issue. As a result of Defendants' conspiracy, Plaintiffs paid more for Drugs at Issue than they otherwise would have and were harmed by Defendants' anticompetitive conduct.

---

[65] Amitriptyline Complaint ¶¶ 3, 81, 84; Clobetasol Complaint ¶¶ 3, 95, 98; Econazole Complaint ¶¶ 3, 75, 90; Fluocinonide Complaint ¶¶ 3, 86, 89; Lidocaine-Prilocaine Complaint ¶¶ 3, 83; and Ursodiol Complaint ¶¶ 3, 79, 90.
[66] Baclofen Complaint ¶¶ 7, 98.
[67] Propranolol Complaint ¶¶ 83, 112.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### X.   AS PART OF THEIR OVERARCHING CONSPIRACY, DEFENDANTS CONSPIRED TO FIX PRICES, ALLOCATE MARKETS AND/OR RIG BIDS FOR THE DRUGS AT ISSUE

182.    From at least as early as 2011 until the present, Defendants agreed to raise the prices of and allocate the markets for the Drugs at Issue.

183.    Currently available evidence focuses predominantly on Heritage's communications within the industry, but Heritage's communications are just one window into Defendants' overarching conspiracy, which clearly cuts across multiple drugs and inculpates all Defendants. Allegations relating to each of the Drugs at Issue are included below.

#### A.   Nystatin

184.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nystatin as follows:

185.    Nystatin, also known by the brand name Mycostatin®, among others, is a medication used to fight fungal infections. It is produced in multiple formulations, including an external cream, an external ointment, and a tablet.

186.    During the relevant time frame, Defendants Actavis, Par, Perrigo, Sandoz and Taro were the primary manufacturers of Nystatin external cream.

187.    During the relevant time frame, Defendants Actavis, Perrigo and Sandoz were the primary manufacturers of Nystatin external ointment.

188.    During the relevant time frame, the primary manufacturers for Nystatin tablets were Teva, Heritage, and Sun (through Mutual).

#### 1.   Nystatin Cream

189.    In the second half of 2011, Taro, Perrigo, Par, and Actavis all raised the list prices of Nystatin external cream. Taro and Perrigo increased their prices in very close succession in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the late spring of 2011. Par followed the price increase in August, and Actavis joined in November. Sandoz joined the price increase when it re-entered the market in 2013.

190.     As late as 2009, Sandoz enjoyed approximately a 50% market share for Nystatin external cream, Taro had 40%, Perrigo had approximately 7% and Par and Actavis had the rest. Through 2009 and into 2010, Sandoz's market share began to decline. By the summer of 2010, Sandoz was effectively out of the market. By this time, Actavis and Par also were effectively out of the market. Although *de minimis* sales by Sandoz, Actavis and Par appear to have continued, they each had a market share of less than 1% by the spring of 2011. By May 2011, Taro had captured as much as 96% of the Nystatin cream market, leaving Perrigo approximately a 4% share.

191.     In June, Taro initiated a large price increase of more than 600%. Rather than compete on price in order to gain market share, Perrigo almost immediately followed Taro's increase and raised its own prices to nearly identical levels. Perrigo ramped up production and managed slowly to gain some market share over the next two years, but—as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable.

192.     In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price-competition. Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

193.     In November, Actavis ramped up production of Nystatin cream and re-joined the market. It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forgo price competition and the prospect of winning a larger share of the market.

Even a fourth entrant into the Nystatin cream market did not cause prices to erode. Defendants' agreement was working.

194.    Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market. Like Perrigo, Par and Actavis before it, rather than compete on price in order to regain lost market share, Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators. Prices remained stable and elevated even with a fifth seller in the market.

195.    As depicted in the graph below, Defendants' list price increases for Nystatin external cream were almost identical, and once in place the prices remained stable and elevated thereafter.



196.    The graph highlights that after a long period of relatively low and stable pricing for Nystatin external cream, Defendants implemented large, abrupt and nearly uniform price increases. The AWP prices for Defendants' products also were elevated to nearly identical levels.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

197.    No product shortages or other market changes can explain Defendants' price increases. In a competitive generic pharmaceutical market, prices tend to decline as the number of sellers increases. Here, the elevated and stable pricing of Nystatin cream even as multiple sellers joined the market is more consistent with anticompetitive conduct than with competition.

198.    Throughout this period, Defendants had numerous opportunities to coordinate their pricing for Nystatin cream. For example, Defendants had the opportunity to discuss pricing at the ECRM Retail Pharmacy Conference in March 2011, which was attended by representatives from Actavis, Par, Perrigo, Sandoz, and Taro. *See* Exhibit 1.

199.    The next month, in April 2011, right before the price increases began, all Defendant manufacturers of Nystatin cream again gathered. Actavis, Par, Perrigo, Sandoz and Taro attended the NACDS Annual Meeting.

200.    The Nystatin cream manufacturers continued to meet at trade conferences thereafter. For example, leading into and following Sandoz's price increase for Nystatin external cream, Sandoz had multiple opportunities to meet with other Defendants. In April 2013, Sandoz was joined by Actavis, Par, Perrigo and Taro at the NACDS Annual Meeting. Then, in June 2013, representatives from these companies attended the GPhA/FDA CMC Workshop in Bethesda, Maryland. In August, all five Nystatin cream manufacturers converged again at the NACDS Total Expo in Las Vegas. These meetings were also attended by numerous other Defendants.

201.    The elevated prices of Nystatin cream that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more for Nystatin cream than they would have paid in a free and fair market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

202.    The unlawful agreement between Actavis, Par, Perrigo, Sandoz and Taro regarding Nystatin external cream was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### 2.    Nystatin Ointment

203.    Nystatin external ointment prices followed a similar pattern to those of Nystatin external cream. In 2009, Sandoz had captured approximately 75% of the market, while Perrigo had 20% and Actavis 5%. From that point through the summer of 2011, Actavis and Sandoz drastically reduced production until they were effectively out of the market. By the summer of 2010 Actavis had approximately a 0% market share, though *de minimis* sales appear to have continued. By the summer of 2011, Sandoz had approximately a 5% market share.

204.    In June 2011, after Sandoz and Actavis had all but ceded the Nystatin ointment market, Perrigo implemented a large price increase—more than 300%.

205.    Five months later, Actavis ramped up production of Nystatin ointment. Rather than undercut Perrigo's elevated price in order to gain market share, Actavis hiked its list prices to nearly identical levels as Perrigo. As intended by the overarching "fair share" agreement among Defendants, the list prices and AWP price for Nystatin ointment remained virtually unchanged, even with the addition of a new seller in the market place.

206.    In the summer of 2012, the pattern repeated itself. Sandoz ramped up its production of Nystatin ointment in June. Rather than compete on price to regain its lost market share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis. Even with a third market participant prices remained unchanged, just as devised by Defendants' agreement.

207.    As depicted in the graph below, Defendants' list price increases for Nystatin ointment were almost identical, and once in place the prices remained stable and elevated.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



208.    The graph highlights that after a long period of relatively low and stable pricing for Nystatin ointment, Defendants implemented abrupt and nearly uniform price increases of more than 300%. The AWP prices for Defendants' products also were elevated to nearly identical levels.

209.    No product shortages or other market changes can explain Defendants' price increases. The pricing conduct here is not consistent with competitive behavior. As multiple sellers enter the market, economic theory predicts that prices should decline. Yet, Nystatin ointment prices remained unchanged, which suggests an anticompetitive agreement among Defendants.

210.    Again, Defendants had the opportunity to discuss pricing of Nystatin external ointment at numerous industry events during the relevant period. For example, all Defendant manufacturers of Nystatin ointment attended the ECRM Retail Pharmacy Conferences and the NACDS Annual Meetings in 2011 and 2012 (in addition to other meetings). *See* Exhibit 1.

65

211.    The elevated prices of Nystatin ointment that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

212.    The unlawful agreement between Actavis, Perrigo and Sandoz regarding Nystatin external ointment was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### 3.    Nystatin Tablets

213.    In 2010 and 2011, the Nystatin oral tablet market was split between Teva and Sun.[68] Teva held approximately 60% of the market, while Sun held 40%. During that time, Teva and Sun had nearly identical list prices for their Nystatin tablets.

214.    In the summer of 2012, Heritage entered the market. Rather than price its Nystatin tablets below that of the incumbent sellers, Heritage identically matched the list prices of Teva and Sun, consistent with the "fair share" agreement between them.

215.    As Heritage ramped up production, it reached out to Teva and Sun, and in April 2013, Sun, Heritage, and Teva began discussing pricing for Nystatin tablets. By this point in time, Sun had accumulated a larger share of the market. Defendants therefore devised a plan to reallocate the shares.

216.    Sun would implement a large price increase. After Teva and Heritage obtained their "fair share" of the market, they would join Sun's price increase. On April 15, 2013, Sun more than doubled its price for Nystatin tablets. Sun, Teva and Heritage had ongoing communications both before and after this increase. The day after Sun increased its Nystatin

---

[68] Sun marketed and sold Nystatin tablets during the relevant period at least in part through its subsidiary, Mutual.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices, Sun Sr. Sales Manager Knoblauch called Heritage's NAM Sather and they spoke for forty minutes.

217.    Knoblauch and Sather regularly communicated throughout the summer of 2013. For example, both Sather and Knoblauch attended the NACDS Total Store Expo in August 2013. This trade association meeting, which also was attended by representatives from every U.S. Defendant except Mayne, provided an opportunity to meet in person and exchange competitive information. *See* Exhibit 1.

218.    In June 2013, Teva began internally discussing price increases for Nystatin tablets, and contemplating when would be the appropriate time to join Sun's elevated prices. But Teva needed to coordinate with Heritage.  Accordingly, on July 9, 2013, Teva's Patel called Heritage's Malek and they spoke for twenty-one minutes. Malek knew Patel from her previous work at AmerisourceBergen. They spoke throughout July—with a nearly ten minute call on July 23 and two calls on July 30. The second call on July 30 lasted more than twelve minutes.

219.    While Heritage's Malek was speaking with Patel at Teva, Heritage remained in contact with Sun. On July 30—the same day Malek spoke with Teva's Patel twice—Malek also spoke to Sun for nearly eleven minutes.

220.    As these conversations continued, in late July 2013 Teva placed Nystatin tablets on its list of potential price increases.

221.    Similarly, throughout August 2013, Malek sent internal Heritage emails discussing drugs targeted for a price increase. Nystatin tablets were identified as one of those drugs.

222.    Discussions between Heritage and Teva about a Nystatin price increase were temporarily tabled while Teva's Patel went on maternity leave on August 12, 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

223.    On February 4, 2014, Teva's Patel contacted Heritage's Malek for the first time since she went on maternity leave in August 2013. Malek returned her call the next day and the two spoke for more than an hour. Upon information and belief, they discussed a price increase for at least the drugs Nystatin and Theophylline. Teva had been considering price increases for both drugs since early 2014.

224.    Three days after that, on February 7, an unidentified employee of either Heritage or Teva created a spreadsheet identifying Nystatin and Theophylline as candidates for price increases. Heritage's Malek and Teva's Patel continued discussing the possibility of such increases.

225.    Throughout February and March 2014, Heritage's Malek and Teva's Patel had a series of phone calls discussing price increases for multiple drugs, including at least the pricing of Nystatin and Theophylline.

226.    Following these discussions, Teva implemented a price increase for Nystatin tablets with an effective date of April 4, 2014. The increase more than doubled Teva's list price to a price nearly identical to Sun's.[69]

227.    The early success in coordinating with Sun and Teva on Nystatin oral tablets emboldened Malek. During the week of April 14, 2014, he met with two Heritage employees and asked them to start analyzing the impact of price increases for numerous generic drugs, including at least thirteen Drugs at Issue: Acetazolamide, Doxycycline Monohydrate, Fosinopril-HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline and Verapamil.

---

[69] Concurrent with this increase, Teva also implemented price increases for Theophylline.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

228.    Before introducing the market-wide price increases to the rest of his sales team, Malek continued to communicate with Patel at Teva. On April 15, 2014, Heritage's Malek had a seventeen-minute phone conversation with Patel, discussing at least seven different Drugs at Issue: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline.

229.    As Malek and Patel had already agreed in February, Teva would lead the price increases for Nystatin and Theophylline.

230.    During their conversation, Malek and Patel agreed that if Heritage increased prices for the other five Drugs at Issue—Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, and Leflunomide—Teva would increase its prices for these drugs, or at a minimum, would not offer lower prices to any of Heritage's customers.

231.    Heritage's Malek and Teva's Patel spoke several times over the next several months to confirm their agreements on Nystatin and other drugs. Malek also kept Patel updated on the progress of Heritage's proposed price increases.

232.    What began as a discussion about a single Drug at Issue—Nystatin oral tablets—expanded into an agreement relating to (at least) seven Drugs at Issue. And, in addition to Heritage and Teva, these seven Drugs at Issue also were marketed and sold during the Class Period by Defendants Actavis, Apotex, Aurobindo, Citron, Mylan, Sun and Zydus, each of which was brought into the relevant drug-specific agreements. This expansion—from two manufacturers agreeing on a single drug to multiple manufacturers agreeing across numerous drugs—was typical of the overarching conspiracy among all Defendants, and a natural outgrowth of their efforts to raise the prices of all Drugs at Issue. As demonstrated in the *quid pro quo*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

arrangements between Heritage and Teva, the various drug-specific agreements were interrelated and part of an overarching agreement to eliminate competition for the Drugs at Issue.

233. On April 22, 2014, Heritage's Malek held a teleconference with his sales team. On the call, Malek dictated a price increase strategy for the thirteen Drugs at Issue identified above to Heritage's NAMs. Prior to the conference call, Malek circulated a spreadsheet to his sales team, which identified each drug slated for a price increase, the competitors for each drug, and their respective market shares.

234. This call set off a chain of pricing and market allocation discussions between Defendants and resulted in numerous drug-specific agreements. Members of Heritage's sales team were assigned to specific competitors for whom they had primary, but not exclusive, responsibility for communicating with about pricing and market share. Malek personally took responsibility to communicate with Defendants Teva and Zydus, as well as co-conspirator Ascend. Anne Sather was assigned to Sun to reaffirm the agreement on Nystatin.[70] She also was assigned Actavis and Lannett. Her Heritage colleagues, Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara were responsible for pricing discussions with four other Defendants.

235. Heritage's Sather was responsible for communicating with Sun about the agreed upon price increase for Nystatin tablets. On April 22, 2014, the same day Heritage held an internal meeting with its sales team to discuss a number of prices increases, Sather and Sun's Knoblauch spoke for more than forty-five minutes and agreed to increase the prices of numerous drugs, including, Nystatin tablets. With respect to Nystatin, by this time, Sun already had raised

---

[70] Sather also spoke with Sun about Paromomycin and spoke with Actavis to confirm agreements on Glyburide-Metformin and Verapamil and with Lannett to confirm agreements on Doxy Mono.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

its price and Teva had just announced that it was matching that price increase. Sather and Knoblauch reaffirmed that Heritage, too, would follow the Nystatin price increase.

236.    Sather emailed Heritage's Glazer, Malek, Edelson, Rich Smith, and O'Mara immediately after her conversation with Knoblauch to report the agreements with Sun. Glazer immediately responded to Sather, instructing her not to put this type of information in writing. He then contacted her using his cell phone.

237.    During this time frame, Glazer directed Malek to call G.P. Singh, the President of Sun, to get further confirmation of Sun's pricing intentions. Ultimately, Malek decided not to reach out to Singh, whom he had never met.

238.    Four days later, however, on April 26-29, 2014, Glazer attended the NACDS Annual Meeting where he had the opportunity to meet in person with G.P. Singh from Sun, as well as with representatives from Teva and nearly every other U.S. Defendant. *See* Exhibit 1.

239.    On or about May 8, Malek requested an update on the status of Sather's negotiations with competitors. Sather confirmed her agreement with Sun.

240.    On or about May 9, Heritage had an internal call to discuss the status of the proposed price increases. Nystatin tablets were slated for a 95% increase.

241.    On June 23, the Heritage sales team had a meeting where they discussed the specific percentage amounts they would seek to increase on certain Drugs at Issue and their strategy for doing so. Malek proposed increases of:

    (a)    Acetazolamide—75%.

    (b)    Fosinopril-HCTZ—200% effective July 1, 2014.

    (c)    Glipizide-Metformin—100% effective July 1, 2014.

    (d)    Glyburide—200% effective July 1, 2014.

71

    (e)      Nimodipine—48%.

    (f)      Nystatin—95%.

    (g)      Paromomycin—100%.

    (h)      Theophylline—150%.

242.    One Heritage employee's notes about the June 23 call indicated that Heritage needed to promptly increase its Nystatin WAC price because Teva already had done so.

243.    Heritage had one final internal call to discuss price increases, including the price of Nystatin tablets on June 25, 2014. While still participating in this internal call about pricing, Heritage's Sather exchanged text messages with Sun's Knoblauch, informing her of the details of Heritage's anticipated price increases.

244.    Similarly, on June 25, Malek had a fourteen minute call with an individual—likely Teva's Patel—in which he reported that Heritage's price increase notices would be mailed on June 26 for Nystatin tablets and several other drugs for which Heritage and Teva had agreed to raise prices.

245.    On June 26, 2014, Heritage began telling its customers that it was increasing its prices for nine drugs, including Nystatin tablets.[71] By July, among the other price increases it implemented, Heritage increased its Nystatin oral tablet list prices to the identical level of Teva (and nearly identical to Sun). This impacted Heritage's customers nationwide.

246.    In accord with their agreement, Teva did not undercut Heritage's prices, even when approached by large potential customers. For example, on July 8, 2014, a large retail customer emailed a Teva representative asking for a quote for Nystatin tablets because it recently

---

[71] Heritage issued prices increase letters for (1) Acetazolamide; (2) Fosinopril-HCTZ; (3) Glipizide-Metformin; (4) Glyburide; (5) Leflunomide; (6) Nimodipine; (7) Nystatin; (8) Paromomycin; and (9) Theophylline.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

was notified of a large price increase from its current supplier. Teva either did not provide a bid or provided a cover bid that allowed Teva and Heritage to maintain their anticompetitive agreement.

247. The price increases of approximately 100% initiated by Sun and joined by Teva and Heritage occurred after a long period of relatively low and stable pricing for Nystatin tablets. The AWP prices for Defendants' products also were elevated to nearly identical levels. These prices remained stable and elevated above competitive levels thereafter.

248. No product shortages or other market changes can explain Defendants' abrupt and nearly identical price increases.

249. The elevated prices of Nystatin oral tablets that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

250. The unlawful agreement between Teva, Sun and Heritage regarding Nystatin oral tablets was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### B.    Nimodipine

251. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nimodipine as follows:

252. Nimodipine, also known by the brand name Nymalize®, is a calcium channel-blocking agent used to reduce problems caused by a bleeding blood vessel in the brain.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

253.    In June 2012, Teva was preparing to exit the market for Nimodipine.[72] This exit would leave Heritage and Sun[73] as the only manufacturers of Nimodipine. Heritage wanted to use Teva's exit as a cover to raise Nimodipine prices.

254.    Pricing discussions with competitors were part of Defendants' "toolkit" for achieving and maintaining elevated prices on Drugs at Issue, and Defendants understood that to maintain market share and increase prices they needed to "play fair." With this in mind, Heritage devised a plan to approach Sun.

255.    Heritage's Malek understood that Nimodipine price increases would need to be "socialized" with competitors, by which he meant that direct outreach to other manufacturers was necessary in order to coordinate and implement a market-wide price increase. To "socialize" a Nimodipine price increase, Malek instructed NAM Sather to reach out to Sun to discuss whether it would agree to raise prices.

256.    At Malek's direction, Ann Sather contacted Sun—most likely Knoblauch. Heritage's Sather exchanged numerous text messages and had multiple phone calls with her contact throughout June 2012. These conversations between Heritage and Sun were successful. The ostensible competitors reached an agreement ***not*** to compete; their goal was to raise prices.

257.    Ultimately, Teva never completely exited the market for Nimodipine, yet it did reduce its sales to a very small share, and ceded the market to Sun and Heritage.

258.    Sather kept Malek apprised of her negotiations with Sun, including through a June 28, 2012 email discussing the status of the agreement on Nimodipine between Heritage and Sun.

---

[72] Teva marketed and sold Nimodipine during the relevant period at least in part through its subsidiary, Barr.

[73] Sun marketed and sold Nimodipine during the relevant period at least in part through its subsidiary, Caraco.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

259.    That same day, Sather sent an analysis of a Cardinal RFP to Malek, Glazer and other Heritage employees. Sather noted that Heritage would submit a bid at an artificially high price which would allow Sun to retain Cardinal's business. Heritage informed Sun about the pricing before submitting to Cardinal. This information allowed Sun to retain Cardinal's business at a price that was higher than it would have been in a competitive market.

260.    On July 20, 2012, another employee at Heritage circulated proposed pricing in response to the Cardinal RFP, which, upon information and belief, quoted pricing at a level lower than Sun. Malek responded the same day and exchanged emails with a Heritage employee (possibly Keith Fleming) about Heritage's pricing on Nimodipine and Heritage's agreement on pricing with Sun. Around the same time, Sather and her contact at Sun were also discussing at least Nimodipine.

261.    Heritage's Sather and Sun's Knoblauch communicated by text and phone over the next few weeks. They also met in person at an industry event.

262.    Through these communications, at the end of July, Heritage and Sun reaffirmed their agreement to raise prices and allocate the market for Nimodipine. As part of this understanding, as it had in June, Heritage again agreed to provide a cover bid to Cardinal.

263.    As a result of Heritage's cover bid, Sun retained its business with Cardinal, and both Heritage and Sun were able to maintain Nimodipine prices above the competitive level.

264.    In September 2012, after Cardinal awarded Sun its Nimodipine business, Sun began to experience supply issues with its Nimodipine.

265.    In October 2012, Cardinal approached Heritage asking for a new bid because it was concerned about Sun's supply chain. Although Sun never fully exited the market, its sales of Nimodipine declined to a small share.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

266.    Sather immediately emailed Heritage's Malek, Glazer and Fleming to apprise them of Cardinal's request. Given the circumstances, Sather felt that responding to Cardinal's request for an RFP did not violate Heritage's agreement with Sun because Cardinal was coming directly to Heritage.

267.    Sather proposed that Heritage respond to Cardinal's request consistent with a price increase it had recently imposed on a different wholesaler. Sather believed that Heritage could offer a higher price and still win the business from Cardinal because she had received Sun's Cardinal pricing from her contact at Sun. Sather also shared information she had learned at the earlier trade conference, which, consistent with industry practice, presumably involved competitive market information.

268.    Heritage's Sather confirmed her understanding that Heritage could submit a bid to Cardinal without violating its agreement with Sun when she spoke with Sun's Knoblauch for thirty-eight minutes the next day.

269.    Heritage continued to monitor when Sun would reenter the Nimodipine market. Malek emailed Sather on December 17, 2012 about Sun's supply issues. In response to Malek's email, Sather reached out to her contact at Sun and kept Malek informed about her conversations.[74]

270.    On April 16, 2013, Sather reported to Malek that Sun was not pursuing Nimodipine customers because it did not know when its product would be available.

271.    Heritage's Malek responded to this information by expressing his willingness to continue Heritage's pricing and market allocation agreement with Sun when Sun reentered the Nimodipine market.

---

[74] During this same time period, Sun (along with Actavis and West-Ward) increased prices on Doxycycline. Doxycycline Complaint ¶ 85.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

272.    Heritage's Sather continued speaking with Sun's Knoblauch to assess when Sun might reenter the Nimodipine market. When they spoke on May 23, 2013, Sather learned that Sun might be returning to the Nimodipine market in June or July. Sather immediately reported this development to Malek, and the two exchanged emails about pricing for Nimodipine.

273.    Ultimately, Sun decided not to reenter the Nimodipine market. In the spring of 2013, Heritage more than doubled the price of Nimodipine capsules and maintained this inflated price for the duration of the Class Period.

274.    When Heritage's Malek learned that Ascend was planning to enter the Nimodipine market in April 2014, he immediately began the process of trying to contact Ascend and bring them into the "fair share" agreement.

275.    On April 8, 2014, Malek informed his staff that Ascend would be entering the Nimodipine market and personally took responsibility for coordinating with Ascend. Malek had met John Dillaway, the Executive Vice President of Ascend, in February 2013, and he used that connection as a way to reach out to Dillaway through LinkedIn. The two executives communicated frequently through LinkedIn in the weeks leading up to April 22.

276.    As discussed above, during an April 22, 2014 Heritage teleconference, Malek identified numerous drugs that were slated for a price increase, including Nimodipine.

277.    On April 22, Dillaway and Malek spoke on the phone about Ascend's entry into the Nimodipine market for nineteen minutes.

278.    Concurrently with Malek's discussions with Ascend, Malek and the rest of Heritage's sales teams were involved in large-scale outreach to Defendants to increase prices for numerous generic drugs.

279.     As part of a May 9 internal conference call about industry-wide price increases for at least nine drugs,[75] Heritage discussed allocating customers to co-conspirators as part of the agreements, including, but not limited to, the potential allocation of certain customers to Ascend as part of the efforts to raise or maintain prices on Nimodipine.

280.     On June 6, 2014, Heritage's Malek emailed Ascend's Dillaway trying to arrange a phone call to discuss Nimodipine. When they were unable to connect by phone, they planned to meet at the NACDS Total Store Expo in Boston in August to solidify their agreements.

281.     As discussed above, during a conference call on June 23 with the Heritage sales team, the targeted percentage price increases for eight drugs were discussed, including Nimodipine, which was slated for a 48% increase.

282.     Three days later, on June 26, Heritage began telling customers that it was increasing prices for nine different drugs, including Nimodipine. Price increase notices were issued on the same date.

283.     Although Ascend ultimately did not enter the Nimodipine market, had it done so, it would have entered at a collusive price as agreed upon with Heritage. Further, Heritage would have walked away from certain customers to allow Ascend to build its market share.

284.     The elevated prices of Nimodipine that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

285.     The unlawful agreement between Heritage and Sun regarding Nimodipine oral tablets was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

---

[75] The Heritage sales team discussed at least Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, Fosinopril-HCTZ, and Glyburide.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

C.    **Doxycycline Hyclate**[76]

286.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Doxycycline Hyclate as follows:

287.    Doxycycline Hyclate is a tetracycline-class antimicrobial used to treat a wide variety of bacterial infections. This medication is also used to prevent malaria. Doxycycline Hyclate is produced in a regular-release formulation ("Doxy RR") and in a delayed-release formulation ("Doxy DR").

1.    **Doxy RR**[77]

288.    Sun, Actavis, and West-Ward, as well as late entrants Mylan and Par, were the dominant market players for Doxy RR during the Class Period.

289.    Throughout 2012, Sun, Actavis, West-Ward, Par, and Mylan attended a number of trade events where they met and discussed the pricing of Doxycycline Hyclate.

290.    In late 2012, during the period in which Heritage and Sun were intensely communicating and coordinating pricing for Nimodipine (as discussed above), including at trade events, Sun imposed dramatic price increases on its Doxy RR products.[78] West-Ward and Actavis quickly followed suit.[79]

---

[76] Plaintiffs incorporate by reference the allegations included in their existing Doxycycline Complaint and do not repeat those allegations here. As noted above, *supra* footnote 17, although the allegations in their Doxycycline Complaint relate to and are a part of the overarching conspiracy alleged herein, given the advanced procedural posture of that case, Plaintiffs propose for the sake of judicial efficiency to keep that case on an individual track at least until motions to dismiss are resolved.

[77] With respect to Doxy RR, all of the relevant facts known to Plaintiffs are included in the Doxycycline Complaint and only a brief summary of those allegations is included here.

[78] Doxycycline Complaint ¶¶ 84-85.

[79] Doxycycline Complaint ¶¶ 84-88.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

291.    The price increases were abrupt, very substantial, nearly identical and nearly simultaneous. Within a two week period, Sun, West-Ward and Actavis raised the list (WAC) prices on their Doxy RR products by more than 2000%.[80] ████████████████████

████████████████████████████████████████[81]

292.    The dramatic price increases followed a period of relatively low and stable pricing for Doxy RR. No shortages or other market changes can explain the extraordinary price increases imposed by Sun, West-Ward and Actavis.[82]

293.    Defendant manufacturers of Doxycycline Hyclate continued to meet regularly at trade events after the initial price hikes. *See* Exhibit 1.

294.    When Defendants Par (through DAVA) and Mylan entered the market, rather than undercut pricing of the incumbent manufacturers, they priced their Doxy RR at similarly elevated prices, consistent with Defendants' "fair share" agreement.[83]

295.    The elevated prices of Doxy RR that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

296.    The unlawful agreement between Sun, Actavis, West-Ward, Mylan, and Par regarding Doxy RR was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

---

[80] Doxycycline Complaint ¶¶ 89-90.

[81] Doxycycline Complaint ¶¶ 84-88.

[82] Doxycycline Complaint ¶¶ 97-105.

[83] Doxycycline Complaint ¶¶ 126-30.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 2.    Doxy DR[84]

297.    Mylan and Heritage were the dominant market players for Doxy DR during much of the Class Period. Mayne entered the Doxy DR market in 2014.

298.    Heritage began selling Doxy DR on July 2, 2013. At the time, Mylan was the only other seller of generic Doxy DR.

299.    Even before entering the market, Heritage contacted Mylan about refraining from price competition. Heritage did not want Doxy DR prices to erode when it entered the market. Mylan also wanted to maintain its prices. Consistent with their overarching "fair share" agreement, both Heritage and Mylan understood that cooperation and coordination was required to keep Doxy DR prices high.

300.    In April 2013, Heritage's Glazer and Malek traveled to India to meet with two Emcure executives, CEO Mehta and President Thapar. The purpose of the trip was to discuss Heritage's plans to enter the Doxy DR market. These meetings included discussions about how to coordinate with Mylan so as to minimize the competition between the two companies for Doxy DR.

301.    During these discussions, it was decided that in order to work out an agreement between Heritage and Mylan relating to (at least) Doxy DR, Mehta would reach out to Defendant Rajiv Malik, a high-level counterpart at Mylan, in order to facilitate communication between Glazer and Malek and their Mylan counterparts.

---

[84] Since the filing of their Doxycycline Complaint, Plaintiffs have learned significant additional facts about Defendants' anticompetitive conduct relating to Doxy DR. In Plaintiffs' opposition to Defendants' motion to dismiss that complaint, Plaintiffs cite and rely on new allegations included in the State AG Complaint, of which this Court may take judicial notice. *See* Case No. 2:16-DX-27242-CMR, Doc. 312 at 2, n.3. These new facts are alleged below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

302.    After returning to the U.S., on or about May 3, 2013, Heritage's Malek tried to set up a call with the Vice-President of Sales at Mylan. Malek learned, however, that the Vice-President of Sales had little to do with National Accounts and was instead directed to the person at Mylan who did have responsibility for such accounts. On information and belief, that person was Jan Bell, who was a Senior Key Account Manager at Mylan from September 2010 to January 2013 and has served as Director of National Accounts at Mylan since January of 2013.[85] Malek promptly contacted Bell through LinkedIn. Malek and Bell communicated by phone on multiple occasions and continued to communicate about various drugs, including Doxy DR.

303.    While Malek was in contact with Bell, other Heritage employees began reaching out to their counterparts at Mylan to discuss Doxy DR and other drugs.

304.    For instance, beginning on or about May 7, 2013, Glazer emailed Mylan's President and Executive Director, Defendant Malik. He copied both Mehta and Thapar at Emcure on the email. Malik responded with a phone number where he could be reached in England, and the two spoke the next day.

305.    During their May 8 telephone conversation, Heritage CEO Glazer and Mylan President Malik reached an agreement to refrain from competing in the Doxy DR market.

306.    Glazer told Malik that Heritage intended to pursue two of Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively made up 30% of the market. Glazer further told Malik that Heritage wanted to gain market share without lowering the pricing of Doxy DR. After numerous discussions, Malik reached an agreement with Glazer wherein Mylan agreed to give up its accounts with McKesson and CVS based upon Mylan's understanding that Heritage would work with Mylan to keep the prices of Doxy DR elevated.

---

[85] *See* Bell LinkedIn Profile, *available at* https://www.linkedin.com/in/jan-bell-51a3135/.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

307.    In the course of his communications with Glazer, Malik made clear that Mylan was willing to enter into this agreement relating to Doxy DR because Heritage had, in the past, abided by its "fair share" agreements with Mylan on other drugs.

308.    Malik told Glazer that he would inform others at Mylan about their agreement. Glazer also kept Heritage's Malek informed about his conversations with Mylan.

309.    In the months following Malik and Glazer's agreement, Mylan surrendered the McKesson and CVS accounts to Heritage.

310.    By allocating the McKesson and CVS accounts in the Doxy DR market, Mylan and Heritage were able to stabilize Doxy DR prices across the market. In a competitive market, Heritage's entry would have spurred price competition across all customers, which would have lowered market prices. By foregoing this competition, Mylan and Heritage kept Doxy DR prices higher than they otherwise would have been.

311.    As discussed above, beginning in July 2013 and continuing through July 2014, Heritage had at least 513 different contacts with various generic drug manufacturers about the pricing of Drugs at Issue, including Doxycycline Hyclate.

312.    Defendants also had the opportunity to discuss Doxy DR and other drugs while attending a number of industry meetings. *See* Exhibit 1.

313.    Following a number of spring and summer trade meetings in 2013, a series of inter-competitor communications led to anticompetitive agreements relating to multiple Drugs at Issue. For example, on June 11, 2013, an employee from Mylan (possibly Aigner or Nesta) called an employee at Heritage (possibly O'Mara). They spoke for ten minutes. Immediately after the telephone call, the Heritage employee called Malek and left a voicemail providing a report. Malek called the employee back fifteen minutes later and they spoke for seven minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

That same day, Heritage also was in contact with other generic drug manufacturers, who in turn communicated with other Defendants, including Par and Mylan. The next day, while Defendants were also discussing pricing for at least Doxy DR, Lannett, consistent with the conspiratorial agreement discussed below, increased the prices for Doxy Mono.

314.    On June 18, 2013, a senior manager at Wholesaler A (believed to be McKesson) contacted a Mylan employee to inform him that Wholesaler A received an unsolicited bid for Doxy DR from a new entrant (Heritage). Mylan was asked to submit a bid by the close of business on June 21, 2013 to retain the business with the wholesaler. Consistent with its agreement to cede its Doxy DR business to Heritage, Mylan failed to submit a counterbid.

315.    On June 27, 2013, following Mylan's failure to bid, Heritage entered into a distribution agreement with Wholesaler A for Doxy DR.

316.    The conversations among Defendants continued throughout 2013. In July 2013, when Heritage began selling Doxy DR, Heritage contacted Mylan three times and Sun once. Heritage spoke with Mylan once and Sun twice in August; spoke with Sun once in October; and with Mylan once in November.

317.    On July 8, 2013, Heritage submitted a proposal to a pharmacy (believed to be CVS) to obtain Doxy DR business. The next day, the pharmacy rejected the proposal as too high. Heritage submitted a revised bid to the pharmacy on July 11, 2013. During this time, Heritage and its parent, Emcure, continued to communicate with Mylan to make sure Mylan was committed to their Doxy DR agreement.

318.    As part of this effort, Emcure's Mehta spoke to Mylan's Malik on July 18, 2013. Information about the call was communicated to Glazer by an Emcure employee shortly after Mehta and Malik spoke.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

319.    In response, Glazer emailed Malik trying to schedule a phone call that day. Malik told Glazer they could speak in the evening, and later that evening, Malik left Glazer a voicemail. Fifteen minutes later, Glazer returned Malik's call and they spoke for four minutes. During the call, Glazer informed Malik of Heritage's strategy with respect to at least Doxy DR and its bid to the pharmacy.

320.    In response to their conversation, Malik immediately spoke to certain Mylan employees, and ultimately, Mylan would walk away from the pharmacy customer in order to avoid price erosion.

321.    In August 2013, Mylan was contacted by an executive at the pharmacy and was told that the pharmacy had received an unsolicited bid for Doxy DR. Mylan was given a chance to submit a counterbid. In response, Mylan submitted a bid that it knew would not be low enough to retain the business. When Mylan was given a second opportunity to lower its pricing, Mylan failed to submit a revised bid, consistent with its agreement with Heritage. In September 2013, the pharmacy awarded its Doxy DR business to Heritage.

322.    The business obtained from Wholesaler A and the pharmacy accounts for more than 80% of Heritage's Doxy DR business. Heritage maintains that business to this day.

323.    After Heritage obtained the pharmacy's business, on several occasions Heritage walked away from other Mylan customers in order to maintain the agreement with Mylan.

324.    For example, in November 2013, Heritage did not pursue a large account, believed to be Walmart, because it was Mylan's customer and was not allocated to Heritage.

325.    When Mayne prepared to enter the Doxy DR market, anticompetitive conversations continued. On January 7, 2014, about a month before Mayne's entry into the Doxy DR market, an employee at Mayne and Heritage's Sather had a 12 minute telephone

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conversation about agreeing not to compete in the market for Doxy DR. These conversations continued throughout early 2014, with the Heritage employee, believed to be Sather, continuing to communicate with the Mayne employee, believed to be Gloria Peluso-Schmid,[86] via text messages, email, and including telephone conversations on March 13 and 17. The Heritage employee emailed and texted Malek, providing him with the information on Mayne's market share and strategy that she had obtained. The shared goal of Heritage and Mayne was to maintain pricing within the Doxy DR market.

326.    After Mayne entered the market, it initially avoided competing with Heritage and instead targeted customers of Mylan. In one such instance, Mayne made a bid to a large wholesaler where Mylan was the incumbent provider and the wholesaler asked Heritage to also submit a bid. Heritage declined, honoring its on-going agreement with Mylan, and provided a false, pretextual reason (inadequate supply) to the wholesaler. Malek knew Heritage had sufficient supply of Doxy DR to fulfill the bid, but instructed Heritage not to submit a bid in order to honor Heritage's agreement with Mylan.

327.    In March 2014, Sather continued to communicate with her contact at Mayne about Doxy DR, speaking briefly via telephone on March 13 and again on March 17 for seventeen mintues.

328.    At the end of March, Mayne presented a bid to one of Heritage's nationwide pharmacy accounts. This led to telephonic, e-mail and text discussions between Mayne and Heritage over the next several months, including on April 1, 2014, when Heritage's Sather and a

---

[86] The Director of National Accounts for Mayne at the time was Gloria Peluso-Schmid, who has held that position since November 2012. *See* Peluso-Schmid LinkedIn Profile, *available at* https://www.linkedin.com/in/gloria-peluso-schmid-72770817.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Mayne employee spoke for twenty-seven minutes. After the call, Sather and Malek exchanged text messages, likely about the substance of the conversation.

329.    Sather and a Mayne employee spoke again the next day for eleven minutes. The same day, Malek emailed CEO Glazer to provide an update on negotiations with Mayne. Sather and a Mayne employee spoke for three minutes on April 9, 2014 and the next day they exchanged multiple text messages. Sather reported these conversations to employees of Heritage, including at least Malek.

330.    Ultimately, because of the agreement between Heritage and Mayne not to compete in the market for Doxy DR, Heritage was able to retain the pharmacy customer at prices higher than they would have been in a competitive market.

331.    In May 2014, it was Mayne's turn. Instead of competing on price, Heritage walked away from a customer being pursued by Mayne.

332.    Similarly, in August 2014, consistent with its agreement with Mylan, Heritage again refused to bid on an RFP issued by a Mylan customer.

333.    In November of 2014, Mayne made offers to the One Stop Program of McKesson Corporation ("McKesson") (a wholesaler) and Econdisc Contracting Solutions ("Econdisc") (a group purchasing organization ("GPO") that includes Express Scripts, Kroger, and Supervalu). Malek contacted personnel at Mayne to discuss the situation and raised the idea that Heritage and Mayne could allocate customers by having Mayne withdraw its offer to McKesson. Malek worked out an agreement with Mayne by November 25, 2014, which Glazer subsequently confirmed. Follow up communications occurred in December 2014 by text message and an in-person meeting at a conference of the American Society of Health-System Pharmacists held on December 9, 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

334.    The agreement resulted in elimination of price competition and higher prices for Doxy DR. When Econdisc put its business out for bid again in January 2015, Heritage deliberately bid a higher price than Mayne, fulfilling its agreement to walk away from the Econdisc business. Likewise, when Heritage was requested to submit a bid by a large nationwide pharmacy chain in September of 2015, it declined to do so after learning that Mayne was the incumbent supplier.

335.    The agreements between Mylan, Heritage and Mayne described herein caused prices for Doxy DR to be higher than they would have been in a truly competitive market and prevented price erosion that might have occurred in such a market.

336.    The elevated prices of Doxy DR that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

337.    The unlawful agreement between Heritage, Mayne and Mylan regarding Doxy DR was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### D.    Doxycycline Monohydrate

338.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Doxycycline Monohydrate as follows:

339.    Doxycycline Monohydrate ("Doxy Mono"), also known by the brand names Acticlate® and Monodox®, among others, is an oral medication used to treat a wide variety of bacterial infections. Doxy Mono is a tetracycline antibiotic, and is also used to prevent malaria.

340.    During the relevant time frame, Heritage, Lannett, Mylan, and Par were the dominant market players for Doxy Mono tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

341.    In February 2013, Heritage believed that demand for some doxycycline products was increasing, and wanted to use this as a pretext to raise the prices of Doxy Mono. Accordingly, Heritage began reaching out to Lannett, Mylan, and Par to institute a price increase for Doxy Mono. These pricing discussions occurred at the same time as Heritage and Dr. Reddy's were discussing pricing and market share for Zoledronic Acid and Meprobamate, as discussed below.

342.    Starting in March 2013, Heritage's Sather began communicating with Lannett about pricing for at least Doxy Mono. On March 7, 2013, Heritage's Sather spoke to Lannett's Sullivan for fourteen minutes about an opportunity Heritage had at Cardinal (a large purchaser).

343.    Six days later, on March 13, 2013, Sather sent an email to Lannett's Sullivan about pricing for at least Doxy Mono. They spoke for five minutes later the same day, again about pricing.

344.    On March 21, 2013—the same day that Malek instructed O'Mara and Edelson to seek a price increase on Meprobamate from Dr. Reddy's (discussed below)—Malek decided he also wanted to increase the price of Doxy Mono by four times the current price. He consulted with Glazer about the price increase.

345.    On March 25, 2013, a Lannett employee—likely Tracy Sullivan—sent an email to her boss at Lannett to provide an update on her conversations with Heritage about price increases for certain drugs, including Doxy Mono. Lannett's Sullivan and Heritage's Sather communicated about Doxy Mono by phone, text message, and in-person meetings over the next several months.

346.    That same day, Malek sent an email to his sales team discussing Heritage's price increases for at least Doxy Mono and another drug—likely Meprobamate or Zoledronic Acid.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

347.   Heritage's Sather continued to "socialize" the idea of a Doxy Mono price increase, and called Lannett's Sullivan and left a message on April 25, 2013. Sullivan returned her call the next day and they spoke for more than eight minutes.

348.   As discussed above, while Heritage's NAMs were speaking with competitors about Doxy Mono, in April 2013 Heritage's Malek and Glazer were in India meeting with Emcure's Mehta and Thapar discussing, among other things, how Heritage and Mylan could minimize competition and avoid price erosion when Heritage entered the Doxy DR market. Mehta decided to reach out to Mylan's Malik to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

349.   Consistent with how the overarching conspiracy operated, throughout the rest of 2013, Heritage spoke with its competitors about pricing for a number of drugs, including Doxy Mono. These communications often overlapped with trade association meetings. For example, on May 14, 2013, the day after Lannett's Sullivan and Heritage's Sather spoke for almost six minutes, the two attended a conference together where they spoke in person and exchanged text messages discussing at least Doxy Mono.

350.   On June 4, 2013, Sather called and texted an employee at Lannett—likely Sullivan. While Sather was exchanging text messages with this Lannett employee, she was attending the HDMA's June 2-5, 2013 Business and Leadership Conference in Orlando, Florida. That conference was attended by key executives for generic sales and pricing from at least Actavis, Apotex (including Hamilton), Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage (including O'Mara and Sather), Lannett (including Sullivan), Mylan (including Bell, Nesta and Aigner) Par, Sandoz, Sun, Teva, West-Ward and Zydus. *See* Exhibit 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

351.   Defendants agreed to implement price increases for Doxy Mono in the late spring and summer of 2013, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

352.   In the lead up to the price increases, the four competitors selling Doxy Mono—Par, Lannett, Heritage, and Mylan—were in frequent communication. For example on June 11, 2013, the day before Lannett's price increase, a Heritage employee (likely O'Mara) spoke with a Mylan employee (believed to be either Aigner or Nesta) for nearly ten minutes. During this same time period, a Lannett employee was communicating with an employee at Par. In turn, this Par employee frequently communicated with a Mylan employee. The Lannett and Par employees were friends and frequently spoke in person at trade association conferences, including about competitive information.

353.   In fact, these employees from Mylan and Par spoke numerous times between June and July 2013. The two had several calls on June 7, 2013 and June 13, 2013—the day after Lannett confirmed that it would increase its prices for Doxy Mono.[87] Further, an unidentified

---

[87] Mylan and Par both increased their prices of Divalproex shortly after these calls, on June 14 and June 26, respectively. Divalproex Complaint ¶ 91.

employee at Lannett exchanged nine text messages with an unidentified competitor on June 11 and June 12, 2013.

354.    Heritage was concerned about supply issues for Doxy Mono in 2013, and thus was cautious about the Doxy Mono price increases. In a competitive market, supply challenges for one supplier would typically create competitive opportunities for other suppliers. But Defendants' "fair share" agreement aimed to mitigate these risks of competition. Accordingly, Sather kept in frequent communication with Lannett during this period to stay abreast of any developments, and to reaffirm Heritage's commitment to their agreement. She also met with a Par employee while at a conference in Arizona on August 1 and 2. Following Sather's meeting with Par in Arizona, there was a flurry of communications between Par, Mylan, Lannett, and Heritage about at least the pricing of Doxy Mono.

355.    The NACDS Total Store Expo in Las Vegas, Nevada August 10-13, 2013 was attended by numerous Defendants, including those known to have exchanged pricing and customer information throughout the class period, including: Apotex (Hamilton), Aurobindo (Cunard), Citron, Dr. Reddy's, Glenmark, Heritage (Glazer, Malek, O'Mara, and Sather), Lannett (Sullivan), Mylan (Nesta, Aigner), Par, Perrigo, Sandoz, Sun (Knoblauch), Taro, Teva, West-Ward and Zydus (Lukasiewicz). Just as their convergence at the HDMA trade show in June led to numerous anticompetitive inter-competitor communications, Defendants' attendance at the Total Store Expo facilitated discussions about market allocation and pricing for the Drugs at Issue.

356.    For example, when Malek asked Sather to obtain specific information about Lannett's price increase for Doxy Mono, Sather used the Total Store Expo as an opportunity to meet in person with Lannett's Sullivan. On August 12, 2013, after meeting in person at the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conference, and in response to a directive from Malek, Heritage's Sather sent a text message to Lannett's Sullivan.

357.    The next day, while still at the Total Store Expo, Sather and Sullivan texted again. Sather also exchanged several text messages and phone calls with another employee at Lannett. In addition, a Lannett employee also sent a text message to an employee at Par.

358.    Later in the evening of August 13, an employee at Par sent an internal email, which was subsequently circulated at Par internally. The email included information about pricing agreements related to the prices of Doxy Mono and other drugs.

359.    On August 20, 2013, a week after Par's internal discussion, Heritage's Sather emailed Malek and confirmed Lannett's agreement related to the pricing of Doxy Mono.

360.    By March 2014, Heritage increased its Doxy Mono price to at least one customer and was working on a much larger across-the-board price increase on Doxy Mono, as well as price increases on several other drugs.

361.    As discussed above, on April 22, 2014, Malek held a teleconference with Heritage's sales team to discuss the strategy for obtaining price increases for numerous drugs, including Doxy Mono.

362.    Malek and the Heritage NAMs took responsibility for communicating with specific Defendants about specific drugs, including Sather, who, among her other assignments, was responsible for communicating with Lannett about Doxy Mono.

363.    Right after the Heritage conference call on April 22, Sather communicated with three different competitors— including a twenty-nine minute phone conversation with Lannett's Sullivan about pricing for Doxy Mono. Through these conversations, Sather reached a number of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pricing agreements covering Doxy Mono and four other drugs (Glyburide-Metformin, Verapamil, Nystatin, and Paromomycin).

364.    Similarly, on April 23, O'Mara, the employee at Heritage who was primarily responsible for communicating with Mylan, contacted his counterpart at Mylan (either Aigner or Nesta) and obtained an agreement to raise prices on Doxy Mono (as well as Glipizide-Metformin and Verapamil). Immediately after speaking with Mylan, O'Mara sent an email to Malek advising him of his discussions with Mylan.

365.    On May 8, 2014, Malek requested an update on discussions with competitors. Sather responded to Malek's email, providing an update on her communications with three Defendants about five drugs, including her conversations with Sullivan at Lannett about Doxy Mono.

366.    Shortly thereafter, on May 14, 2014, Sather attended the MMCAP National Member Conference where she was able to confirm, among other agreements, an agreement with Lannett on Doxy Mono pricing.[88]

367.    The elevated prices of Doxy Mono that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

368.    The unlawful agreement between Heritage, Lannett, Mylan and Par regarding Doxy Mono was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

---

[88] Sather also secured agreements with at least Aurobindo (Glyburide, Glyburide-Metformin, and Fosinopril-HCTZ), and Sandoz (Fosinopril-HCTZ).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### E.    Zoledronic Acid

369.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Zoledronic Acid as follows:

370.    Zoledronic Acid belongs to a class of drugs known as bisphosphonates. It is used to treat high blood calcium levels (hypercalcemia) that may occur with cancer. Zoledronic Acid is also used with cancer chemotherapy to treat bone problems that may occur with multiple myeloma and other types of cancer (such as breast, lung) that have spread to the bones. It is sold in two formulations—a 5mg injection and a 4mg injection.

371.    In early 2013, Heritage began preparing to launch a generic version of the 5mg injection. It planned to be the first generic entrant in the Zoledronic Acid market.

372.     Dr. Reddy's was positioned to enter the Zoledronic Acid market shortly after Heritage. Par, which did not have an ANDA for Zoledronic Acid, eventually was able to obtain the rights to market and sell Zoledronic Acid using an ANDA obtained by MDL Defendant Breckenridge Pharmaceutical, Inc. Par entered the market approximately 8 months after Heritage and Dr. Reddy's.

373.    Being the first generic to the market was atypical for Heritage, and Heritage wanted to work with its competitors so that it could enter the market at a price that would not be challenged by subsequent market entrants. For that reason, on January 21, 2013, Heritage's Malek instructed O'Mara to reach out to his contact at Dr. Reddy's, VP of Sales and Marketing John Adams, to discuss market strategy and to "socialize" the idea of keeping prices elevated above a competitive level.

374.    O'Mara attempted to call Dr. Reddy's Adams the next day, but Adams was on a conference call. When O'Mara informed Malek that Adams was going to call him back later that

95

morning, Malek outlined exactly what he wanted O'Mara to say when he finally spoke with Adams.

375.   Dr. Reddy's Adams called Heritage's O'Mara after his conference call on January 22, 2013 and they spoke for ten minutes. After the call, O'Mara reported to Malek. O'Mara had learned that Dr. Reddy's would launch a 4mg product on the first day it could produce a generic, but it was not certain if it would launch on the 5mg formulation. (Dr. Reddy's ultimately did launch the 5mg formulation.)

376.   O'Mara also reported that Dr. Reddy's wanted its "fair share" of the market. As discussed above, "fair shares" were allocated to Defendants across Drugs at Issue and within a particular drug market based upon the number of competitors in the market and the timing of their entry into the market. If Dr. Reddy's entered the Zoledronic Acid market first—consistent with fair share agreements that had long existed in the generic pharmaceuticals market—it expected a 60% share of the market. If Heritage entered the market at the same time as Dr. Reddy's, the expectation was that the market share would be split evenly.

377.   Less than an hour after they first spoke on January 22, Heritage's O'Mara and Dr. Reddy's Adams spoke again for nearly nine minutes and discussed a plan to keep the pricing of Zoledronic Acid elevated above competitive levels. O'Mara and Adams spoke for nearly twenty-four minutes again on January 24, 2013.

378.   While Heritage had confirmed that Dr. Reddy's was going to enter the market, it would not have been difficult for Heritage to ascertain that Mylan and Actavis also had received ANDA approval for 4mg Zoledronic Acid in early March 2013.

379.   Not wanting to take chances, Heritage's Malek set out to confirm that there would be no other entrants to the market. Malek instructed another Heritage employee (believed to be

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Sather) to reach out to competitors and large customers in an effort to confirm that no other manufacturers were planning on entering the generic Zoledronic Acid market. In his instructions to this employee, Malek provided the same list of questions he had provided to O'Mara for contacting Dr. Reddy's Adams.

380.    Prior to the launch, Heritage continued communicating with Dr. Reddy's to refine their agreement on market share and pricing.[89] For example, Heritage's O'Mara called his counterpart at Dr. Reddy's, Adams, on March 3, 2013 and left a message. Adams (or another individual from Dr. Reddy's) returned the call two days later and spoke with Heritage's O'Mara for fifteen minutes.

381.    While these conversations were occurring, Heritage's Malek learned that Dr. Reddy's was quoting low prices on Zoledronic Acid to customers, including Cardinal, and the pricing was lower than he had hoped. Malek was upset by Dr. Reddy's pricing because Malek did not view Dr. Reddy's as "playing fair." He emailed Sather and O'Mara on March 6 to express this concern and to ask about pricing.

382.    Malek also instructed O'Mara to speak with Dr. Reddy's Adams about Zoledronic Acid when they were both attending the same customer conference in March 2013. On March 12, 2013, the two spoke by phone twice and exchanged numerous text messages.

383.    Heritage's Malek asked O'Mara for an update on Dr. Reddy's on March 13. O'Mara responded with information about his conversation with Dr. Reddy's Adams.

384.    On April 3, 2013, Heritage's O'Mara spoke with Dr. Reddy's Adams and confirmed that Dr. Reddy's had just begun shipping the 5mg product. Adams also provided

---

[89] While these conversations with Dr. Reddy's were occurring, Heritage, Lannett, Mylan, and Par were also discussing pricing for Doxy Mono.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

information about its pricing. O'Mara and Adams spoke numerous times throughout the rest of April about customers and pricing for both Zoledronic Acid and Meprobamate.[90]

385.    Consistent with their agreement, in April 2013 both Heritage and Dr. Reddy's entered the Zoledronic Acid market at a higher price than they otherwise would have absent their collusive pricing agreement.  Heritage and Dr. Reddy's announced list prices that were within a few percentage points of each other. They maintained these list prices through at least early 2016. These list prices remained stable even when a third manufacturer entered the market.

386.    After Zoledronic Acid launched, any disagreements about the allocation of customers between Heritage and Dr. Reddy's were resolved through direct communications between the two companies.

387.    Heritage's ability to contact Dr. Reddy's and obtain an agreement on allocation of the market and the price of Zoledronic Acid would not have been possible absent the existing "fair share" agreement among Defendants. The discussions between Dr. Reddy's and Heritage make clear that they were not starting from zero in working out the details of their agreement on Zoledronic Acid, but were building on an existing understanding about "fair share" and the avoidance of competition across numerous drugs.

388.    Defendants were aware that their conversations were anticompetitive and illegal. For example, on April 19, 2013, Malek sent a text message to his entire sales team reminding them not to put their pricing discussions with competitors in writing.

389.    Defendants' ability to exchange information and negotiate pricing agreements was aided by the near constant ability of Defendants to meet in person at trade association meetings and conferences. *See* Exhibit 1. For example, shortly before Dr. Reddy's and

---

[90] At the same time, Sun and Heritage's Sather were discussing Nimodipine pricing and market share.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Heritage's March conversations, both Defendants, ▮▮▮▮▮▮▮, attended two trade association meetings where they also had the opportunity to exchange information. *Id.*

390.    Similarly, shortly before Par entered the market for Zoledronic Acid, it attended the NACDS Total Store Expo in Las Vegas, which also was attended by numerous Defendants (including personnel directly implicated in anticompetitive communications): Apotex (Hamilton), Aurobindo (Cunard), Citron, Dr. Reddy's, Glenmark, Heritage (Glazer, Malek, O'Mara, and Sather), Lannett (Sullivan), Mylan (Nesta, Aigner), Sandoz, Sun (Knoblauch), Taro, Teva, West-Ward and Zydus (Lukasiewicz).

391.    When Par finally entered the market in late 2013, it announced list prices even **_higher_** than Heritage and Dr. Reddy's. List prices for Dr. Reddy's, Heritage and Par remained elevated thereafter. As it had done in the Doxy Mono market discussed above, Par sought to avoid price competition. Although it was the third generic manufacturer into the market, Par did not undercut the prices of Heritage and Dr. Reddy's in an effort to gain market share, as economic theory predicts of a competitive market. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, consistent with the "fair share" agreement Par imposed higher list prices and attempted to prevent price erosion in the market for Zoledronic Acid.

392.    The elevated prices of Zoledronic Acid that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

393.    The unlawful agreement between Dr. Reddy's, Heritage and Par regarding Zoledronic Acid was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### F.     Meprobamate

394.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Meprobamate as follows:

395.     Meprobamate, also known by the brand-names Miltown® and Equanil®, is a generic pharmaceutical drug used to treat short-term anxiety, tension, and insomnia.

396.     In 2013, Actavis exited the Meprobamate market, which left Heritage and Dr. Reddy's as the two remaining suppliers in the market. Heritage wanted to use Actavis' exit from the market as pretext to increase prices.

397.     While Dr. Reddy's and Heritage were negotiating pricing and market share for Zoledronic Acid (as discussed above), they also were discussing pricing for Meprobamate.

398.     On March 21, 2013, Heritage's Malek emailed O'Mara and Edelson and instructed them to contact Dr. Reddy's—the only competitor remaining in the Meprobamate market—to tell Dr. Reddy's that Heritage wanted to increase the price on Meprobamate. Malek's proposed price increase was approximately four times the current price.[91]

399.     On March 22, during the same time they were exchanging price information for Zoledronic Acid with Dr. Reddy's, Heritage's O'Mara spoke to Dr. Reddy's Adams for nine minutes about at least Meprobamate. During that conversation, Dr. Reddy's and Heritage reached an agreement to, at a minimum, raise the price of Meprobamate. O'Mara confirmed the agreement in an email to Malek that same day, stating, "Dr. Reddy's is on board."

400.     Three days later, on March 25, Malek emailed O'Mara about the agreement, and O'Mara responded again confirming that Dr. Reddy's would "follow suit" if Heritage raised the

---

[91] At this time, O'Mara had already been discussing the pricing of Zoledronic Acid with Dr. Reddy's Adams for several months.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

price on Meprobamate. In a competitive market, a supplier risks losing market share if it raises price, but Dr. Reddy's assurance to Heritage that it would "follow suit" eliminated that risk—and eliminated price competition in the market for Meprobamate.

401.    During this period, Dr. Reddy's was having supply issues with Meprobamate, and Heritage's O'Mara reported that this "lack of inventory" kept Dr. Reddy's prices "stationary." As a result of these supply issues, on March 27, 2013, AmerisourceBergen ("ABC") asked Heritage to give a bid on both formulations of Meprobamate.

402.    Malek immediately forwarded the RFP internally and discussed Heritage's proposed response. Malek's response to the discussion reflected a clear understanding of and an intention to abide by the agreement between Heritage and Dr. Reddy's on pricing for Meprobamate. This agreement was confirmed in a four and a half minute conversation between Heritage and Dr. Reddy's on March 29, 2013.

403.    In April 2013, Dr. Reddy's approached Heritage to discuss obtaining additional Meprobamate market share and asked Heritage to give up a specific large pharmacy chain. Because of their agreement, Heritage gave up some of its market share to Dr. Reddy's.

404.    Heritage sent an email to the large pharmacy chain on April 24, 2013, and on May 17, Heritage's Malek provided Dr. Reddy's with clarifying information about precisely which business Heritage had agreed to give up to Dr. Reddy's.

405.    Heritage's O'Mara called Adams, his counterpart at Dr. Reddy's, on May 17, 2013. The two subsequently spoke on May 21, 2013 for nearly seven minutes.

406.    As a result of Heritage and Dr. Reddy's agreement, both raised Meprobamate prices across the board. Their price increases were nearly simultaneous. Heritage's price increase became effective in late April 2013, and Dr. Reddy's price increases became effective in early

May. Heritage and Dr. Reddy's imposed identical list prices for 200mg Meprobamate tablets (an increase of nearly 400%) and 400mg Meprobamate tablets (an increase of approximately 350%). AWP prices for both products were elevated as well. List and AWP prices remained elevated above competitive levels thereafter.

407.   No product shortages or other market changes can explain Defendants' abrupt, simultaneous and identical price increases.

408.   Dr. Reddy's and Heritage's Meprobamate pricing discussions happened nearly simultaneously with their pricing and market share discussions about Zoledronic Acid.

409.   Further, as discussed above, Defendants' ability to quickly reach agreement on market share and price increases was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. Heritage, Dr. Reddy's, and representatives of other Defendants attended at least three such meetings when these price increases were being discussed.

410.   Heritage and Dr. Reddy's continued to discuss pricing for Meprobamate throughout the Class Period. For example, Meprobamate was identified during the April 22, 2014 Heritage teleconference as one of the numerous drugs targeted for a price increase.

411.   On April 24, 2014, a Heritage employee—believed to be Matt Edelson— exchanged six text messages with his contact at Dr. Reddy's about pricing for Meprobamate (and possibly other drugs as well). The two spoke briefly on May 6, 2014.

412.   On May 8, 2014, Malek emailed the Heritage sales team requesting an update on the status of agreements with competitors so that Heritage could move forward with the price increases discussed on April 22, 2014. A Heritage employee (likely Edelson) responded to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Malek that he was awaiting feedback from one competitor (believed to be Dr. Reddy's) about the drug Meprobamate.

413.    The elevated prices of Meprobamate that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

414.    The unlawful agreement between Dr. Reddy's and Heritage regarding Meprobamate was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### G.    Acetazolamide

415.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Acetazolamide as follows:

416.    Acetazolamide, also known by the brand name Diamox®, among others, is a medication used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure. Acetazolamide is sold in two formulations—tablets (manufactured by Taro and Lannett) and sustained release capsules (manufactured by Heritage, Zydus and Teva).

### 1.    Acetazolamide Tablets

417.    Taro and Lannett dominate the market for Acetazolamide tablets. Since at least the spring of 2012, Taro and Lannett have coordinated pricing and market share in this market.

418.    Acetazolamide tablets come in two dosages: 125mg and 250mg. Both Taro and Lannett make the 250mg dosage, which is the predominant form. Only Taro makes the 125mg dosage, yet it appears to be included in the agreement between Taro and Lannett to elevate the prices of Acetazolamide.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

419.     Prior to the spring of 2012, Taro and Lannett priced their Acetazolamide tablets similarly, but not identically. Small price increases in 2009 and 2010 were implemented by both manufacturers, but were not identical, nor were they simultaneous. For example, when Taro implemented a price increase at the end of 2009, Lannett kept its prices unchanged for a year before implementing an increase. Market share between Taro and Lannett also shifted during this period. Things changed, however, in April and May of 2012.

420.     In April and May of 2012, Taro and Lannett imposed 40% to 50% list price increases, and brought their list prices for Acetazolamide 250mg tablets to identical levels. Taro also increased the list price of 125mg tablets around this time.

421.     In early 2013, Taro made slight price increases to both of its tablets. By the middle of 2013, Taro and Lannett appear to have worked out a remarkably stable split of the market, accounting for both 125mg and 250mg tablets.

422.     By the end of 2013, Taro and Lannett were ready to impose a large price increase. Within weeks of each other, in November and December, Taro and Lannett imposed identical list prices for Acetazolamide 250mg tablets. The increases were well over 200%. Taro imposed a similarly large list price increase on 125mg tablets around this time. AWP prices for both products also increased significantly.

423.     The graph below shows Taro and Lannett's lockstep pricing behavior on list prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



424.    The list and AWP prices for Acetazolamide tablets remained elevated above competitive levels thereafter.

425.    Throughout their coordinated price increases, Taro and Lannett captured remarkably stable shares of the 250mg tablet market, with Lannett claiming approximately 56% and Taro claiming 44%. Taro, as the lone manufacturer of 125mg tablets, had 100% of sales of that dosage. Interestingly, the total dollar sales across both products was virtually even, and remained remarkably stable. Lannett's larger share of 250mg tablets was offset by Taro's sales of 125mg tablets. The graph below shows combined market share (total dollar sales) for Acetazolamide 125mg and 250mg tablets:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



426.    The lockstep price increases and nearly perfect market share split across multiple dosages by Taro and Lannett is consistent with Defendants' "fair share" agreement.

427.    The pricing conduct of Taro and Lannett is not consistent with competition. Manufacturers would not impose a large price increase absent some assurance that their competitor would do the same, lest they lose market share.

428.    No shortages or other market changes can explain the abrupt, simultaneous and large price increases by Taro and Lannett.

429.    The ability of Taro and Lannett to reach agreement on market share and price increases was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. For example, In August 2013, not long before the large price increases imposed by Taro and, both Defendants (including Tracy Sullivan) attended the NACDS Total Store Expo. *See* Exhibit 1.

430.    In October 2013, representatives from Taro and Lannett, among other Defendants, attended the GPhA Fall Tech Conference in Bethesda, Maryland, which provided another opportunity to discuss price increases for Acetazolamide.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

431.    The elevated prices of Acetazolamide tablets that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

432.    The unlawful agreement between Taro and Lannett regarding Acetazolamide tablets was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### 2.    Acetazolamide Capsules

433.    The vast majority of the Acetazolamide capsule market is captured by Heritage, Teva and Zydus, with Heritage and Teva combining for approximately 78% of sales.[92]

434.    As discussed earlier, during the week of April 14, 2014, Heritage's Malek met with two employees and asked them to start analyzing the impact of price increases for numerous generic drugs, including Acetazolamide.

435.    Before introducing the market-wide price increases to the rest of his sales team, Malek began communication with Patel at Teva, who was the competitor on seven Drugs at Issue on Malek's initial list. On April 15, 2014, Heritage's Malek spoke with Patel of Teva for more than seventeen minutes. During that phone call, Patel agreed to support Heritage's price increase for Acetazolamide and a series of other drugs. Patel, of course, already had secured Heritage's agreement to support Teva's price increases for Nystatin and Theophylline.

436.    Malek and Patel spoke several more times over the next several months to confirm their agreement to raise prices and to keep abreast of the progress of Heritage's price increases.

---

[92] Teva marketed and sold Acetazolamide capsules during the relevant period at least in part through its subsidiary, Barr.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

437.    On April 16, 2014, the day after Malek spoke to Patel, a Teva employee—believed to be Patel—then called an employee at Zydus to discuss the pricing of at least Acetazolamide. The two spoke for nearly twenty minutes, and spoke again the next day for nearly twelve minutes. Over the next several months, the two communicated frequently.

438.    As noted above, on April 22, 2014, Heritage's Malek held a telephone conference with the sales team and dictated a pricing strategy that targeted numerous drugs for a price increase. This list included Acetazolamide.

439.    As with the other drugs he targeted, Malek believed it was important to "socialize" the idea of an Acetazolamide price increase with competitors before implementing it. To that end, he and the Heritage NAMs contacted Teva and Zydus to discuss pricing and customers either via phone, text or email, or in person, often through industry trade association meetings and conferences.

440.    Malek personally took responsibility to communicate with Defendants Teva and Zydus. Anne Sather was responsible for Lannett as well as two other Defendants. Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara were responsible for contacting four other Defendants about pricing for various drugs.

441.    Four days after this phone call, on April 26-29, CEO Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from numerous Defendants, including the other manufacturers of Acetazolamide capsules, Teva and Zydus. *See* Exhibit 1.

442.    While Teva's Patel and Heritage's Malek were discussing increasing prices for at least the seven Drugs at Issue discussed above, on April 24, 2014, Malek contacted a Zydus

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

employee through the website LinkedIn to discuss at least Acetazolamide. The Zydus employee responded later that day.

443.    In a May 6 and 7 email exchange, Malek explained that he had obtained agreements to raise the price of Acetazolamide. Malek had previously told an unidentified Heritage sales person to hold off on responding to a large customer's request for a price reduction. After confirming his agreement with Teva and Zydus to raise the price of Acetazolamide, he informed his sales person that Heritage would not agree to reduce its price.

444.    Malek also confirmed an agreement with another competitor—most likely Zydus—on Acetazolamide pricing on May 7.

445.    During this time Heritage avoided bidding on any potential customers where Zydus was already supplying Acetazolamide. Heritage did this in furtherance of Defendants' agreement not to compete on Drugs at Issue.

446.    During this time, employees at Teva and Zydus were also in close contact with each other about Acetazolamide. On May 14, 2014, employees of Teva and Zydus exchanged numerous text messages.

447.    All Defendants had plentiful opportunities to speak in person about these agreements. Between April and October 2014, all U.S. Defendants attended at least one of the many trade events organized by NACDS, MMCAP, HDMA, or GPhA, in addition to several customer conferences. *See* Exhibit 1.

448.    Defendants used these meetings as an opportunity to confirm agreements on pricing and otherwise engage in anticompetitive conduct related to the Drugs at Issue. For example, on June 3, at the HDMA Business and Leadership Conference, Heritage's Sather had dinner and drinks with sales people from Sandoz, Par, and Lannett.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

449.    On June 23, the Heritage sales team had a meeting where they discussed the specific percentage amounts they would seek to increase on the identified drugs and their strategy for doing so. The proposed increase for Acetazolamide capsules was 75%.

450.    On June 26, 2014, Heritage began sending out price increase notices to its customers for nine different drugs, including Acetazolamide. By July 9, 2014, Heritage had raised the price of Acetazolamide to at least seventeen different customers nationwide.

451.    The elevated prices of Acetazolamide capsules that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

452.    The unlawful agreement between Heritage, Teva and Zydus regarding Acetazolamide capsules was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### H.    Fosinopril-HCTZ

453.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fosinopril-HCTZ as follows:

454.    Fosinopril-Hydrochlorothiazide ("Fosinopril-HCTZ"), also known by the brand name Monopril HCT®, is a medicine used to treat hypertension.

455.    The primary sellers of Fosinopril-HCTZ during the relevant period were Aurobindo, Citron, Glenmark, Heritage and Sandoz.

456.    In early 2012, the incumbent manufacturers of Fosinopril-HCTZ were Aurobindo, Glenmark and Sandoz. In the spring of 2012, Heritage entered the market. (Citron did not enter the market until 2014.) Instead of entering with a lower-priced product in order to gain market

share, Heritage announced a list price identical to Sandoz, slightly higher than Aurobindo, and slightly lower than Glenmark.

457.   Even though it was not offering better pricing, Heritage quickly captured market share for Fosinopril-HCTZ, consistent with the "fair share" agreement between Defendants.

458.   During this period, all the Fosinopril-HCTZ manufacturers at the time— Aurobindo, Glenmark, Heritage and Sandoz—met on numerous occasions at trade events. *See* Exhibit 1.

459.   Prices remained stable in the Fosinopril-HCTZ market from 2012 into 2014, at which time Heritage included Fosinopril-HCTZ on its target list for price increases.

460.   As discussed earlier, during the week of April 14, 2014, Heritage's Malek asked two employees to analyze the impact of price increases for numerous generic drugs, including Fosinopril-HCTZ, and during an April 22, 2014 Heritage conference call, Malek informed the sales team that Fosinopril-HCTZ was targeted for a price increase.

461.   As with Heritage's other targeted price increases, Malek aimed to "socialize" the idea of price increases with the other Fosinopril-HCTZ manufacturers by direct outreach and communication about Heritage's intentions. Both Malek and Glazer pushed Heritage employees to communicate with their competitors and to obtain agreement to raise prices.

462.   Between the time of the sales team call in April and Heritage's price increase in July, Heritage communicated by phone call or text with every other manufacturer of Fosinopril-HCTZ, totaling at least 100 contacts. *See* Table 3. Some of these communications are detailed below.

463.   On April 26, representatives from Aurobindo, Citron, Glenmark, Heritage and Sandoz met at the NACDS 2014 Annual Meeting in Scottsdale, AZ.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

464.   On April 28, 2014, Malek emailed Lukasiewicz directing him to contact Aurobindo about pricing for Fosinopril-HCTZ, Glyburide, and Glyburide-Metformin. Tellingly, Glazer told Lukasiewicz not to put any of his communications with Aurobindo on pricing in writing. Lukasiewicz exchanged several voicemails with his contact at Aurobindo on April 28 and 29, 2014.

465.   In May 2014, Heritage's Lukasiewicz began speaking with employees at Aurobindo and Glenmark—both via phone and through LinkedIn—about price increases for Fosinopril-HCTZ. On May 2, 2014, a Heritage employee—likely Lukasiewicz—contacted an employee at Glenmark via LinkedIn to discuss pricing for at least Fosinopril-HCTZ.

466.   A Heritage employee—likely Lukasiewicz—spoke by phone with his Aurobindo contact for sixteen minutes on May 8, 2014. During this call, they reached an agreement to raise the price of at least Fosinopril-HCTZ, Glyburide-Metformin, and Glyburide.

467.   On May 8, 2014—the same day Lukasiewicz spoke with Aurobindo— Lukasiewicz called an employee at Glenmark, and they spoke for more than fourteen minutes. The next day, on May 9, the Aurobindo employee spoke with an employee at Glenmark for over nine minutes.

468.   On May 9, Heritage had another internal conference call discussing the list of drugs proposed for increases. Fosinopril-HCTZ, Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, and Glyburide were all on the May 9 price increase list. During the conference call, the Heritage sales team shared the results of their conversations with competitors in seeking agreements to raise prices on certain drugs.

469.   Lukasiewicz was not the only Heritage employee communicating with other manufacturers of Fosinopril-HCTZ. On May 14, 2014, Sather attended the MMCAP National

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Member Conference in Bloomington, Minnesota. She used this conference as an opportunity to speak in person with a number of different competitors about pricing. Sather confirmed agreements on pricing with at least Aurobindo (Fosinopril-HCTZ, Glyburide, and Glyburide-Metformin), Sandoz (Fosinopril-HCTZ), and Lannett (Doxy Mono). Sather emailed Malek on May 15, telling him of the agreements with Aurobindo, Sandoz, and Lannett.

470.    Also on May 15, the day after speaking with Heritage's Sather and while the MMCAP National Member Conference was still ongoing, the same Aurobindo and Sandoz employees spoke by phone and texted each other multiple times. A week later, a competitor—likely an employee from Aurobindo or Heritage—exchanged text messages with the same employee at Sandoz to confirm she had his correct cell phone number.

471.    During this time, an employee at Aurobindo also spoke with employees at Glenmark and Sandoz about price increases for Fosinopril-HCTZ.

472.    On May 15, 2014, a large pharmacy customer informed Heritage that Aurobindo had recently provided a lower bid for Fosinopril-HCTZ. Sather recommended that Heritage not reduce its price to retain business, because she was confident that Aurobindo would stick to the pricing strategy she and Aurobindo had reached the day prior.

473.    Heritage's Sather continued her pricing discussions on Fosinopril-HCTZ in person while at the June 2014 HDMA Business and Leadership Conference. On June 3, Sather had dinner and drinks with a number of Heritage's competitors at the Sandbar Restaurant, including a contact at Sandoz.

474.    Following these trade association meetings, there was a sharp uptick in discussions among competitors. Between June 3, 2014 and June 10, 2014, an Aurobindo

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

employee had three phone calls with a Sandoz employee and five phone calls and multiple text messages with Glenmark, likely to discuss pricing of at least Fosinopril-HCTZ.

475.    On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for twenty-two minutes. Again, these discussions were presumably about the pricing of Drugs at Issue, including Fosinopril-HCTZ.

476.    On June 23, the Heritage sales team had a meeting where they discussed the price increases targeted for the identified drugs. The proposed increase for Fosinopril-HCTZ was 200%.

477.    Heritage's Lukasiewicz spoke with his contact at Aurobindo for eighteen minutes on June 25, the day before Heritage issued price increase letters for numerous drugs, including Fosinopril-HCTZ. They would speak for three and a half minutes again on July 7, 2014.

478.    Also on June 25, a Heritage employee texted a friend at Citron to discuss Citron's entry into the Glyburide market and proposed price increases in that market. During this text exchange, Heritage learned for the first time that Citron was planning to enter the market for Fosinopril-HCTZ as well. After learning about Citron's proposed entry into the Fosinopril-HCTZ market, the Heritage employee disclosed Heritage's plan to increase the pricing for Fosinopril-HCTZ. She also informed the Citron employee that Aurobindo was a competitor for Fosinopril-HCTZ.

479.    Just as the anticompetitive agreement between Heritage's Malek and Teva's Patel started with one Drug at Issue (Nystatin oral tablets) and evolved into an agreement about seven Drugs at Issue, this exchange between Heritage and Citron provides another example of the overarching conspiracy at work. Although Heritage contacted Citron to discuss pricing on

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Glyburide, the communications—and anticompetitive agreement—naturally and inevitably expanded to include an additional Drug at Issue, in this instance, Fosinopril-HCTZ.

480.    On June 26, 2014, Heritage issued price increases for nine drugs, including Fosinopril-HCTZ.

481.    On June 27, the day after Heritage began sending out price increase notices for Fosinopril-HCTZ, an employee of Aurobindo and an employee of Glenmark spoke twice, with one of their calls lasting almost eighteen minutes. Over the next several months, Glenmark and Aurobindo continued to speak about at least Fosinopril-HCTZ.

482.    On July 1, 2014, Citron called an employee at Heritage to discuss Citron's agreement to raise prices on certain drugs and to discuss Heritage's price increase plan for Fosinopril-HCTZ. They spoke for thirteen minutes. During this conversation, the Citron employee told Heritage that they should not communicate with Citron through email, but should instead call to convey any sensitive information about pricing for Fosinopril-HCTZ or any other drugs.

483.    Employees of Heritage and Citron spoke for nearly twenty-two minutes again on July 2, 2014 about Fosinopril-HCTZ and other drugs. These conversations continued throughout July and August 2014.

484.    On July 18, 2014, a Heritage employee—likely Lukasiewicz—spoke directly with a Glenmark employee for twenty-three minutes about at least Fosinopril-HCTZ. On July 30, 2014, they spoke for more than five minutes.

485.    By July, Heritage had raised its list (WAC) prices by 100% for Fosinopril-HCTZ ████████████████████████████████████████████████. Fosinopril-HCTZ prices remained elevated thereafter.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

486.     The "fair share" agreement among Defendants enabled Heritage to maintain or even increase its market share for Fosinopril-HCTZ, even though it had raised prices above a competitive level.

487.     During this time, Citron also was communicating directly with Aurobindo. On July 28, 2014, an employee of Citron called and texted an employee at Aurobindo several times until the two were finally able to connect by phone. They spoke later that day for more than twenty-four minutes.

488.     That day, Citron confirmed internally that Heritage had increased its list prices for Fosinopril-HCTZ, and also had raised prices on two other drugs that Citron was trying to match on price increases (Glyburide and Glyburide-Metformin).

489.     Citron spoke with an employee of Glenmark twice on July 14, 2014. The first call lasted for seven minutes. The second call, which occurred shortly thereafter, was for more than thirteen minutes. The next day, Citron increased its Fosinopril-HCTZ prices to be in line with the price increases adopted by Heritage.

490.     Although Heritage significantly raised its prices for Fosinopril-HCTZ, it did not lose market share until at least 2016 (when it appears to have begun to exit the market). Maintaining a dominant share of the market was only possible because of the "fair share" agreement between Heritage, Aurobindo, Citron, Glenmark and Sandoz.

491.     No shortages or other market features can explain the elevated pricing of Fosinopril-HCTZ.

492.     The elevated prices of Fosinopril-HCTZ that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

493.    The unlawful agreement between Aurobindo, Citron, Glenmark, Heritage and Sandoz regarding Fosinopril-HCTZ was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### I.    Glipizide-Metformin

494.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Glipizide-Metformin as follows:

495.    Glipizide-Metformin HCl, also known by the brand name Metaglip®, is a combination medicine used to treat high blood sugar levels that are caused by a type of diabetes mellitus or sugar diabetes called type 2 diabetes.

496.    Since 2009, numerous Defendants have sold Glipizide-Metformin, including Mylan, Teva, Sandoz (mostly exited the market by 2010), Actavis (mostly exited the market by 2014), Heritage (entered the market in 2010 and mostly exited the market by July 2017), Sun (sold *de minimis* amounts up until 2016) and Zydus (entered the market in September 2016).

497.    By April 2014, Defendants Heritage, Teva and Mylan controlled nearly the entire Glipizide-Metformin market.

498.    As noted above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two spoke for more than seventeen minutes and discussed seven different Drugs at Issue for which Teva was a competitor of Heritage, including Glipizide-Metformin. During their conversation, Patel agreed that if Heritage increased prices for the seven drugs they discussed, including Glipizide-Metformin, Teva would support the price increases.

499.    Heritage's Malek and Teva's Patel spoke several more times over the next several months to confirm and finalize their agreements regarding numerous drugs, including Glipizide-Metformin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

500.    As discussed above, during an April 22, 2014 Heritage sales team teleconference, numerous drugs were slated for a price increase, including Glipizide-Metformin.

501.    Concurrent with these discussions, and as outlined throughout, Heritage sales staff were also speaking with Defendants to formalize pricing agreements. For Heritage, O'Mara was responsible for communicating with Mylan (either Aigner or Nesta) about a number of drugs, including Glipizide-Metformin. On April 23, the day after Malek directed Heritage's sales team to contact Defendants about price increases, Mylan and Heritage agreed to raise prices on at least three different drugs, including Glipizide-Metformin (as well as Doxy Mono and Verapamil). O'Mara conveyed this agreement with Mylan to Malek via email the same day.

502.    Teva and Mylan were also in frequent communication with each other about pricing. On May 9, 2014, an employee at Mylan and an employee at Teva spoke with each other multiple times about pricing for at least Glipizide-Metformin. Their conversations included one call that lasted more than seven minutes. They continued to be in contact throughout 2014.

503.    Also on May 9, 2014, Heritage held an internal call about price increases. Glipizide-Metformin was one of the drugs slated for a price increase.

504.    Heritage had a call on June 25 and discussed an analysis of the proposed price increases and reviewed inter-competitor communications. The next day, Heritage began notifying customers of price increases for nine drugs, including Glipizide-Metformin. Glipizide-Metformin was slated for a 100% increase effective July 1, 2014. Price Increase Notices were mailed the same day.

505.    By July 9, 2014, Heritage had increased prices of Glipizide-Metformin nationwide for at least 27 different customers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

506.    On August 20, 2014, an unidentified individual—likely a Heritage employee—updated a Sun employee via text messages on the agreements Heritage had reached with Actavis to increase the prices of Glyburide-Metformin and Verapamil. These text messages occurred just days before the start of the 2014 NACDS Total Store Expo, which was attended by individuals from Heritage, Teva, Mylan and Sun that are directly implicated in anticompetitive communications: Heritage (Glazer, Malek, O'Mara and Sather), Mylan (Aigner and Nesta), and Teva (Patel). Numerous other Defendants attended as well. *See* Exhibit 1.

507.    Consistent with their agreement, neither Teva nor Mylan challenged Heritage on its price increases. By November 2014, Teva had increased its bid prices of Glipizide-Metformin to potential customers.

508.    Although Heritage, Mylan and Teva imposed price increases on their customers, throughout the relevant period, the ***list*** (WAC) prices announced for Glipizide-Metformin by Heritage, Mylan and Teva, as well as by Defendants Actavis, Sandoz and Zydus, were virtually identical and unchanged. Regardless of the number of sellers in the market, and despite multiple entrances and exits from the market, list prices did not change or vary. This suggests an absence of price competition and is consistent with Defendants' "fair share" agreement. Rather than compete in the market, Defendants announced identical list prices, then, as described above, colluded with each other to elevate the prices paid by their customers.

509.    The elevated prices of Glipizide-Metformin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

510.    The unlawful agreement between at least Heritage, Mylan and Teva regarding Glipizide-HCTZ was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

J.    Glyburide[93]

511.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Glyburide as follows:

512.    Glyburide is a commonly prescribed oral anti-diabetic medication used to treat high blood sugar levels caused by Type 2 diabetes. Introduced in the mid-1980s under the brand names Micronase® and DiaBeta®, generic Glyburide has been available since the mid-1990s.

513.    As of April 2014, Defendants Aurobindo, Heritage, and Teva were the dominant sellers of Glyburide. Defendant Citron would enter the Glyburide market in July of 2014.

514.    As detailed above, on April 15, 2014, Heritage's Malek called Teva's Patel and they discussed seven different Drugs at Issue, including Glyburide. During their conversation, Heritage and Teva agreed not to compete in the Glyburide market. Malek and Patel spoke several more times over the next several months to confirm and finalize their agreements regarding Glyburide and numerous other drugs.

515.    As discussed above, on April 22, 2014, the Heritage sales team held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide. At the time of this call, Aurobindo and Teva were Heritage's only competitors in the Glyburide market.

---

[93] Plaintiffs propose that the EPP Glyburide complaint (Case 2:16-GL-27242-CMR, Doc. 47), be incorporated into this complaint for the purposes of judicial efficiency. EPPs will meet and confer with Defendants regarding the procedural mechanism for doing so.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

516.    Malek was responsible for communicating with Teva (among other Defendants) and Lukasiewicz was assigned to communicate with Aurobindo.

517.    Malek and Glazer pushed Heritage employees to communicate with their competitors in order to reach agreements to raise prices. Malek and Glazer sent several emails imploring their sales staff to reach agreements with their competitors in the generic Glyburide market, among other generic markets, as soon as possible. For example, on April 28, 2014, Malek sent an email to one Heritage employee—likely Lukasiewicz—concerning the status of discussions with Aurobindo.

518.    Glazer followed up the next day (April 29) with an email to Lukasiewicz requesting further information, and Malek sent an additional email on April 30 requesting an update. Lukasiewicz eventually connected with his Aurobindo contact on May 8, 2014, when the two spoke for sixteen minutes.[94] During this call, they agreed to raise the price of a number of drugs, including Glyburide.

519.    On May 9, 2014, Heritage's sales team had another teleconference to share the results of their conversations with competitors and further discuss the contemplated price increases for at least nine generic drugs, including Glyburide.[95]

520.    The following week, on May 14, Heritage's Sather met in-person and discussed price increase strategies with several competitors at MMCAP in Bloomington, Minnesota. During that meeting, Aurobindo and Heritage's Sather agreed to raise the prices of Glyburide.

---

[94] Lukasiewicz also spoke with his contact at Glenmark for fourteen minutes the same day, and the following day, an Aurobindo employee spoke with an employee of Glenmark, likely about Fosinopril-HCTZ. While coordinating price increases for Glyburide as part of the overarching conspiracy, Aurobindo, Heritage, Glenmark and Sandoz were also coordinating price increases for Fosinopril-HTCZ.

[95] Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, and Fosinopril-HCTZ were all slotted for price increases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Sather confirmed this agreement in a May 15 email to Malek. Sather also indicated that she would try to meet with Teva at MMCAP.

521.    On June 23, 2014, Heritage employees met and discussed the specific percentage amounts they would seek to increase Glyburide, as well as other generic drugs, and the strategies for doing so. They reached a consensus that Glyburide prices would be increased by 200%.

522.    Over the next several weeks, Heritage employees continued reaching out to numerous generic drug competitors and potential competitors—including in the Glyburide market—in order to secure agreements to raise prices for Glyburide and other generic drugs.

523.    On June 25, 2014, one Heritage employee texted her friend, an employee of Defendant Citron, to discuss whether Citron would be selling Glyburide in the near future. Once it was determined that Citron would be entering the Glyburide market, Citron and Heritage had extensive phone, text message, and in-person conversations concerning Citron's Glyburide pricing and bidding strategies.

524.    For example, on July 1, 2014, Citron called an employee at Heritage and they spoke for thirteen minutes, confirming Citron's agreement to raise prices on certain drugs, including Glyburide. During this conversation, the Citron employee told Heritage that they should not communicate with Citron through email, but should instead call to convey any sensitive information about pricing for Glyburide or other drugs.

525.    The two spoke for nearly twenty-two minutes the next day.

526.    As Citron entered the Glyburide market in July 2014, it frequently contacted Heritage about Glyburide pricing and bidding strategies. Citron set an initial target of obtaining less than 10% of the Glyburide market share. It was careful, however, to coordinate with Heritage so that it could acquire additional market share without eroding the price increases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

527.    Citron and Heritage's discussions did not occur in isolation. Concurrent with these pricing discussions, Heritage's Malek and his sales team continued to communicate with Defendants about pricing for Glyburide and other Drugs at Issue.

528.    By July 9, 2014, Heritage had announced Glyburide price increases for at least seventeen customers. Teva also had increased pricing on Glyburide. Citron, after confirming internally that Heritage had increased its list prices for Glyburide, also increased its Glyburide pricing in line with the price increases on July 15, 2014.

529.    Consistent with the parties' understanding of their agreements and the principles of "playing fair" within the market, throughout the summer, Teva, Aurobindo, Citron, and Heritage were in contact with each other to ensure they were complying with their agreements on pricing for Glyburide.

530.    For example, on July 9, 2014, a large national retail chain asked Teva to bid on both Glyburide and Nystatin because of Heritage's price increases. Instead of quoting a price that would win the business, Teva—consistent with Defendants' agreement—raised its own list prices for Glyburide to a similar level as Heritage.

531.    Similarly, in response to Heritage's price increase on Glyburide and other drugs discussed in this complaint, a large wholesaler separately emailed Teva and Aurobindo on July 25, 2014 and asked for bids. Aurobindo and Teva immediately contacted Heritage to coordinate their responses and ensure that they were complying with their pricing agreements.

532.    Teva's Patel and Heritage's Malek spoke for fifteen minutes the day the wholesaler's request was received. After this conversation, Teva declined to provide a bid to the wholesaler.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

533.    The same day, Malek sent a text message to an unidentified individual believed to be at Aurobindo. Malek and this individual then spoke for thirteen minutes and determined that Aurobindo would not provide a Glyburide bid in response to the wholesaler.

534.    Ultimately, neither Teva nor Aurobindo responded to the bid.

535.    While Teva, Aurobindo, and Heritage were trying to maintain their price increases for Glyburide, Citron also was communicating directly with Aurobindo presumably to coordinate its entry into at least the Glyburide market.

536.    On July 28, 2014, a Citron employee called and texted an Aurobindo employee several times until the two were finally able to connect by phone. They spoke later that day for more than twenty-four minutes, including about the pricing of Glyburide and other drugs.

537.    The elevated prices of Glyburide that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

538.    The unlawful agreement between Aurobindo, Citron, Heritage and Teva regarding Glyburide was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### K.    Glyburide-Metformin

539.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Glyburide-Metformin as follows:

540.    Glyburide-Metformin, also known by the brand name Glucovance®, is an oral medication used to treat Type 2 diabetes.

541.    Glyburide-Metformin has been marketed and sold by a number of Defendants since 2009, including Actavis, Aurobindo, Citron (entered the market in August 2014), Dr.

Reddy's (selling only *de minimis* amounts by 2011), Heritage (entered the market in January 2013), Par (selling only *de minimis* amounts by 2010), Sandoz (selling only *de minimis* amounts by 2013), Teva, and Zydus (entered the market in September 2016).

542.    As of April 2014, Teva, Aurobindo, and Actavis were the primary sellers in the market for Glyburide-Metformin. Heritage had approximately a 5% market share, but nonetheless wanted to raise prices.

543.    As discussed above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two discussed a number of Drugs at Issue, including Glyburide-Metformin. Patel and Malek agreed not to compete on these drugs. Over the next several months, Malek and Patel spoke several more times to confirm and finalize their agreements.

544.    On April 22, 2014, Heritage held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin. After the call, Malek assigned Lukasiewicz to contact Aurobindo about Glyburide-Metformin (and, as discussed above, Fosinopril-HCTZ), and Sather was assigned to Actavis to discuss Glyburide-Metformin.

545.    Right after the Heritage sales call and in response to Malek's direction, Sather communicated with three different competitors about multiple drugs—including with Actavis about Glyburide-Metformin.[96] Sather spoke with Actavis for nine minutes the day of the April 22 pricing call and reached an agreement with Actavis to raise the price of Glyburide-Metformin (and, as discussed below, Verapamil). Sather updated Malek on her communications with Actavis on May 8.

---

[96] Sather was assigned to speak with Defendants Actavis, Sun, and Lannett and through her discussions reached pricing agreements on at least five drugs: Nystatin, Paromomycin, Glyburide-Metformin, Verapamil, and Doxy Mono.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

546.    Within Actavis, news of its agreement with Heritage spread quickly. On April 28, 2014, an email to the Actavis sales and pricing team discussed the agreement and potential price increases for a number of different drugs.

547.    In response to that April 28 email, on May 6, an unidentified employee at Actavis called an employee at Mylan, and they spoke for five minutes. They spoke three more times on May 6, with one call lasting fifteen minutes. They continued to communicate over the next several months. It is believed that they discussed pricing for Glyburide-Metformin.

548.    On April 28, 2014, Heritage CEO Glazer sent an email to Lukasiewicz directing him to contact Aurobindo about potential price increases on a number of drugs, including Glyburide-Metformin. Tellingly, Glazer told Lukasiewicz not to put any of his communications with Aurobindo on pricing in writing. Lukasiewicz exchanged several voicemails with his contact at Aurobindo on April 28 and 29, 2014. Glazer would request status updates from Lukasiewicz several times at the end of April.

549.    Heritage's Lukasiewicz and his Aurobindo contact spoke for sixteen minutes on May 8, 2014. During this phone call, they reached an agreement to raise the price of Glyburide, Glyburide-Metformin and Fosinopril-HCTZ.

550.    And, as noted above, on May 15, 2014, while attending the MMCAP National Member Conference, Sather confirmed pricing agreements for five different drugs with three different Defendants. Among the agreements Sather confirmed was an agreement with Aurobindo on pricing for Glyburide-Metformin and two other drugs.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

551.    Concurrent with these discussions, on May 12, an employee of Actavis spoke with Bob Cunard, the CEO of Aurobindo, twice about its Glyburide-Metformin pricing.[97] Between May 19 and May 22, 2014, that same Actavis employee also exchanged thirty text messages with a Teva employee about drug pricing.

552.    On June 25, 2014, a Heritage employee texted a friend at Citron about Citron's entrance into the Glyburide market. As part of this discussion, they also spoke about Glyburide-Metformin, a drug which Citron had approval to sell, but was not actively selling at the time.

553.    In July 2014, both Heritage and Teva increased their WAC prices for Glyburide-Metformin.

554.    Citron took note of these actions. In a July 9, 2014 internal Citron memo, Citron noted that both Heritage and Teva had increased their prices on three different drugs, including Glyburide-Metformin. In the same memo, a Citron employee then reiterated Citron's intent to abide by the agreement with Heritage and Teva.

555.    On August 20, 2014, an unidentified individual—likely a Heritage employee—exchanged text messages with a Sun employee. The text exchange described the agreements reached with Actavis to increase the price of Glyburide-Metformin and Verapamil. This, again, highlights the overarching nature of the conspiracy; Sun was kept apprised of agreements (in this case between Actavis and Heritage) relating to Drugs at Issue that it did not market or sell.

556.    By September 2014, Citron had mobilized to enter the Glyburide-Metformin market. Instead of undercutting the prices of Actavis, Aurobindo, Heritage and Teva in an effort to gain market share, Citron announced list (WAC) prices higher than all of them.

---

[97] *See* Cunard LinkedIn Profile, *available at* https://www.linkedin.com/in/bob-cunard-a14a505/.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

557.    No shortages or other market features can explain the elevated prices of Glyburide-Metformin.

558.    The elevated prices of Glyburide-Metformin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

559.    The unlawful agreement between Actavis, Aurobindo, Citron, Heritage and Teva regarding Glyburide-Metformin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

**L.    Leflunomide**

560.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Leflunomide as follows:

561.    Leflunomide, also known by the brand name Arava®, is an immunosuppressive disease-modifying antirheumatic drug used to treat active moderate-to-severe rheumatoid arthritis and psoriatic arthritis.

562.    As of April 2014, the main competitors for Leflunomide were Defendants Apotex, Teva, and Heritage. Heritage was a dominant player in the market, with a 60% market share.

563.    As discussed above, during the week of April 14, 2014, Malek met with two employees and asked them to analyze the impact of price increases for numerous generic drugs, including Leflunomide.

564.    Before introducing the market-wide price increases to the rest of his sales team, Malek began communicating with Patel at Teva about at least seven Drugs at Issue, including Leflunomide.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

565.    On April 15, 2014, Malek and Patel spoke on the phone and agreed that if Heritage increased prices for Leflunomide, Acetazolamide, Glipizide-Metformin, Glyburide, and Glyburide-Metformin, Teva would support the increases.

566.    Malek and Patel spoke several more times over the next several months to confirm their agreements. During this time, Malek kept Patel updated on the progress of Heritage's proposed price increases.

567.    While Malek was speaking with Teva's Patel about increasing prices on Leflunomide, he and other Heritage employees were also in contact with individuals from Apotex to discuss price increases for at least Leflunomide.

568.    During the infamous April 22, 2014 Heritage sales call, Malek identified Leflunomide as a drug slated for an increase. In the wake of this call, Malek personally took responsibility for communicating with Teva. Matt Edelson was assigned to Apotex.

569.    Defendants had numerous opportunities to meet in person at industry events to discuss the pricing of Leflunomide. For example, on April 26-29, Heritage's Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from Teva and Apotex, among others. *See* Exhibit 1.

570.    On May 2, 2014, Edelson spoke with Apotex's Beth Hamilton for thirteen minutes about at least Leflunomide. Four days later, on May 6, a Heritage employee—likely Edelson—had two more phone calls with Apotex's Hamilton after learning that Teva would be exiting the Leflunomide market.

571.    After speaking with Hamilton, Edelson emailed Malek to report what they discussed. Malek replied, confirming the strategy with Edelson. That same day (May 6), either

Malek or Edelson called Apotex. They had two calls, lasting nine and eight minutes, respectively.

572.    The following day—on May 7, 2014—Edelson and Hamilton had two more phone conversations where they agreed to avoid competition and increase prices on Leflunomide. Seven phone calls in five days, and an agreement was reached.

573.    On May 8, in response to an email from Malek requesting a status update, Edelson provided an additional update on his discussions with Apotex.

574.    On May 9, Heritage had another internal conference call discussing the list of drugs proposed for increases, including for Leflunomide. During the conference call, the Heritage sales team shared the results of their conversations with competitors, including Apotex.

575.    On May 27, Heritage learned that Apotex had increased the price on Leflunomide to bring it more in line with Heritage's price.

576.    On June 26, 2014, Heritage began sending price increase notices to its customers for nine drugs, including Leflunomide.

577.    Beginning in July 2014, rather than compete for Leflunomide sales, Teva ceded the market to Apotex and Heritage and began to exit the market.

578.    Pursuant to their agreement, Heritage and Apotex ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

579.    No shortages or other market features can explain the Leflunomide price increases.[98]

580.    The elevated prices of Leflunomide that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

581.    The unlawful agreement between Apotex, Heritage and Teva regarding Leflunomide was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

**M.    Paromomycin**

582.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Paromomycin as follows:

583.    Paromomycin, also known by the brand names Humatin®, Catenulin® and others, is a broad spectrum oral capsule antibiotic used to treat amoeba infection in the intestines and complications of liver disease.

584.    Sun and Heritage were the sellers of Paromomycin during the relevant time frame. Heritage had approximately 65% market share for Paromomycin.

585.    As discussed above, starting in at least June 2012, Heritage and Sun began discussing price increases and market allocation for at least two drugs—Paromomycin and Nimodipine.

---

[98] In November 2016, Heritage and Apotex did report shortages. Apotex did not provide a reason. Heritage asserted that there were delays in obtaining the active ingredient. In any case, the large price increases that began in May 2014 cannot be explained by a purported shortage more than two years later.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

586.     At Malek's direction, Ann Sather contacted Sun—most likely Knoblauch. Throughout the summer of 2012, Heritage's Sather exchanged numerous text messages and had multiple phone calls with her Sun contact.

587.     Heritage and Sun, as well as other Defendants, had the opportunity to discuss pricing and market share and otherwise further their conspiratorial discussions at trade meetings throughout this period, including at the October GPhA Fall Technical Conference. *See* Exhibit 1.

588.     By the end of October 2012, Sun had increased its list (WAC) prices for Paromomycin to be identical with Heritage's pricing. Heritage and Sun kept their list prices at the same level thereafter.

589.     After the April 22, 2014 Heritage teleconference with the sales team in which Paromomycin was targeted for a price increase, Malek assigned Anne Sather to communicate with Sun.

590.     Right after the Heritage sales call, Sather communicated with three different competitors—Sun, Actavis, and Lannett—and reached a number of pricing agreements with these Defendants covering at least five different drugs, including Paromomycin.

591.     Sather spoke with Susan Knoblauch, her counterpart at Sun, for more than forty-five minutes. During this conversation, Sather and Knoblauch discussed pricing and agreed to increase the prices of numerous drugs, including Paromomycin. Sather immediately reported her agreement with Sun to Malek.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

592.    In response to a May 8 status request from Malek, Sather emailed him to report the agreement she had reached with a number of competitors, including with Sun for Paromomycin.[99]

593.    During a May 9 internal Heritage call, Paromomycin remained on the list of drugs slated for a price increase.

594.    Heritage and Sun spoke again for more than twelve minutes on May 20. During the call, Heritage learned that Sun would be making changes to the production of Paromomycin. Malek was immediately informed of this development.

595.    On June 23, Heritage employees discussed the specific percentage increases they would seek for a variety of drugs. Paromomycin was slated for a 100% increase.

596.    Heritage had a final call confirming that Paromomycin would have a price increase on June 25, 2014, and the next day Heritage began sending out price increase notices.

597.    By July 9, 2014, Heritage announced price increases for Paromomycin to at least thirteen different customers nationwide.

598.    Over the ensuing months, pursuant to their agreement, Heritage and Sun continued to increase their prices for Paromomycin. ███████████████████████

████████████████████████████████████████████████████

████

599.    No shortages or other market features can explain Defendants' price increases for Paromomycin.

---

[99] Sather also reported agreements she reached with Actavis for Glyburide-Metformin and Verapamil, with Lannett for Doxy Mono and with Sun for Nystatin.

600.    The elevated prices of Paromomycin that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

601.    The unlawful agreement between Heritage and Sun regarding Paromomycin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

### N.    Theophylline

602.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Theophylline as follows:

603.    Theophylline ER, also known by the brand name Theodur®, is a medication used to treat asthma and airway narrowing associated with long-term asthma or other lung problems, such as chronic bronchitis and emphysema. Theophylline is an extended release medication, which means that it is released into the body throughout the day.

604.    Prior to Heritage's entry into the market for 300mg and 450mg Theophylline tablets in late 2011, Teva had captured nearly 100% of sales.[100]

605.    Instead of pricing its products below Teva's in order to gain market share, Heritage announced Theophylline list prices that were identical or even slightly above those of Teva. Even with Heritage's entry into the market, Theophylline prices remained relatively stable. Consistent with their "fair share" agreement, prices did not decline as would be expected in a competitive market.

---

[100] Teva marketed and sold Theophylline during the relevant period at least in part through its subsidiary, PLIVA.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

606.    Teva began considering a price increase for Theophylline in early 2014. On February 4, 2014, Teva's Patel contacted Heritage's Malek for the first time since she went on maternity leave in August 2013. Malek returned her call the next day and the two spoke for more than an hour and discussed a price increase for Theophylline and at least one other drug (Nystatin, as discussed above).

607.    Three days after that, on February 7, a Heritage employee created a spreadsheet that included Theophylline as a candidate for price increases.

608.    Throughout February and March 2014, Malek and Patel had a series of phone calls discussing price increases for multiple drugs, including Theophylline.

609.    Shortly thereafter, Teva began implementing across-the-board price increases for Theophylline. These price increases also had an effective date of April 4, 2014.

610.    By the time Heritage held its April 22, 2014 meeting with its sales team to discuss a number of price increases, it had already agreed to follow Teva on Theophylline and Nystatin price increases. As he outlined the proposed price increases, Malek specifically told his sales team that Heritage would follow Teva's price increase on Theophylline.

611.    On April 24, 2014, Teva received an email from a customer seeking an adjustment to its price increase. Consistent with its agreement with Heritage, Teva stuck to its price increase for Theophylline.

612.    On May 9, 2014, Heritage had an internal sales call regarding the drugs subject to price increases, including Theophylline. Several weeks later, on June 23, Heritage employees discussed the specific percentage price increases they would seek. Theophylline was slated for a 150% increase.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

613.    On June 25, Malek had a nearly fourteen minute call with a Teva employee—likely Patel. Malek reported that Heritage would be sending out price increase notices on June 26 for Theophylline and several other drugs for which Heritage and Teva had agreed to raise prices.

614.    On June 26, 2014, Heritage began telling customers that it would be increasing prices for nine drugs, including Theophylline. By July 9, 2014, among the other price increases it implemented, Heritage increased its Theophylline prices to at least twenty different customers nationwide.

615.    Teva and Heritage imposed list price (WAC) increases of approximately 80% on 300mg tablets and approximately 30% on 450mg tablets. █████████████████

█████████████████████████████████████████████

███████████

616.    No shortages or other market features can explain Defendants' price increases for Theophylline.

617.    The elevated prices of Theophylline that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

618.    The unlawful agreement between Heritage and Teva regarding Theophylline was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

**O.    Verapamil**

619.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Verapamil as follows:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

620.     Verapamil, also known by various brand names, is a calcium channel blocker used to treat hypertension, angina, and certain heart rhythm disorders. It works by relaxing the muscles of the heart and blood vessels.

621.     The relevant manufacturers of Verapamil are Actavis, Heritage and Mylan.

622.     From 2009 forward, Actavis and Mylan have dominated the market for Verapamil HCl regular release tablets and for certain dosages of Verapamil HCl sustained release capsules. Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain tablet share in 2013.

623.     Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013. When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for 80mg tablets. Heritage announced prices slightly higher than both Mylan and Actavis for 120mg tablets. Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

624.     Instead of entering the market with lower prices of Verapamil tablets in order to gain market share—as would be expected in a competitive market—Heritage priced its tablets identically or even higher than the incumbent producers, Actavis and Mylan. This was entirely consistent with Defendants' "fair share" agreement.

625.     Without offering better prices, Heritage was hard pressed to gain market share, and initially was able to capture only a sliver of the market. In October 2012, however, Mylan increased its tablet prices by approximately 50%, which facilitated Heritage rapidly gaining share. By January, Heritage had captured more than 25% of the entire tablet market. As devised

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

by their "fair share" agreement, market shares between Actavis, Heritage and Mylan quickly stabilized and remained relatively constant thereafter.

626.    In the months prior to Mylan's price increases, Actavis, Heritage and Mylan had numerous opportunities to meet and discuss Verapamil. *See* Exhibit 1. For example, all three Defendants attended the HDMA Business Leadership Conference in San Antonio, TX in early June 2012. All three also attended the GPhA Fall Technical Conference in Bethesda, MD, which took place on October 1 through 3, 2012.

627.    Similarly, on the heels of the 2013 NACDS Total Store Expo—attended by (among others) Actavis, Mylan (Nesta and Aigner) and Heritage (Glazer, Malek, O'Mara, Sather and Edelson)—Mylan raised the list (WAC) prices of its Verapamil capsules to identical levels as Actavis.

628.    As market shares for Verapamil tablets between Actavis, Heritage and Mylan stabilized, Heritage aimed to implement a price increase. Verapamil was on the list of drugs that Heritage's Malek identified on the April 22, 2014 sales team call.

629.    As part of those price increase discussions, Heritage's O'Mara had the primary responsibility for communicating with Mylan about Verapamil. On April 23, O'Mara contacted his counterpart at Mylan (believed to be Aigner). O'Mara and Aigner agreed to raise prices on at least three different drugs, including Verapamil (and, as discussed above, Doxy Mono and Glipizide-Metformin).

630.    Immediately after speaking with Mylan's Aigner, O'Mara emailed Malek providing an update of his discussions with Mylan.

631.    Heritage's Sather was responsible for speaking with Actavis about Verapamil, among other drugs. On April 22, she and an unidentified Actavis employee spoke for nine

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

minutes and reached an agreement to raise the price of Verapamil and other drugs slated for an increase.

632.    News of the agreement on Verapamil and at least one other drug (as discussed above, Glyburide) reached the Actavis sales and pricing team on April 28, 2014, including through an internal email discussing potential price increases for a list of different drugs.

633.    A week after the April 28 email, on May 6, 2014, an Actavis employee called a Mylan employee and left a message seeking to discuss at least pricing for Verapamil. The two spoke for three minutes on May 9 and spoke for almost seven minutes on May 19, presumably about at least Verapamil. Both continued to communicate over the next several months.

634.    On May 8, 2014, Malek emailed the Heritage sales team requesting an update on competition communications. An employee responded to Malek's email, providing an update on communications with at least Actavis (Verapamil and Glyburide-Metformin), Lannett (Doxy Mono), and Sun (Nystatin and Paromomycin).

635.    While Heritage did not increase its Verapamil prices market wide in July as it did for other drugs, it announced a price increase for Verapamil to at least one customer as the result of Defendants' price increase efforts.

636.    On August 20, 2014, a Heritage employee exchanged text messages with an employee at Sun. The text exchange described the agreement Heritage and Actavis reached to increase the price of Verapamil among other drugs.

637.    Throughout this period, Actavis and Mylan coordinated increases on their Verapamil HCl sustained release capsules (120mg, 180mg, 240mg). The price increases by Actavis and Mylan were staggered, but steady and unexplained, suggesting coordination throughout the relevant period.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

638.    From April of 2012 (shortly before Mylan imposed a price increase for its Verapamil tablets) through April of 2016, Actavis and Mylan attended at least 25 trade events together. *See* Exhibit 1. Over this period, Mylan's Verapamil capsule prices nearly tripled, and Actavis's prices doubled. By the spring of 2016, Actavis and Mylan had imposed virtually identical list (WAC) prices.

639.    The higher prices for 120mg, 180mg and 240mg capsules enabled Actavis also to raise its prices for 360mg capsules, for which it was the lone seller in the market. Between April 2012 and May 2016, Actavis's prices for 360mg capsules nearly tripled.

640.    No shortages or other market features can explain Defendants' price increases for Verapamil.

641.    The elevated prices of Verapamil that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

642.    The unlawful agreement between Actavis, Heritage and Mylan regarding Verapamil was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of the Drugs at Issue.

## XI.    FACTORS INCREASING THE MARKET'S SUSCEPTIBILITY TO COLLUSION

643.    Publicly available data on the generic drug market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 1. Industry Concentration

644.     A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. Here, Defendants control the generic market. For each of the generic drugs described above, a small number of competitors—between two and six manufacturers in the United States—controlled a significant market share for that drug during the relevant time period. Defendants were the dominant players in each individual drug market. As explained above, industry consolidation and exits have led to this dominance.

### 2. Barriers to Entry

645.     Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

646.     There are significant capital, regulatory, and intellectual property barriers to entry in the generic drug market that make such entry time-consuming and expensive. For example, as explained above, manufacturers must undergo an intense application process—that lasts nearly four years—in order to obtain ANDA approval to manufacture a generic drug. Historically, the price of ANDA filing is approximately $1 million. Numerous other barriers to entry exist in the generic drug market, including costs of manufacture and expenses related to regulatory oversight.

### 3. Demand Inelasticity

647.     Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life—

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life. In other words, a person on the verge of dying of thirst will pay almost anything for water.

648.    In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

649.    Demand for generic drugs is highly inelastic. Each generic drug described above is medically necessary to the health and well-being of the patient for whom it is prescribed. Despite the substantial price increases alleged in this Complaint, demand for each of the generic drugs remained largely the same following the price increase.

### 4.    Lack of Substitutes

650.    For most generic drugs, there are significant barriers to changing treatments. A generic drug is considered a therapeutic equivalent of the brand-name version of a drug. However, generic drugs are not generally considered therapeutic equivalents of other drug products, even similar ones. A patient who is prescribed a specific generic drug cannot purchase a different drug using his or her prescription regardless of the respective prices of the drugs.

651.    Branded versions of generic drugs do not generally serve as economic substitutes for generic versions, because branded products generally maintain substantial price premiums over even supra-competitively priced generic counterparts.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 5.        Standardized Product with High Degree of Interchangeability

652.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

653.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug. This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

654.    Each generic drug described above is an interchangeable bioequivalent of the branded counterpart.

### 6.        Inter-Competitor Contacts and Communications

655.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings.

656.    Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events such as industry dinners, girls nights out, lunches, parties, and frequent telephone calls, emails, and text messages. For example, Heritage's Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of Doxycycline Hyclate and Glyburide.

657.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, have uncovered numerous inter-competitor communications. These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[101] The sheer number of companies implicated in the investigations (including many of the Defendants here) highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion. In addition to the guilty pleas of Heritage CEO Glazer and President Malek, there are the following:

(a)    **Aceto**:   On April 23, 2018, Aceto disclosed: "In connection with the DOJ's ongoing investigation into marketing and pricing practices throughout the generic pharmaceutical industry, Aceto Corporation (the "Company") received a subpoena from the Antitrust Division of the U.S. Department of Justice (the "DOJ"). The Company is one of many operating companies in the generic pharmaceutical industry to receive a subpoena from the DOJ relating to its years-long investigation into the industry.[102]

(b)    **Actavis**:    In February 2016, Actavis's former parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[103]

---

[101] State AG Complaint ¶ 9.

[102] Aceto, SEC 2018 Form 8-K (April 23, 2018), *available at* http://investor.aceto.com/static-files/6fed4dee-5d2f-419c-9c11-6b9828c079d1.

[103] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at F-106, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)    **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[104] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[105]

(d)    **Citron**: In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[106]

(e)    **Dr. Reddy's**: In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[107]

(f)    **Heritage**: As a private company, Heritage is not required to make public disclosures. Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ,[108] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.

---

[104] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit,* Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[105] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[106] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[107] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[108] Tom Schoenberg , David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas,* Bloomberg (Dec. 14, 2016), *available at*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(g)   **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[109]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[110] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular…digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[111]

(h)   **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[112] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product

---

https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[109] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[110] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[111] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[112] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and is not limited to any particular time period."[113] On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[114]

(i)  **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[115]  On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on Doxycycline Hyclate delayed-release tablets (generic) and potassium chloride powders."[116]

(j)  **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic

---

[113] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[114] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, *available at* http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[115] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[116] Mayne Pharma, Update on Status of DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

products (including Doxycycline) and communications with competitors about such products."[117] In September 2016, Mylan's Pennsylvania headquarters was raided by federal authorities in connection with the generic drugs investigation. And on November 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-Metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[118]

(k)     **Par**: In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to Digoxin and Doxycycline.[119] In November 2015, Endo, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic Doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[120] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of

---

[117] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdo c.htm.

[118] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdo c.htm.

[119] Par Pharmaceutical Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[120] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[121] Notably, the inquiry appears to focus on at least three products (Doxycycline, doxazosin mesylate, and methotrexate sodium) that were manufactured by Par (via its acquisition of DAVA).

(l)   **Perrigo**:  In May 2017, Perrigo disclosed that it was the subject of a raid by federal authorities in the generic drugs investigation.

(m)   **Pfizer:**  On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[122]

(n)   **Sandoz**: In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[123]

(o)   **Sun**: On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents . . . relating to corporate and employee records, generic

---

[121] *Id.* at 31.

[122] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

[123] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/novartis-annual-report-2016-en.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[124]

(p)    **Taro**:  In September 2016, Taro disclosed that the Company "as well as two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[125]

(q)    **Teva**: In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[126]

(r)    **West-Ward (Hikma)**: In January 2017, Hikma Pharmaceuticals PLC, the parent company of West-Ward, disclosed in its 2016 annual report: "In January 2017 the Group received a subpoena from a state attorney general, requesting certain pricing and costing information."[127]

(s)    **Zydus**: Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[128]

---

[124] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[125] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[126] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

[127] Hikma Pharmaceuticals PLC, 2016 Annual Report, *available at* https://www.hikma.com/media/1189/2016-annual-report.pdf.

[128] *See* Rupali Mukherjeel, *US Polls, Pricing Pressure May Hit Indian Pharma Cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## XII.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.   The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy.

658.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic drugs.

659.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the AG's Proposed Amended Complaint.

660.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic drugs.

661.   Plaintiffs are purchasers who indirectly purchased generic drugs manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

662.   Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies, which prohibited the type of collusion alleged in this Complaint. For example:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)     Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[129]

(b)     Apotex's Code of Conduct directs employees: "Do not communicate with competitors about competitive business matters such as prices, costs discounts, customer suppliers, marketing plans, production capacities or any terms of conditions of sale that could create the appearance of improper agreements or understandings. Do not make agreements or reach understandings with competitors regarding allocation of customers, territories or market share. Do not conspire with other bidders when competing for contracts."[130]

(c)     Dr. Reddy's' Code of Conduct provides: "We believe in free and open competition and never engage in improper practices that may hamper fair competition. We never look to gain competitive advantages through unethical or unlawful business practices. . . . [W]e must never enter into agreements with competitors to engage in any anti-competitive behavior, including colluding or cartelization, fixing prices, dividing up customers, suppliers or markets."[131]

(d)     Glenmark's Code of Conduct states: "We must engage in fair competition and must ensure that our business dealings comply with all applicable local antitrust and competition laws, such as monopoly, unfair trade, or price discrimination laws. We must not make agreements or engage in concerted actions with a competitor with the intent of improperly dividing markets by allocating territories, customers, goods, or services, or price-fixing or collusion."[132]

(e)     Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange

---

[129] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct.

[130] Apotex Code of Conduct, *available at* http://www1.apotex.com/docs/librariesprovider3/business-ethics/code-of-conduct-en.pdf?sfvrsn=6.

[131] Dr. Reddy's Code of Conduct, *available at* http://www.drreddys.com/media/508807/cobe_booklet.pdf.

[132] Glenmark Code of Conduct, *available at* https://www.glenmarkpharma.com/sites/all/themes/glenmark/pdf/glenmark-code-english.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

information with third parties in a way that could improperly influence business outcomes."[133]

(f)     Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason."[134]

(g)     Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[135]

(h)     Novartis' (Parent of Sandoz) Code of Conduct states: "We are committed to fair competition and will not breach competition laws and regulations."[136]

(i)     Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[137]

(j)     Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as "antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."[138]

(k)     Sun Pharmaceutical Industries, Ltd. (parent of Sun and Taro) has a Global Code of Conduct that provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate

---

[133] Hikma Code of Conduct, *available at* https://www.hikma.com/media/1687/code-of-coduct-en.pdf.

[134] Mayne Pharma Group Business Code of Conduct, *available at* https://www.maynepharma.com/media/1786/business-code-of-conduct.pdf.

[135] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf.

[136] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

[137] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

[138] Perrigo Code of Conduct, *available at* http://perrigo.investorroom.com/download/Code+of+Conduct.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."[139]

(l)    Taro's Code of Conduct provides: "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition. If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance."[140]

(m)   Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."[141]

663.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

664.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.    Fraudulent Concealment Tolled the Statutes of Limitations.**

665.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs. Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government

---

[139] Sun Pharma Global Code of Conduct, *available at* http://www.sunpharma.com/Shareholder-Information/Policies/93092/Global-Code-of-Conduct.

[140] Taro Code of Conduct, *available at* https://secure.ethicspoint.com/domain/media/en/gui/20249/Code_of_Conduct.pdf.

[141] Teva Code of Conduct, *available at* http://www.tevapharm.com/files/about/corporate_governance/code_of_conduct/TEVA_CodeOf Conduct_FINAL_111715%5B2%5D.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic drugs.

666.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the AG's Proposed Amended Complaint.

667.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic drugs.

668.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic drugs. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic drugs they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic drugs. Defendants' false statements and conduct concerning the prices of generic drugs were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic drugs at prices established by a free and fair market.

### 1.  Active Concealment of the Conspiracy.

669.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

670.     Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

671.     For example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing going back to at least 2012. This conduct included a concerted and conscious effort to destroy documents, instructions not to put incriminating evidence in writing, directives not to use email, and the deletion of incriminating text messages.

672.     Specific examples of these acts of fraudulent concealment with respect to Heritage, President Malek, and CEO Glazer, include: (a) Glazer reminding Malek on June 26, 2014 not to put evidence of his illegal conduct in writing;[142] (b) Heritage being instructed by a competitor not to communicate through e-mail but to instead communicate by telephone;[143] (c) Malek sending a text message about how to avoid detection by regulators, a text message that was not produced by Heritage in response to a subpoena by the Connecticut AG;[144] (d) deletion of e-mails and text messages by Glazer, Malek, and other employees of Heritage regarding illegal communications with competitors;[145] and (e) one of Mayne's key executives who participated in the conspiracy deleting several of the most incriminating text messages from her

---

[142] State AG Complaint ¶ 457.

[143] State AG Complaint ¶ 459.

[144] State AG Complaint ¶ 460.

[145] State AG Complaint ¶ 461.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

cellular telephone before the data on that telephone were imaged and produced to the Connecticut AG's office.[146]

673.    As Attorney General Jepsen said in the press release referenced above that was issued at the time that the original AG Complaint was filed: "[t]he states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation."[147]

674.    The Defendants also gave pretextual reasons for price increases. For example, during an August 11, 2015 earnings call, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the products...where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.

675.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic drugs to inflated, supracompetitive levels.

676.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public

---

[146] State AG Complaint ¶ 462.

[147] Connecticut AG, Press Release (Dec. 15, 2016), http://portal.ct.gov/AG/Press-Releases/2016-Press-Releases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

677.    As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that the Defendants chose to communicate in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The structure of the generic drug industry provided numerous opportunities for collusive communications at trade shows, customer events and smaller more intimate dinners and meetings. When communications were reduced to writing or text message, Defendants often took overt and calculated steps to destroy evidence of those communications.

## 2.    Plaintiffs Exercised Reasonable Diligence.

678.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

679.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

680.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

681.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XIII.   <u>CONTINUING VIOLATIONS</u>

682.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XIV.   <u>DEFENDANTS' ANTITRUST VIOLATIONS</u>

683.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, and/or stabilize prices for Drugs at Issue sold in the United States.

684.    In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Drugs at Issue sold in the United States. These activities included the following:

(a)     Defendants participated in meetings and/or conversations regarding the price of Drugs at Issue in the United States;

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Drugs at Issue sold in the United States;

(c)     Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of Drugs at Issue; and

159

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

685.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

686.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased Drugs at Issue at inflated and supracompetitive prices.

687.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

688.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for Drugs at Issue than they would have paid in a competitive market.

689.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs. Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of the drugs.

690.    The unlawful contract, combination and conspiracy has had the following effects, among others:

160

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)     price competition in the market for Drugs at Issue has been artificially restrained;

(b)     prices for Drugs at Issue sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)     end-payer purchasers of Drugs at Issue sold by Defendants have been deprived of the benefit of free and open competition in the market for Drugs at Issue.

## XV.    CLASS ACTION ALLEGATIONS

691.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Drugs at Issue, other than for resale, from March 1, 2011 through the present.
>
> Drugs at Issue are defined herein to include:  Acetazolamide tablets (125mg and 250mg) and extended release capsules (500mg); Doxycycline Hyclate regular release tablets (100mg) and capsules (50mg and 100mg); Doxycycline Hyclate delayed release tablets (75mg, 100mg and 150mg); Doxycycline Monohydrate tablets (50mg, 75mg, 100mg and 150mg); Fosinopril-Hydrochlorothiazide tablets (10-12.5mg and 20-12.5mg); Glipizide-Metformin Hydrochloride tablets (2.5-250mg, 2.5-500mg, and 5-500mg); Glyburide tablets (1.25mg, 2.5mg and 5mg); Glyburide-Metformin Hydrochloride tablets (1.25-250mg, 2.5-500mg, and 5-500mg); Leflunomide tablets (10mg and 20mg); Meprobamate tablets (200mg and 400mg); Nimodipine capsules; Nystatin cream; Nystatin ointment; and Nystatin oral tablets; Paromomycin Sulphate capsules; Theophylline (anhydrous) extended release tablets (300mg and 450mg); Verapamil Hydrochloride regular tablets (80mg and 120mg) and Verapamil Hydrochloride sustained release capsules (120mg, 180mg, 240mg); and Zoledronic Acid for intravenous infusion (4mg/5ml and 5mg/100ml).
>
> This class excludes:  (a) natural person consumers; (b) Defendants, their officers, directors, management, employees, subsidiaries, and

affiliates; (c) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (d) all persons or entities who purchased Defendants' Drugs at Issue for purposes of resale or directly from Defendants; (e) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); and (f) pharmacy benefit managers.

692.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[148] on behalf of the following class (the "Damages Class"):

> All persons and entities in the End-Payer Damages Jurisdictions that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Drugs at Issue, other than for resale, from March 1, 2011 through the present.
>
> Drugs at Issue are defined herein to include:  Acetazolamide tablets (125mg and 250mg) and extended release capsules (500mg); Doxycycline Hyclate regular release tablets (100mg) and capsules (50mg and 100mg); Doxycycline Hyclate delayed release tablets (75mg, 100mg and 150mg); Doxycycline Monohydrate tablets (50mg, 75mg, 100mg and 150mg); Fosinopril-Hydrochlorothiazide tablets (10-12.5mg and 20-12.5mg); Glipizide-Metformin Hydrochloride tablets (2.5-250mg, 2.5-500mg, and 5-500mg); Glyburide tablets (1.25mg, 2.5mg and 5mg); Glyburide-Metformin Hydrochloride tablets (1.25-250mg, 2.5-500mg, and 5-500mg); Leflunomide tablets (10mg and 20mg); Meprobamate tablets (200mg and 400mg); Nimodipine capsules; Nystatin cream; Nystatin ointment; and Nystatin oral tablets; Paromomycin Sulphate capsules; Theophylline (anhydrous) extended release tablets (300mg and 450mg); Verapamil Hydrochloride regular tablets (80mg and 120mg) and Verapamil Hydrochloride sustained release capsules (120mg, 180mg, 240mg); and Zoledronic Acid for intravenous infusion (4mg/5ml and 5mg/100ml).

---

[148] The "End-Payer Damages Jurisdictions" include all States (except Indiana and Ohio), as well as the District of Columbia and Puerto Rico.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

This class excludes: (a) natural person consumers; (b) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (c) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (d) all persons or entities who purchased Defendants' Drugs at Issue for purposes of resale or directly from Defendants; (e) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); and (f) pharmacy benefit managers.

693. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

694. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

695. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Drugs at Issue and/or engaged in market allocation for Drugs at Issue sold in the United States;

(b) The identity of the participants of the conspiracy;

(c) The duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d) Whether the conspiracy violated the Sherman Act, as alleged in the First Count;

(e) Whether the conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the conspiracy on the prices of Drugs at Issue sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Drugs at Issue, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

696.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Drugs at Issue purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

697.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

698.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

699.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

700.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### XVI.   CAUSES OF ACTION

701.   As to the overarching conspiracy in which all Defendants participated, and as to each drug-specific conspiracy in which certain Defendants participated as alleged above, Plaintiffs seek relief under the laws specified in Counts 1 through 4 below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## FIRST COUNT

### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

702.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

703.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

704.   This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above, which include the following:

     (a)   Acetazolamide:
          (i)    Tablets:  Lannett, Taro;
          (ii)   Capsules:  Heritage, Teva, Zydus;

     (b)   Doxycycline Monohydrate:  Heritage, Lannett, Mylan, Par;

     (c)   Fosinopril-HCTZ:  Aurobindo, Citron, Glenmark, Heritage, Sandoz;

     (d)   Glipizide-Metformin:  Heritage, Mylan, Teva;

     (e)   Glyburide:  Aurobindo, Citron, Heritage, Teva;

     (f)   Glyburide-Metformin:  Actavis, Aurobindo, Citron, Heritage, Teva;

     (g)   Leflunomide:  Apotex, Heritage, Teva;

     (h)   Meprobamate:  Dr. Reddy's, Heritage;

     (i)   Nimodipine:  Heritage, Sun;

     (j)   Nystatin:
          (i)    Cream:  Actavis, Par, Perrigo, Sandoz, Taro;
          (ii)   Ointment:  Actavis, Perrigo, Sandoz;
          (iii)  Tablets:  Heritage, Sun;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(k)   <u>Paromomycin</u>:  Heritage, Sun;

(l)   <u>Theophylline</u>:  Heritage, Teva;

(m)   <u>Verapamil</u>:  Actavis, Heritage, Mylan;

(n)   <u>Zoledronic Acid</u>:  Dr. Reddy's, Heritage, Par.[149]

705.   Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

706.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for Drugs at Issue, thereby creating anticompetitive effects.

707.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Drugs at Issue.

708.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased Drugs at Issue have been harmed by being forced to pay inflated, supracompetitive prices for Drugs at Issue.

709.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

---

[149] Although the Doxycycline Hyclate conspiracy is discussed throughout, and although purchasers of Doxycycline Hyclate are included in the Class, overcharges (and other damages) and equitable relief arising from purchases of Doxycycline Hyclate are *not* included here among the Counts of this Complaint because Plaintiffs already are seeking relief for that drug-specific conspiracy in their existing Doxycycline Complaint. *See also* footnote 16, *supra*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

710.     Defendants' conspiracy had the following effects, among others:

(a)      Price competition in the market for Drugs at Issue has been restrained, suppressed, and/or eliminated in the United States;

(b)      Prices for Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)      Plaintiffs and members of the Nationwide Class who purchased Drugs at Issue indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

711.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Drugs at Issue purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

712.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

713.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## SECOND COUNT

### Violation of State Antitrust Statutes[150]
### (on behalf of Plaintiffs and the Damages Class)

714.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

715.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

716.   This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above, which include the following:

(a)   Acetazolamide:
    (i)   Tablets:  Lannett, Taro;
    (ii)  Capsules:  Heritage, Teva, Zydus;

(b)   Doxycycline Monohydrate:  Heritage, Lannett, Mylan, Par;

(c)   Fosinopril-HCTZ:  Aurobindo, Citron, Glenmark, Heritage, Sandoz;

(d)   Glipizide-Metformin:  Heritage, Mylan, Teva;

(e)   Glyburide:  Aurobindo, Citron, Heritage, Teva;

(f)   Glyburide-Metformin:  Actavis, Aurobindo, Citron, Heritage, Teva;

(g)   Leflunomide:  Apotex, Heritage, Teva;

(h)   Meprobamate:  Dr. Reddy's, Heritage;

(i)   Nimodipine:  Heritage, Sun;

---

[150] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

    (j)   <u>Nystatin</u>:
        (i)     Cream:  Actavis, Par, Perrigo, Sandoz, Taro;
        (ii)    Ointment:  Actavis, Perrigo, Sandoz;
        (iii)   Tablets:  Heritage, Sun;

    (k)   <u>Paromomycin</u>:  Heritage, Sun;

    (l)   <u>Theophylline</u>:  Heritage, Teva;

    (m)   <u>Verapamil</u>:  Actavis, Heritage, Mylan;

    (n)   <u>Zoledronic Acid</u>:  Dr. Reddy's, Heritage, Par.[151]

717.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

718.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of Drugs at Issue and to allocate customers for Drugs at Issue in the United States.

719.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize prices paid by Plaintiffs and members of the Damages Class with respect to Drugs at Issue provided in the United States; and (b) participating in

---

[151] Although the Doxycycline Hyclate conspiracy is discussed throughout, and although purchasers of Doxycycline Hyclate are included in the Class, overcharges (and other damages) and equitable relief arising from purchases of Doxycycline Hyclate are *not* included here among the Counts of this Complaint because Plaintiffs already are seeking relief for that drug-specific conspiracy in their existing Doxycycline Complaint. *See also* footnote 16, *supra*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

720.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for Drugs at Issue.

721.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

**Arizona**

722.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for Drugs at Issue was restrained, suppressed, and eliminated throughout Arizona; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**California**

Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code § 16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of Drugs at Issue at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Drugs at Issue. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of Drugs at Issue. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for Drugs at Issue has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased Drugs at Issue indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Drugs at Issue than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**District of Columbia**

723.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Drugs at Issue in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Drugs at Issue in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for Drugs at Issue, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of

Columbia Code Ann. § 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

**Hawaii**

724.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq.*

**Illinois**

725.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*). Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

726.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Kansas**

727.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of Drugs at Issue, increasing the prices of Drugs at Issue, preventing competition in the sale of Drugs at Issue, or binding themselves not to sell Drugs at Issue, in a manner that established the price of Drugs at Issue and precluded free and unrestricted competition among themselves in the sale of Drugs at Issue, in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq*.

**Maine**

728.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

restrained, suppressed, and eliminated throughout Maine; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

**Michigan**

729.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an

177

agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq.*

**Minnesota**

730.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq.*

**Mississippi**

731.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq.* Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

**Nebraska**

732.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

**Nevada**

733.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Hampshire**

734.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

**New Mexico**

735.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

at Issue. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

**New York**

736.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New York; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

737.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq*.

**North Dakota**

738.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

**Oregon**

739.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Accordingly, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

**Rhode Island**

740.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq*.

**South Dakota**

741.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs

185

and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*.

**Tennessee**

742.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq*.

186

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

**Utah**

743.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Utah; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

**Vermont**

744.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

**West Virginia**

745.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Wisconsin**

746.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq.* Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq.*

**As to All Jurisdictions Above**

747.    Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for Drugs at Issue than they otherwise would have paid in the absence of Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

748.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

749.     Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes[152]
### (on behalf of Plaintiffs and the Damages Class)

750.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

751.     This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

752.     This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above, which include the following:

    (a)    Acetazolamide:
        (i)    Tablets:  Lannett, Taro;
        (ii)   Capsules:  Heritage, Teva, Zydus;

    (b)    Doxycycline Monohydrate:  Heritage, Lannett, Mylan, Par;

---

[152] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)     <u>Fosinopril-HCTZ</u>:  Aurobindo, Citron, Glenmark, Heritage, Sandoz;

(d)     <u>Glipizide-Metformin</u>:  Heritage, Mylan, Teva;

(e)     <u>Glyburide</u>:  Aurobindo, Citron, Heritage, Teva;

(f)     <u>Glyburide-Metformin</u>:  Actavis, Aurobindo, Citron, Heritage, Teva;

(g)     <u>Leflunomide</u>:  Apotex, Heritage, Teva;

(h)     <u>Meprobamate</u>:  Dr. Reddy's, Heritage;

(i)     <u>Nimodipine</u>:  Heritage, Sun;

(j)     <u>Nystatin</u>:
        (i)     Cream:  Actavis, Par, Perrigo, Sandoz, Taro;
        (ii)    Ointment:  Actavis, Perrigo, Sandoz;
        (iii)   Tablets:  Heritage, Sun;

(k)     <u>Paromomycin</u>:  Heritage, Sun;

(l)     <u>Theophylline</u>:  Heritage, Teva;

(m)     <u>Verapamil</u>:  Actavis, Heritage, Mylan;

(n)     <u>Zoledronic Acid</u>:  Dr. Reddy's, Heritage, Par.[153]

753.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

---

[153] Although the Doxycycline Hyclate conspiracy is discussed throughout, and although purchasers of Doxycycline Hyclate are included in the Class, overcharges (and other damages) and equitable relief arising from purchases of Doxycycline Hyclate are *not* included here among the Counts of this Complaint because Plaintiffs already are seeking relief for that drug-specific conspiracy in their existing Doxycycline Complaint. *See also* footnote 16, *supra*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Alaska**

754.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Alaska; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Arkansas**

755.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**California**

756.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed Drugs at Issue in California, and committed and continue to commit acts of unfair

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competition, as defined by § 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of Drugs at Issue in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for Drugs at Issue. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

**Colorado**

757.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.*  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Colorado; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

758.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Delaware; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**District of Columbia**

759.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Drugs at Issue were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing Drugs at Issue

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Drugs at Issue, including their illegal conspiracy to secretly fix the price of Drugs at Issue at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for Drugs at Issue. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

760.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Florida; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

761.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

eliminated throughout Georgia; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

762.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Massachusetts**

763.   Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

764.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

765.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Minnesota

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

766.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.* Plaintiffs and members of the Damages Class purchased and/or reimbursed for Drugs at Issue for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of Drugs at Issue in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Drugs at Issue by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of Drugs at Issue

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing Drugs at Issue at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

**Montana**

767.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Montana; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et. seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

768.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.  Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

769.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

770.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*.  Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Mexico**

771.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for Drugs at Issue as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing Drugs at Issue because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Drugs at Issue, including their illegal conspiracy to secretly fix the price of Drugs at Issue at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Drugs at Issue. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New York**

772.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of Drugs at Issue that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Drugs at Issue; and Defendants alone possessed material

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased Drugs at Issue were misled to believe that they were paying a fair price for Drugs at Issue or the price increases for Drugs at Issue were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing Drugs at Issue would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing Drugs at Issue would have a broad impact, causing consumer class members who indirectly purchased Drugs at Issue to be injured by paying more for Drugs at Issue than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New York; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

dominated and controlled, manufactured, sold and/or distributed Drugs at Issue in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

773.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of Drugs at Issue created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Drugs at Issue in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

774.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

775.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Members of the Damages Class purchased

and/or reimbursed for Drugs at Issue for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**South Carolina**

776.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

777.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Utah**

778.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq*.  Members of the Damages Class purchased and/or reimbursed for Drugs at Issue for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Utah; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and

members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

779.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Virginia**

780.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq.*  Members of the Damages Class purchased and/or reimbursed for Drugs at Issue to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Virginia; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**West Virginia**

781.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Wisconsin**

782.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## FOURTH COUNT

### Unjust Enrichment[154]
### (on behalf of Plaintiffs and the Damages Class)

783.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

784.    This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

785.    This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above, which include the following:

      (a)    Acetazolamide:
               (i)      Tablets:  Lannett, Taro;
               (ii)     Capsules:  Heritage, Teva, Zydus;

---

[154] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia and Puerto Rico.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)     <u>Doxycycline Monohydrate</u>:  Heritage, Lannett, Mylan, Par;

(c)     <u>Fosinopril-HCTZ</u>:  Aurobindo, Citron, Glenmark, Heritage, Sandoz;

(d)     <u>Glipizide-Metformin</u>:  Heritage, Mylan, Teva;

(e)     <u>Glyburide</u>:  Aurobindo, Citron, Heritage, Teva;

(f)     <u>Glyburide-Metformin</u>:  Actavis, Aurobindo, Citron, Heritage, Teva;

(g)     <u>Leflunomide</u>:  Apotex, Heritage, Teva;

(h)     <u>Meprobamate</u>:  Dr. Reddy's, Heritage;

(i)     <u>Nimodipine</u>:  Heritage, Sun;

(j)     <u>Nystatin</u>:
        (i)     Cream:  Actavis, Par, Perrigo, Sandoz, Taro;
        (ii)    Ointment:  Actavis, Perrigo, Sandoz;
        (iii)   Tablets:  Heritage, Sun;

(k)     <u>Paromomycin</u>:  Heritage, Sun;

(l)     <u>Theophylline</u>:  Heritage, Teva;

(m)     <u>Verapamil</u>:  Actavis, Heritage, Mylan;

(n)     <u>Zoledronic Acid</u>:  Dr. Reddy's, Heritage, Par.[155]

786.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

787.    Defendants have unlawfully benefited from their sales of Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully

---

[155] Although the Doxycycline Hyclate conspiracy is discussed throughout, and although purchasers of Doxycycline Hyclate are included in the Class, overcharges (and other damages) and equitable relief arising from purchases of Doxycycline Hyclate are *not* included here among the Counts of this Complaint because Plaintiffs already are seeking relief for that drug-specific conspiracy in their existing Doxycycline Complaint. *See also* footnote 16, *supra*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions.

788.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

789.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

790.    Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue while Plaintiffs and the Damages Class have been impoverished by the overcharges they paid for Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

791.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

792.    Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

793.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

794.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Drugs at Issue are ascertainable by review of sales records.

795.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Drugs at Issue.

796.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Drugs at Issue, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

797.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

798.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

799.    It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia and Puerto Rico, for Defendants to be permitted to retain any of the overcharges for Drugs at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

800.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

801.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Drugs at Issue.

802.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Drugs at Issue by Plaintiffs and the Damages Class.

803.    Plaintiffs and the Damages Class have no adequate remedy at law.

804.    By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of Drugs at Issue and forcing them to pay higher prices for Drugs at Issue, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

805.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Drugs at Issue.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Alaska**

806.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Alaska at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Arizona**

807.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue. Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Arkansas**

808.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**California**

809.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in California at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Colorado**

810.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants have benefitted at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Connecticut**

811.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Connecticut at prices that were more than they would have been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Delaware**

812.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Delaware at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue.    Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.    There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**District of Columbia**

813.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

814.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Florida at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

815.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

816.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Idaho**

817.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

818.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Illinois at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

819.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

820.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Kansas at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kentucky**

821.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Kentucky at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Louisiana**

822.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Louisiana at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Maine**

823.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Maine at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

824.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Maryland at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Massachusetts**

825.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Massachusetts at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Michigan**

826.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Michigan at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

827.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Minnesota at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Mississippi**

828.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Drugs at Issue, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

829.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Missouri at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

**Montana**

830.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Montana at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Nebraska**

831.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Nebraska at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

**Nevada**

832.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Nevada at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Drugs at Issue.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

833.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New Hampshire at prices that were more than they would

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

834.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New Jersey at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Drugs at Issue.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Mexico**

835.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New Mexico at prices that were more than they would have been but for Defendants' actions.  Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Drugs at Issue.  To allow Defendants to retain the benefits would be unjust because the benefits resulted

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

836.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New York at prices that were more than they would have been but for Defendants' actions.   Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.   Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.   It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

837.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in North Carolina at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.   The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.   The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.   Defendants consciously accepted the benefits conferred upon them.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**North Dakota**

838.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.   Plaintiffs and the Damages Class have no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Oklahoma**

839.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Oregon**

840.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Oregon at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Pennsylvania**

841.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Puerto Rico**

842.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Puerto Rico at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue.   Plaintiffs and the Damages Class have been

impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

**Rhode Island**

843. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Rhode Island at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Carolina**

844. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in South Carolina at prices that were more than they would have been but for Defendants' actions. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class. Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Dakota**

845.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

**Tennessee**

846.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Tennessee at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Drugs at Issue.  It would be futile for

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Drugs at Issue directly from any Defendant.

**Texas**

847.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Texas at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Drugs at Issue.  Plaintiffs and the Damages Class have no remedy at law.

**Utah**

848.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Utah at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Vermont**

849.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

850.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.  Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

**Washington**

851.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Washington at prices that were more than they would have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### West Virginia

852.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Wisconsin

853.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

854.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Wyoming at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.


## XVII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.   That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

3.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

5.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

### XVIII.  JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Date: June 7, 2018

Respectfully submitted,

*Roberta D. Liebenberg*

Roberta D. Liebenberg, Esquire
Fine, Kaplan and Black, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
(215) 567-6565
rliebenberg@finekaplan.com

**Lead Counsel for the End-Payer Plaintiffs**

Gregory S. Asciolla, Esquire
Labaton Sucharow LLP
140 Broadway
New York, NY  10005
(212) 907-0700
gasciolla@labaton.com

Michael M. Buchman, Esquire
Motley Rice LLC
600 Third Avenue, Suite 2101
New York, NY  10016
(212) 577-0040
mbuchman@motleyrice.com

Elizabeth J. Cabraser, Esquire
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
(415) 956-1000
ecabraser@lchb.com

James R. Dugan, II, Esquire
The Dugan Law Firm, APLC
365 Canal Street, Suite 1000
New Orleans, LA 70130
(504) 648-0180
jdugan@dugan-lawfirm.com

Jayne A. Goldstein, Esquire
Shepherd Finkelman Miller & Shah, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
(886) 849-7545
jgoldstein@sfmslaw.com

Mindee J. Reuben, Esquire
Lite DePalma Greenberg, LLC
1835 Market Street, 27th Floor
Philadelphia, PA  19103
(267) 314-7980
mreuben@litedepalma.com

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Joseph R. Saveri, Esquire
Joseph Saveri Law Firm, Inc.
555 Montgomery Street, Suite 1210
San Francisco, CA  94111
(415) 500-6800
jsaveri@saverilawfirm.com

Dena C. Sharp, Esquire
Girard Gibbs LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
chc@girardgibbs.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

**End-Payer Plaintiffs' Steering Committee**

Audrey A. Browne, Esquire
Seth Kennedy, Esquire
American Federation of State, County and
  Municipal Employees District Council 37
  Health & Security Plan
125 Barclay Street, Room 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net
skennedy@dc37.net

Dan Drachler, Esquire
Zwerling Schachter & Zwerling, LLP
41 Madison Avenue
New York, NY 10010
(212) 223-3900
ddrachler@zsz.com

Peter Safirstein, Esquire
Safirstein Metcalf LLP
1250 Broadway, 27th Floor
New York, NY 10001
(212) 201-2845
psafirstein@safirsteinmetcalf.com

**Additional End-Payer Plaintiffs' Counsel**

252

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER